UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>-v.-<br><br>ARIK LEV,<br><br>Defendant. | No. 20 Cr. 440 (JGK) |

## **SENTENCING MEMORANDUM ON BEHALF OF ARIK LEV**

COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018

*Attorneys for Arik Lev*

# Table of Contents

I.    PRELIMINARY STATEMENT ............................................................... 1

II.   FACTS ................................................................................................... 1

      A.   Arik's Personal and Family Background ................................. 1

      B.   Arik's Exceptional Record of Good Deeds and Charitable Acts..................... 6

           1.   Arik's Involvement in His Religious Community ................................. 7

           2.   Arik's Generosity to Those in Need ........................................ 13

           3.   Arik's Advice and Support to Others........................................ 22

      C.   Arik's Family ............................................................................ 26

      D.   COVID-19 and Conditions of Confinement .................................. 29

      E.   Immigration Status and Conditions of Confinement ....................... 31

      F.   Acceptance of Responsibility .................................................... 33

III.  SENTENCING ..................................................................................... 36

      A.   Introduction.............................................................................. 36

      B.   There is a Compelling Case for the Court to Exercise Substantial
           Leniency Under § 3553(a) ...................................................... 38

           1.   Arik's History and Characteristics Merit a Non-Incarceratory
                Sentence ......................................................................... 38

           2.   Incarceration Is Not Required to Satisfy the Remaining Goals of
                Sentencing........................................................................ 44

           3.   A Non-Incarceratory Sentence Would Be Sufficient, But Not
                Greater than Necessary, To Comply with the Purposes of
                Sentencing........................................................................ 47

IV.   CONCLUSION ................................................................................... 50

## Index of Letters Submitted to the Court

| Names | Exhibit |
|---|---|
| Abraham, Batya | 1 |
| Abramovich, Yael | 2 |
| Alkobi, Yehuda | 3 |
| Aminov, Boris | 4 |
| Argaman, Kfir | 5 |
| Arje, Michael | 6 |
| Attias, Cori | 7 |
| Attias, Haim | 8 |
| Azrad, Yaacov | 9 |
| Bailey, Anthony | 10 |
| Chayo, Rina | 11 |
| Chetrit, Joseph | 12 |
| Dahari, Yaniv | 13 |
| Davidi, Alex | 14 |
| Ezra, Saar | 15 |
| Friedman, Yehuda | 16 |
| Furman, Mark | 17 |
| Goodbeer, Osnat | 18 |
| Hanimov, Nathan | 19 |
| Hatanian, Pinchas and Tehilla | 20 |

Hernandez, Consuelo ............................................................................................. 21

Klein, Avigayel ..................................................................................................... 22

Lev, Emily ............................................................................................................. 23

██████████ ............................................................................................... 24

Lev, Limor ............................................................................................................. 25

Lev, Moshe ............................................................................................................ 26

Lev, Nadia ............................................................................................................. 27

Lev, Penina ............................................................................................................ 28

Lev, Sharon ........................................................................................................... 29

Lev, Tiffany ........................................................................................................... 30

Levy, Michael ........................................................................................................ 31

Meir, Vlad .............................................................................................................. 32

Minus, Damon ....................................................................................................... 33

Moas, Chaim and Miriam ...................................................................................... 34

Naim, Sharone ...................................................................................................... 35

Neuman, Dan ......................................................................................................... 36

Neuman, Limor ...................................................................................................... 37

Noah, Haim ........................................................................................................... 38

Noah, Merav .......................................................................................................... 39

Norman, Danielle ................................................................................................... 40

Nur, Muhammad .................................................................................................... 41

Perelson, Yisroel ................................................................................................... 42

Perez, Lenin ................................................................................................... 43

Perrien, Ronald Tolliver ................................................................................. 44

Raskin, Yaakov ............................................................................................... 45

Raz, Shalev .................................................................................................... 46

Rigamonty, Magdalena ................................................................................... 47

Robinson, Shanida .......................................................................................... 48

Rome, Ezra ..................................................................................................... 49

Ryklin, Joey and Jacklyn ............................................................................... 50

Shaharabany, Ronen ....................................................................................... 51

Shololom, Shai ............................................................................................... 52

Shriki, Yoav ................................................................................................... 53

Stavrach, Anat ................................................................................................ 54

Todd, Abraham ............................................................................................... 55

Twina, Maayan ............................................................................................... 56

Vanunu, Liz .................................................................................................... 57

Zaibak, Victour .............................................................................................. 58

Zarger, Joseph ................................................................................................ 59

**Table Of Authorities**

**Page(s)**

**Cases**

*Gall v. United States,*
 552 U.S. 38 (2007) .................................................................................. 37, 47

*Pepper v. United States,*
 562 U.S. 476 (2011) ...................................................................................... 46

*United States v. Anderson,*
 267 F. App'x 847 (11th Cir. 2008) ............................................................... 43

*United States v. Chatwal,*
 No. 14 Cr. 143 (ILG), Doc. No. 40 (E.D.N.Y. Dec. 10, 2014) ..................... 49

*United States v. Chin Chong,*
 No. 13–CR–570, 2014 WL 4773978 (E.D.N.Y. Sept. 24, 2014) ............ 40, 44, 45

*United States v. Cowan,*
 No. 09–CR–261, 2010 WL 694098 (E.D.N.Y. Feb. 18, 2010) .................... 41

*United States v. E.L.,*
 188 F. Supp. 3d 152 (E.D.N.Y. 2016) .......................................................... 46

*United States v. Edwards,*
 595 F.3d 1004 (9th Cir. 2010) ...................................................................... 44

*United States v. Gaind,*
 829 F. Supp. 669 (S.D.N.Y. 1993) ................................................................ 45

*United States v. Hernandez,*
 604 F.3d 48 (2d Cir. 2010) ............................................................................ 45

*United States v. Kon,*
 No. 04 CR, 271-03(RWS), 2006 WL 3208555 (S.D.N.Y. Nov. 2, 2006) .................. 38

*United States v. Leitch,*
 No. 11-CR-00039 (JG), 2013 WL 753445 (E.D.N.Y. Feb. 28, 2013) ......... 47

*United States v. Milne,*
 384 F. Supp. 2d 1309 (E.D. Wis. 2005) ........................................................ 43

*United States v. Roque,*
    536 F. Supp. 2d 987 (E.D. Wis. 2008) .......................................................................... 38

*United States v. Samson,*
    No. 16 Cr. 334 (JLL), Doc. Nos. 24, 25 (D.N.J. Mar. 7, 2017) ................................... 49

*United States v. Schulman,*
    No. 16 Cr. 442 (JMA), Doc. No. 155 (E.D.N.Y. Sept. 26, 2017) ............................... 46

*United States v. Sherlock,*
    No. 17-cr-597 (RJS), 2020 WL 7263520 (S.D.N.Y. Dec. 10, 2020) .......................... 38

*United States v. Stewart,*
    590 F.3d 93 (2d Cir. 2009) .......................................................................................... 45

*United States v. Thavaraja,*
    740 F.3d 253 (2d Cir. 2014) ............................................................................. 38, 40, 46

*United States v. Thurston,*
    544 F.3d 22 (1st Cir. 2008) .......................................................................................... 42

*United States v. Tomko,*
    562 F.3d 558 (3d Cir. 2009) ........................................................................................ 41

*United States v. Warner,*
    No. 13 Cr. 731 (CPK), Doc. No. 33 (N.D.Ill. Jan. 14, 2014) ............................... 47, 49

*Kimbrough v. United States,*
    552 U.S. 85 (2007) ...................................................................................................... 37

## Statutes

18 U.S.C. § 371 ............................................................................................................... 33

18 U.S.C. §3553(a) ................................................................................................... *passim*

## Other Authorities

Centers for Disease Control and Prevention, *Key Things to Know About
    COVID-19 Vaccines,* (last viewed April 26, 2021) ..................................................... 30

Filter, *Brooklyn Federal Prison Denying Communication Rights in
    Pandemic* (Jan. 25, 2021) ............................................................................................ 31

Office of the Attorney General, U.S. Dep't of Justice, *Memo. For Dir. of Bureau of Prisons re Increasing Use of Home Confinement at Instits. Most Affected by COVID-19* (Apr. 3, 2020) ........................................................ 31, 48

Office of the Attorney General, U.S. Dep't of Justice, *Memo. For Dir. of Bureau of Prisons re Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic* (Mar. 26, 2020)..................... 31, 48

L.A. Times, *California's coronavirus strain looks increasingly dangerous: 'The devil is already here'* (Feb. 23, 2021) .................................................. 30

N.Y. Times, *2 Companies Say Their Vaccines Are 95% Effective. What Does That Mean?* (Nov. 20, 2020) ............................................................ 30

N.Y. Times, *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System* (last viewed April 23, 2021)............................................ 29

N.Y. Times, *New Coronavirus Variant Is Spreading in New York, Researchers Report* (Feb. 24, 2021) ............................................................ 30

N.Y. Times, *Vulnerable Inmates Left in Prison as Covid Rages* (Mar. 10, 2021) ......................................................................................................... 31

Marshall Project, *1 in 5 Prisoners in the U.S. Has Had COVID-19* (Dec. 18, 2020) ......................................................................................................... 29

U.S. Probation & Pretrial Services, *Court & Community: An Information Series About U.S. Probation & Pretrial Services: Community Service* (2001) ...................................................................................................... 49

U.S. Sentencing Commissionn, *The Effects of Aging on Recidivism Among Federal Offenders* (Dec. 2017) ................................................................ 45

Washington Post, *Pfizer and Moderna vaccines have reduced effectiveness against South African variant, newly published studies show* (Feb. 18, 2021) ......................................................................................................... 30

## I.    PRELIMINARY STATEMENT

This memorandum is respectfully submitted on behalf of Arik Lev, who is scheduled to be sentenced by the Court on May 13, 2021.

For the reasons set forth below, we respectfully submit that, in light of Arik's exceptional record of charitable acts and good deeds throughout his life; the devastating impact that incarceration would have on his wife and five children; the serious collateral immigration consequences he and his family will likely endure as a result of his conviction; his acceptance of responsibility and efforts to make amends; and the unusually punitive impact a prison sentence would have due to his immigration status as well as COVID-19, a non-incarceratory sentence would constitute punishment "not greater than necessary" to achieve the purposes of sentencing.

## II.   FACTS

### A.    Arik's Personal and Family Background

Arik Lev was born in Petah Tikva, Israel on ███████, 1972 to Moshe Lev and Tikva Sharbali.  Arik is the oldest of four children, with a brother — Abraham Lev — and two sisters — Maayan and Limor Lev, all of whom live in Israel.  (Presentence Investigation Report ("PSR") ¶ 36).

Arik's childhood years in Israel were marred by significant and repeated traumas. As a young child, Arik lived in Israel during a tumultuous and volatile time.  Arik witnessed people kidnapped in front of him, and saw firsthand the destruction of cars and coffee shops in bombing attacks.  Living under the cloud of this violence impacted nearly every facet of his young life.  For example, when Arik traveled to school, he had to wear a gas mask in

1

order to protect himself.  According to Arik, he grew resigned and desensitized to the constant turmoil, but realized that "things could happen any day at any time." (PSR ¶ 37).

This trauma continued when his father — who was a police officer in nearby Tel Aviv — became the city's Chief of Detectives.  When Arik was seven years old, the leader of an organized crime ring, whom his father had helped arrest, escaped from prison.  The escapee, bent on revenge, planted a bomb in what he thought was the family's apartment building.  The explosion of the bomb — which had in fact been planted in the wrong building — completely destroyed the second floor and injured several civilians.  In the aftermath of this attack, Arik's family was assigned 24-hour security for months, until the escaped inmate was caught.  (PSR ¶¶ 37–38).

Approximately one year later, Arik was riding in his father's police car when his father received an emergency request to respond to a nearby crime scene.  His father ordered Arik to stay in the car, but Arik's curiosity overcame him.  When he stepped out of the car, Arik found himself looking at the lacerated and bloody body of a murdered young woman.  Unsurprisingly, Arik was deeply shaken by what he saw, but never told his father what he had seen.  For a long time following this traumatic event, Arik — who was only eight years old at the time — struggled to sleep.  (PSR ¶ 39).

After a few years, Arik's family was then thrown into financial uncertainty when his father was forced to leave the Israel Police.  A short time earlier, Arik's father had uncovered a ring of politicians and senior police officials who were involved in an effort to smuggle consumer electronics into the country.  When he attempted to expose those

involved, senior officials balked and pressured him to walk away.  Arik's father felt that he could no longer continue in his position in good conscience and resigned from service. Suddenly unemployed, Arik's father was forced to work in a series of small jobs just to make ends meet and provide for his wife and children.  (PSR ¶ 40).

In 1989, the struggles of Arik's father to provide for his family suffered another setback.  At the time, Arik's father ran a small business selling posters and gifts.  One day, an unknown individual or group — who were never caught — set the business on fire, destroying it completely.  Included in the destruction was all of Arik's father's equipment and unsold inventory, for which he owed hundreds of thousands of dollars.  Tragically, the insurance on the building had run out only weeks earlier.  As a result, the fire left Arik's family with massive debt, no income, and extraordinary financial stress.  Arik remembers seeing his parents watching their livelihood burn to the ground, and recalls the strain that it put on his family.  (PSR ¶ 40).

Around the same time, when Arik was 17 years old, three assailants ambushed him while he was walking in the street.  During the assault, one of the attackers stabbed Arik in the back three times with a commando knife, seriously injuring him.  Collapsed and bleeding heavily, Arik was left for dead.  In the end, Arik was saved only after a bystander brought him to the hospital where, because of his serious wounds and blood loss, he spent weeks recuperating.  (PSR ¶ 41).  Arik still carries the scars from this attack.  (*Id.* ¶ 46).

After he recovered from his wounds, Arik continued living in Israel for another year, during which time his father fought in the Iraq war.  Arik and his family wore gas masks

and hid every time they heard warning sirens. Because of the turmoil in Israel, as well as the attack he survived a year earlier, Arik moved to Belgium and eventually continued on to New York City. (PSR ¶ 41). Since that time, Arik has worked in several car dealerships in Brooklyn and Queens, often until late at night. On several occasions while working late, Arik was held up at gunpoint and robbed. (*Id.*).

After two years in the United States, Arik met his wife Nadia, and they were married the same year. In her letter to the Court, Nadia credits Arik for helping her recover from a traumatic childhood that involved fleeing from a war-torn Syria and helping to care for her paralyzed mother. According to Nadia, "I was a lost young girl who didn't understand the meaning of self-love. Well that all changed when I met Arik. He taught me how to love myself by showing me what true love really is." (Letter from Nadia Lev, Exhibit 27). In the 23 years since they were married, Arik and Nadia have raised five children: 22-year-old twin daughters, Tiffany and Sharon; an 18-year-old daughter, Emily; a 11-year-old daughter, █████; and █████, their 7-year-old son.

Shortly after Arik and Nadia were married, Arik's mother — who was living in Israel — was diagnosed with breast cancer and passed away several months later, at age 49. Tragically, Arik's immigration status meant he was unable to leave the United States to be at his mother's side while her prognosis worsened, and could not attend her funeral. Not being able to see his mother one last time was devastating to Arik, and "ate him up inside." (Letter from Nadia Lev, Exhibit 27). His father likewise recalls that Arik was left "broken" by the loss of his mother, and was particularly pained that he could not see her in

4

her final days.  (Letter from Moshe Lev, Exhibit 26).  It deeply affected Arik's family as well: Nadia recalls that watching Arik "go through such pain" was one of the most difficult trials of her life.  (*Id.*)

After Arik's mother passed away, his father, who is now 73 years old, was left to care for and support two of Arik's siblings — Arik's brother, Abraham, who was seriously injured in a motorcycle accident several years ago and left partially disabled, and his sister Maayan, ███████████████████, has four children of her own, and relies on her father for financial support.  But Arik's father has struggled with many health difficulties of his own in recent years, including ████████████████████ ██████ for which Arik was unable to travel to Israel due to COVID-19.  (PSR ¶ 36).

In recent years, Arik and his family have also had to struggle with the loss of Nadia's parents.  Nadia's father passed away in 2017 after a long battle with lung cancer.  While he was ill, Arik took primary responsibility for taking care of his five children in order to allow Nadia to care for her father.  In her letter to the Court, Nadia writes that "I don't know what I would have done if Arik wasn't taking care of all the family's needs, financially, emotionally and physically being there for us through it all."  Heartbreakingly, Nadia's mother — who became paralyzed after suffering a stroke in Syria decades earlier — also passed away recently, succumbing to COVID-19 in March 2020.  (Letter from Nadia Lev, Exhibit 27).

Since Arik's arrest in December 2019 and the ensuing onslaught of COVID-19, the pandemic has ravaged the Lev family, beginning with the death of Arik's mother-in-law.

Arik and his wife Nadia also contracted the virus, and are still suffering from its lingering effects. (PSR ¶ 47). The pandemic has also devastated the family's income. In March 2020, Nadia lost her job and has been unemployed since, leaving Arik as the family's sole financial support. (Letter from Nadia Lev, Exhibit 27). But the pandemic has also devastated Arik's used car business, and the family is now accumulating significant credit card debt. (PSR ¶¶ 53–54). Even with their bank temporarily excusing mortgage payments for the past several months and Nadia's public assistance — each of which will not last indefinitely — the family is struggling to make ends meet and is worried that, if Arik cannot work, they will lose their home and their sole means of financial support. (PSR ¶¶ 44, 54).

## B.    Arik's Exceptional Record of Good Deeds and Charitable Acts

Despite the many traumas of his early years, as well as the demanding requirements of building a business and raising five children, helping others has always been second nature to Arik. Over the years, he has worked tirelessly to provide for countless individuals and causes within his community, wherever and whenever he has seen the need arise. In doing so, Arik has helped people in whatever way he could, not just financially, but emotionally and spiritually as well. Through his actions, which he often performs unprompted, Arik has proven himself to be at the heart of his community. As the dozens of letters to the Court amply describe, Arik's willingness to give of himself has had a lasting impact on a large number of people — from family, to close friends, to acquaintances, to business associates, to complete strangers.

1.    <u>Arik's Involvement in His Religious Community</u>

Since he settled in New York City, Arik and his family have been deeply involved in the Jewish community in Mill Basin, Brooklyn, and Arik's affinity towards helping others is indisputably demonstrated by the contributions he has made in service to his faith. As many of the letters submitted to the Court describe, Arik is constantly contributing however he can to the betterment of others.  As Rabbi Yehuda Friedman from Mill Basin attests, "Arik is a community leader who doesn't just delegate to others in the hope it gets done; rather, he makes sure to see it through." (Letter from Yehuda Friedman, Exhibit 16).

For example, after Arik's mother Tikva passed away from breast cancer, Arik took it upon himself to create a new synagogue in her honor — Shaare Tikva. (*See, e.g.*, Letter from Yaniv Dahari, Exhibit 13).  Arik contributed his time, his money, and his labor to that effort.  In one example, a close friend remembers how Arik paid out of his own pocket for custom millwork. (Letter from Yehuda Alkobi, Exhibit 3).  Not only did Arik help fund the project with his own money, but he also took an active role in performing the renovations himself.  He worked tirelessly for three days to ensure the temple was ready for the upcoming holiday, Rosh Hashanah, so that members would have a place to congregate and pray. (Letter from Sharone Naim, Exhibit 35; Letter from Yehuda Alkobi, Exhibit 3).  After its construction, Arik continued to donate generously in order to ensure that Shaare Tikva could continue to operate, even helping cover its day-to-day expenses. (Letter from Yaniv Dahari, Exhibit 13).

Not only did Arik help fund this new synagogue, he also ensured that it benefitted as many people as possible.  Dan Neuman, who first met Arik as he was building the

temple, recalls that it was created "with the goal of it being open to everyone without high dues and membership fees." (Letter from Dan Neuman, Exhibit 36). Similarly, Michael Arje writes that when Arik "single handedly put together our own little Synagogue," he did so with the purpose that "people from many different Jewish backgrounds would feel comfortable praying together." (Letter from Michael Arje, Exhibit 6). And by all measures, the synagogue *has* benefited many members of the community. Among many others, Yaniv Dahari writes that, "[t]his Temple feeds and guides young and old people in need. . . . I have seen guys that were downtrodden make a huge turn around in their lives through the center. If it were not for Arik I do not know where these people would be today." (Letter from Yaniv Dahari, Exhibit 13). Likewise, Mark Furman writes that "[t]he shul that [Arik] runs supports many unhoused neighbors and families that are struggling. I can't imagine what we would all do without him being home and present; it would create a gaping hole in the community fabric unfillable by others." (Letter from Mark Furman, Exhibit 17). In much the same way, Merav Noah credits Arik's efforts with addressing "[o]ne of the biggest challenges the Jewish community [faces] in our neighborhood" — keeping the community's youngest generation involved. (Letter from Merav Noah, Exhibit 39).

Many members of the community directly credit Arik for these developments. For example, Michael Levy writes that "Arik is everything that the synagogue represents, and his hospitality, kindness and passion is the very reason the walls of his synagogue stand strong." (Letter to Michael Levy, Exhibit 31). Indeed, some credit Arik's work with the

synagogue in directly benefitting their own lives.  It was Arik's actions, according to Michael Arje, that helped Mr. Arje "become more committed to my Jewish faith; to pray more, to do more good deeds and to try my best to help anyone and everyone I can." (Letter from Michael Arje, Exhibit 6).

Arik's financial generosity in building Shaare Tikva reflects only a portion of his service to the Jewish community.  He also took an active role in the renovation of a second synagogue.  (Letter from Ronen Shaharabany, Exhibit 51).  Arik's close friend Yehuda Alkobi remembers Arik hiring him to create "custom bookcases for a community study room" in the synagogue, which Arik then donated.  (Letter from Yehuda Alkobi, Exhibit 3).  Beyond this, Arik has continuously sought other ways to assist individuals in the community.  For example, Arik has worked to develop programs and events that help the Shaare Tikva synagogue in its mission.  In particular, Nathan Hanimov — a younger member of Arik's synagogue — recalls how Arik put together prayer services for young adults and took it upon himself to personally invite the young members of his community to participate. (Letter from Nathan Hanimov, Exhibit 19).

Arik is also well-remembered by members of his synagogue as a constant warm and welcoming presence whenever they arrived at the temple.  For example, Pinchas and Tehilla Hatanian met Arik for the first time at the synagogue.  Every time they returned, Arik could always be found welcoming others with "a smile, [and] a kind word." (Letter from Pinchas and Tehilla Hatanian, Exhibit 20).  Michael Levy writes that he will never forget when he arrived at Shaare Tikva for the first time:  "Arik ran to grab me a seat

amongst the warm, welcoming crown and without hesitation offered me food, drink and a warm smile." He adds: "[Arik] is a man who . . . went out of his way to treat every person who walked through the door as someone who deserved to feel special, wanted and above all, important. It was this very welcoming nature that had me coming back." (Letter from Michael Levy, Exhibit 31).

Arik is also known for his efforts to ensure that the synagogue and its members want for nothing. A friend and member of Arik's temple, Kfir Argaman, writes that Arik "has a heart of gold, [and] always makes sure that our temple and its people are taken care of; whether it be by organizing food for the Sabbath or him and his wife hosting a ladies study group at their home." (Letter from Kfir Argaman, Exhibit 5). Another member of the synagogue, Nathan Hanimov, recalls that Arik "brings toys every Friday to the Synagogue for the little kids to play with and brings food for the congregants. He is always helping and being kind." (Letter from Nathan Hanimov, Exhibit 19). Sharone Naim echoes this sentiment, writing that Arik, with the assistance of his young son, ███, "donates . . . food and toys to desperate families every Friday before the Sabbath." (Letter from Sharone Naim, Exhibit 35).

Arik, along with his family, has also made a habit of welcoming members of the community into their home for Shabbat. Yehuda Alkobi writes that, over the years, he has often seen Arik "welcome friends and community visitors to his home for a Friday night (Sabbath) meal and even a place to stay." (Letter from Yehuda Alkobi, Exhibit 3). According to Arik's sister-in-law, Rina Chayo, it is "amazing to see" how Arik's doors are

"always open for anyone in need." (Letter from Rina Chayo, Exhibit 11). This sentiment is shared by Alex Davidi, among many others, who describes how he "will never forget all the times where I personally saw Arik welcome strangers into his home who had no place to live, he welcomed them into his home like family." (Letter from Alex Davidi, Exhibit 14). By providing Shabbat dinner to those who are "unable to afford the ritualistic foods and techniques associated with the weekly holiday[,] . . . Arik has proven his dedication to community building, providing for the less fortunate, and improving the general well-being of [the] neighborhood." (Letter from Shai Sholomon, Exhibit 52).

To some, being welcomed into the Lev home was a life-changing event. In a poignant example of the effects of Arik's generosity, Vlad Meir writes to the Court that, while he had never previously observed the Sabbath, after sharing Shabbat dinner with the Lev family, and with Arik's continued friendship, he has begun observing the Sabbath and his life has improved dramatically:

> My whole life has taken a positive route and I have followed a positive way of living. Six years later, I have become closer to God and have a different perspective on life. I look up to him. Arik has inspired me to try inviting as many people to the Synagogue so we can invite them to take part in our Jewish religion and heritage. Arik also took me along to a very special place for the first time, Jerusalem Israel. It is somewhere I always dreamed of going but didn't know who to go with and to really learn the history. He took me there and taught me as much as he could about all of Jerusalem with an open hand and kind heart. (Letter from Vlad Meir, Exhibit 32).

Arik's willingness to open his home to those in need is also remembered clearly by his eldest daughters. In her letter to the Court, Arik's daughter Sharon writes that, as she was growing up, Arik would invite people — including "strangers on the street who didn't have money for food or for a place to stay" — for dinner on Shabbat. Because of this,

11

Sharon knows her father to be "the type of person to give you his own bed and sleep on the couch." (Letter from Sharon Lev, Exhibit 29). Another of Arik's daughters, Tiffany, also remembers her father's welcoming generosity. In her letter, she recalls that her father "kept the doors of our house open for anyone, and when we would have guests over he would put them before himself and give them a place to sleep, or clothing, or whatever else they needed to feel comfortable." Tiffany credits her father's generosity with teaching her family "much about giving," and recalls a common refrain from her father: "'the more you give the more you get,' especially in terms of happiness and fulfillment." (Letter from Tiffany Lev, Exhibit 30).

Ultimately, members of Arik's synagogue marvel at his devotion to others. Haim Attias, for example, recalls how Arik "was always the one to volunteer to be a helping hand when needed, for example cooking and preparing meals for the members of the synagogue and really anyone that was in need of a meal." (Letter from Haim Attias, Exhibit 8). Likewise, Nathan Hanimov recounts how exhaustive Arik's efforts are: he will "help[] many families in the community in every way he can with tremendous sensitivity and care." (Letter from Nathan Hanimov, Exhibit 19). But perhaps Michael Levy, a man who credits Arik's efforts to strengthen his religious faith, puts it best:

> From coordinating holiday dinners and weekly Sabbath children's programs, Arik, whether directly or indirectly, has made people, couples and families smile and grow through the power of love, attention and positivity. I have personally seen Arik's emotional, physical and financial commitment to the synagogue; and all the while I have seen him always put his best foot forward in order to make another person feel good. I remember hearing how Arik would take from his own personal funds and deny himself a night's dinner,

so that the synagogue could thrive another day with the proper utilities, stock and resources needed to grow.  (Letter from Michael Levy, Exhibit 31).

2.      Arik's Generosity to Those in Need

While Arik has given generously to those within Brooklyn's Mill Basin community, his generous spirit also extends to many others.  As the following paragraphs describe, Arik has given generously — not just financially, but also of his time and energy — whenever and wherever he has found someone in need.

To those that know him, Arik's generosity is an unquestionable fact.  For example, in her letter to the Court, Arik's close friend Avigayel Klein writes of the rarity of people like Arik:  "[Arik] has always demonstrated generosity, compassion and humility to all those around him.  He is an incredible human being, with a noble heart.  There are not many people of his kind left in this world."  (Letter from Avigayel Klein, Exhibit 22). According to Chaim and Miriam Moas, it is well known that if you ever find yourself in need of "a place to eat or sleep," all you need do is "[k]nock on the Lev door" and you will "always [be] welcomed with laughter and joy and treated with dignity."  (Letter from Chaim and Miriam Moas, Exhibit 34).  Consuelo Hernandez, a business associate, tells much the same story, describing Arik as "the type of person that will give you the shirt off his back if he had to." (Letter from Consuelo Hernandez, Exhibit 21).  Likewise, the Arik that his close friend Sharone Naim knows is a man that is "full of heart, kindness and compassion" and someone who is always the first to help those in need.  (Letter from Sharone Naim, Exhibit 35).

13

Over the past years, Arik has regularly seized on the opportunity to volunteer by helping those in need. For example, for over two years, Arik has regularly volunteered with Aishel Shabbat, a non-profit organization that packages and delivers food to over 250 low-income families in New York City. According to Anat Stavrach, the chairwoman of the organization, Arik's assistance with the deliveries has made him a "valuable member of our team," and he is someone they count on "weekly." (Letter from Anat Stavrach, Exhibit 54). Bishop Perrien, a pastor at the Resuscitated Church in Brooklyn, also thanks Arik for helping his church provide food and school supplies to the community. (Letter from Bishop Ronald Tolliver Perrien, Exhibit 44). Similarly, Anthony Bailey writes that after he reached out to Arik to be a sponsor for a financial literacy program at East Side Community High School in Manhattan, Arik not only donated financially, but also volunteered to speak at several events and personally mentored students from the school. (Letter from Anthony Bailey, Exhibit 10). Joseph Chetrit experienced Arik in much the same way while working in the Israeli Consulate. According to Mr. Chetrit, Arik often contacted him to volunteer his time or to reach out on behalf of those who needed assistance. In particular, Mr. Chetrit writes that Arik assisted with an after-school program designed for at-risk youth in the Israeli community, not only donating financially but also leading group discussions and mentoring participants one-on-one. (Letter from Joseph Chetrit, Exhibit 12).

Arik is also well known for helping to raise money for the less fortunate. In his letter to the Court, Michael Arje, who writes that he "personally witnessed Arik always

14

trying to raise money to help the needy," notes that when "[a]nyone . . . came to Arik with a problem[,] he was eager to help. He always made calls to try and raise charity for people he knew and even some that he didn't know." (Letter from Michael Arje, Exhibit 6). Haim Attias writes that in "20 years of witnessing [Arik's] generosity, sympathy and integrity," he regularly saw Arik "promoting charities to support and attend." (Letter from Haim Attias, Exhibit 8). In another example, Joseph Chetrit contacted Arik on behalf of a family that couldn't afford the $9,000 necessary to bring the body of a recently deceased family member to Israel for burial. When he learned of the family's plight, Arik coordinated with others in the community and quickly raised the money on the family's behalf. (Letter from Joseph Chetrit, Exhibit 12).

Before the family's financial stability was undermined by the COVID-19 pandemic, Arik also personally provided financial assistance to members of his community. As one of the many people who were helped by Arik's generous giving, Sharone Naim can speak from experience:  she writes that, without anybody else's knowledge, Arik's generosity rescued her from what felt like a financial "roller coaster." Ms. Naim remains thankful to Arik to this day, writing that "I owe him my gratitude for being there to help me get on my feet." (Letter from Sharone Naim, Exhibit 35).

Beyond donations and regularly scheduled volunteering, Arik has also constantly been the first to lend a hand when a crisis develops, big or small. When a single father of two children was struggling to keep food in the refrigerator, Arik was there to bring food and ensure that the children could eat. (Letter from Haim Noah, Exhibit 38). When that

same friend was hospitalized, Arik stayed with him in the emergency room, making sure he ate and drank.  (*Id.*)  When Arik was driving with friends early one morning and witnessed a brutal car crash, Arik leapt to the rescue, extracted the wounded and heavily bleeding driver from the car, and cared for him until paramedics arrived.  (Letter from Joseph Zarger, Exhibit 59).  When a 19-year-old young man recently found employment but had no means of getting to work, Arik stepped in and helped him secure a car loan.  (Letter from Lenin Perez, Exhibit 43).  When one of Arik's friends lost his car in Superstorm Sandy, Arik lent his friend a car until he was able to get himself back on his feet.  (Letter from Ezra Rome, Exhibit 49).  When a friend's mother-in-law passed away, Arik took it upon himself to organize the ceremony in her honor rather than have that burden fall upon the family.  (Letter from Cori Attias, Exhibit 7).  When he saw a woman struggling after the loss of her husband, Arik took it upon himself to ensure that she could enjoy a proper Sabbath meal every Friday night.  (Letter from Danielle Norman, Exhibit 40).  And when a Rabbi needed financial assistance to publish a book, Arik financed the project "with willingness and love."  (Letter from Ronen Shaharabany, Exhibit 51).

Yet many of those whom Arik has helped did not even know him well.  Indeed, Arik's sister-in-law, Rina Chayo, writes that Arik's kind-hearted nature is not reserved just for family and friends, but is displayed to "each and every individual he has the pleasure of meeting."  (Letter from Rina Chayo, Exhibit 11)  For example, Yoav Shriki once witnessed a member of the community share with Arik that because of mounting debts, he hadn't been able to pay his rent.  As a result, the individual had received an eviction notice

and was struggling to find a place to shelter his family.  Arik immediately arranged for the

man and his family to stay at a hotel until they were able to get on their feet a week later.

And even after the family found stable housing, Arik continued to provide them with

assistance.  In another case, Mr. Shriki writes that when Arik heard of a recently widowed

woman who couldn't afford a car and was struggling to get her children to school, Arik

gave the woman a car so that she could more easily care for her family.  (Letter from Yoav

Shriki, Exhibit 53).

Remarkably, when Arik learned of a single mother raising a young daughter alone

in Israel, he became deeply involved in their lives.  In her letter to the Court, the daughter

— Shalev Raz — writes that Arik not only provided the family with financial support for

years, but also encouraged her to pursue a college degree and paid her college tuition so

that she could focus on her schoolwork.  She adds that, even today, Arik is a source of

emotional support and that, if she hadn't met him, "[her] whole life would be different."

(Letter from Shalev Raz, Exhibit 46).

Even in the face of natural disasters, Arik can be found helping those in need.  When

New York City was struck by Superstorm Sandy, Arik's home in Mill Basin was flooded.

Arik quickly brought his family to safety and then returned to Mill Basin to assist others in

any way that he was able.  In her letter to the Court, Avigayel Klein vividly recounts these

events:

> [Arik] literally walk[ed] through flooded homes to rescue those whose entire
> lives were under water, ensuring they had a place to stay and a hot meal to
> eat.  He personally went house to house to see who he could help without
> thinking about himself, putting his own life at risk, to be able to help others

in need.  He has always been the type of person that considers the well-being of others before thinking about himself.  (Letter from Avigayel Klein, Exhibit 22).

Likewise, Yael Abramovich remembers that he first truly got to know Arik after a hurricane had forced Mr. Abramovich and his family to flee Miami.  According to Mr. Abramovich, despite not knowing the Abramovich family well, Arik opened his house and welcomed them to stay.  (Letter from Yael Abramovich, Exhibit 2).

Arik's commitment to those he helps is wide-ranging.  In her letter to the Court, Magdalena Rigamonty explains that, before meeting Arik, she had struggled to hold onto jobs while being a young mother with no high school degree and ███████████████.  That changed when she met Arik.  According to Ms. Rigamonty, Arik recognized how hard things were for her, and not only gave her a job, but — without lowering her pay — also gave her three hours off every day so that she could obtain her GED.  (Letter from Magdalena Rigamonty, Exhibit 47).

In her letter to the Court, Ms. Rigamonty recounts another story that highlights the depths of Arik's commitment.  During the time that she worked for Arik, ███████████ ██████████████████████████████████████████████.  When he saw this, Arik and his wife Nadia took the extraordinary step of personally moving her to a safe new home.  As Ms. Rigamonty recalls:

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████ Arik and his wife Nadia moved me out of the Bronx to Brooklyn in 3 days to get away from that horrible situation.  That emotional and physical support that Arik and his wife Nadia

gave me and still give me is something that I will never forget and I cherish so deeply. (*Id.*)

Arik has also shown himself to be willing to assist the senior members of his community, particularly those who have begun to struggle with everyday tasks. In his letter to the Court, Abraham Todd — who is 85 years old — writes that Arik has happily helped him with numerous tasks that have become more and more difficult as he has aged. In particular, Arik has provided Mr. Todd with food during Jewish holidays, helped him with transportation, and assisted him in other ways. According to Mr. Todd, doing so is second nature to Arik: "I can't count how many times Arik took time out of his day to help with my day and never thought twice to help." (Letter from Abraham Todd, Exhibit 55).

Another touching example of Arik's willingness to help those in need is provided by Jacqueline Ryklin. As Ms. Ryklin explains, her husband had been hoping to propose to her, but "was frightened with the financial aspects of a wedding." After Arik heard of this, he quietly became involved, organized venues, and helped prepare and throw "a beautiful wedding." Thanks to Arik's efforts, Ms. Ryklin remembers that she got the wedding of her dreams: "[t]he look on my face when I entered the room was indescribable. I will forever be grateful to [Arik] for his selfless acts." (Letter from Jacqueline Ryklin, Exhibit 50).

Even after they were married, Arik continued to support the Ryklin family. At one time, Ms. Ryklin's husband found himself unemployed while Ms. Ryklin was "three months pregnant and very worried how we would financially get all the things prepared for our baby." Ms. Ryklin writes how Arik saved the day:

19

Arik is a man of faith and every time he saw me he told me not to worry and to trust Hashem (God).  He called my husband every day to check on him and offered him a job at his car dealership.  Because of God's mercy and grace upon my family and Arik giving my husband a job we were able to get all the things in order to provide for the birth of my son.  (*Id.*)

Arik's kindness and dependability is also well-known to his own family, and are characteristics that became vital after his mother passed away.  Arik's youngest sister, Maayan, was only 14 years old when she and her siblings lost their mother to breast cancer, a loss which left her emotionally devastated.  Maayan writes to the Court that, in the wake of their mother's passing, Arik was a constant presence in her life, helping care for her as best he could, "check[ing] in with me constantly to make sure I was happy and staying focused in school, guiding me in those critical teen years."  Years later, while visiting Arik and his family in New York, Maayan fell unconscious moments before she was due to leave for the airport.  Arik helped his sister regain consciousness, and swiftly brought her to a doctor to ensure she could safely fly.  Then, after subsequent tests revealed that Maayan had ████████████████, Arik stayed with her for the entirety of her two-week stay in the hospital.  (Letter from Maayan Twina, Exhibit 56).

Arik's devotion to his family members is attested to by other relatives as well.  In the words of his other sister, Limor Lev, Arik is "always willing to be helpful in times of need, with a huge giving hand even when he does not have for himself."  As an example, Limor shares Arik's actions following their brother's near-fatal motorcycle accident several years ago.  As soon as Arik heard the news, he "dropped everything," rushed to Israel, and barely left his brother's side for the 15 days he was in the ICU.  At the same time, Arik ensured that his brother's wife and children were cared for during those

traumatic days, and strongly advocated for his brother with the doctors. Limor writes, "[t]hanks to the tremendous medical care Abraham received from the persistence of Arik being there by his side, Abraham lives today." (Letter from Limor Lev, Exhibit 25).

Abraham's wife, Penina Lev, describes this horrible episode with similar gratitude for Arik's unsolicited but critical help. Ms. Lev notes that her husband's prognosis was "very grim" and that she was "in shock with a feeling of helplessness and despair" as she grappled with what she believed was "the inevitable outcome." But "[w]ithin 24 hours things took a drastic turn for the better thanks to one person, Arik Lev." She then describes Arik's critical role in her husband's recovery:

> Arik arrived from New York without anyone requesting or suggesting he could be of help. Without fanfare but with tremendous fortitude he came to Abraham's bedside and fought for his life. He did so primarily by getting the best doctors to review Abraham's condition and find the best treatment. Arik was literally a godsend for Abraham and me. Having Arik there fighting for my husband shook me out of my despair and I was able to regain a sense of composure. (Letter of Penina Lev, Exhibit 28).

Ms. Lev also recounts Arik's continued help during her husband's lengthy rehabilitation: "Arik was there for us by making sure the kids were provided for and cheering them up from this horrible hell of their father being in such bad health. . . . If it weren't for Arik's presence, concern, care and critical assistance I would not have been able to cope with the crushing stress and responsibility." (*Id.*)

Arik's father also recognizes the critical role that his son plays for the entire Lev family and in his own life in particular. In his letter to the Court, Arik's father explains that he suffers from various illnesses which require him to follow a strict medication regimen and have necessitated both ███████████. As a result, and despite living

21

in different countries, Arik devotes considerable time to caring for his father and ensuring he receives his medication.  In fact, Arik's efforts are so consistent that his father will not sleep until he receives his daily call from his son.  In light of all this, Arik's father writes that it is a "great joy" to have Arik in his life and that Arik is "very much the person that keeps me going."  (Letter from Moshe Lev, Exhibit 26).

Perhaps the most dramatic example of Arik's selflessness is his heroic efforts to literally save the life of his cousin, Moshe Abraham.  During the course of a family boating trip near Miami, the water became uncharacteristically rough and, as the boat crashed through large waves, Moshe was thrown into the turbulent waters.  While others stood in shock, Arik grabbed a rope, threw it to Moshe, and — without any regard for his own life — dove into the water to try to save him.  Eventually, rescue boats arrived and were able to pull both Arik and Moshe aboard using the rope Arik had thrown.  In recounting this frightening episode, Moshe's mother, Batya Abraham, writes to the Court that "I shudder to think what the outcome would be if not for Arik's swift and heroic efforts."  (Letter of Batya Abraham, Exhibit 1).

Arik's extraordinary commitment to helping others is perhaps best summed up by Rabbi Ronan Shaharabany, who has known Arik for 20 years and writes that "Arik is the kind of man every community wished they had.  We all love him."  (Letter from Ronen Shaharabany, Exhibit 51).

3.    Arik's Advice and Support to Others

In letters submitted to the Court, numerous individuals describe how Arik's generosity in times of need, as well as the advice Arik has given them when they found

22

themselves at personal crossroads, has improved their lives immeasurably.  For example, Merav Noah writes that, through Arik's work with Shaare Tikva, Arik "single-handedly influenced the lives of many young individuals who would have led very different lives." (Letter from Merav Noah, Exhibit 39).

On numerous occasions, members of his community have come to Arik for advice and counsel.  When Saar Ezra needed relationship advice, Arik "was there for [him], giving . . . advice that helped [him] out immensely."  (Letter from Ezra Saar, Exhibit 15). Likewise, when Haim Noah was a single father, Arik "was the only friend [he] had" and one who "supported [him] and helped [him] build [himself] to where [he is] today." (Letter from Haim Noah, Exhibit 38).  When Lenin Perez's best friend unexpectedly passed away, "Arik stepped up to the plate and offered [him] a ton of support during those trying times." According to Mr. Perez, "[i]f it wasn't for [Arik's] counsel, I don't know where I would be today." (Letter from Lenin Perez, Exhibit 43).  Poignantly, Mark Furman — who states he "turn[s] to Arik with questions about business, advice about my car, and reflective conversations on becoming a better version of myself" — writes in his letter that he thanks Arik in particular for the encouragement Arik gave him to date the person who he eventually married.  Mr. Furman writes:  "It's wonderful to think of how I have Arik to thank for my marriage." (Letter from Mark Furman, Exhibit 17).  Mr. Furman and his wife are not the only couple that found each other through Arik — Michael Levy met his wife through Arik and the community that Arik helped build at Shaare Tikva.  (Letter from Michael Levy, Exhibit 31).

Others have credited Arik's business and professional advice with turning their lives around.  Magdalena Rigamonty tells a compelling story of how Arik's support allowed her to thrive in a business dominated by men:

> When I started with Arik I knew nothing about the car business.  He is my mentor, he taught me the business from A-Z.  He really treated me like family, proving to me that there are kind people out there. . . .  Fast-forward and I'm proud to say that I am becoming a partner now at a dealership.  I can say with absolute certainty that I owe this achievement to Arik.  My hard work did pay off but the knowledge he shared with me and the pep talks he gave me are what got me here.  Most importantly he showed me that it didn't matter if this was a male dominated field, I'm a woman and I achieved this.  Thanks to Arik I'm not that scared little girl that was ashamed to speak and blamed myself for other people's evil doing.  Now I speak my truth, with self-confidence, I made partner in a car dealership, and have a 17 year old son who wants to go to college -- all to the credit of Arik Lev.  (Letter from Magdalena Rigamonty, Exhibit 47).

Arik's business advice has also helped communities other than his own.  In his letter to the Court, Anthony Bailey — who thanks Arik for "always encourag[ing] [him] to further [his] business by gently prodding [him] to be persistent and goal oriented" — credits Arik with "not only help[ing] me develop into the person that I am today, but also for [helping] other young men of color to achieve their dreams."  (Letter from Anthony Bailey, Exhibit 10).  Similarly, Damon Minus has "witnessed Arik providing employment opportunities to young people, especially minorities who needed a job and an opportunity to provide for their families."  (Letter from Damon Minus, Exhibit 33).  Muhammad Nur, who founded a non-profit organization focused on addressing "addiction, homelessness, joblessness and hopelessness," likewise credits Arik's "substantial contributions" for enabling the organization to "help and serve underprivileged famil[ies], kids and the community."  (Letter from Muhammad Nur, Exhibit 41).

24

The tremendous impact Arik's generosity has had on others has also made him a role model for his own family.  For example, his daughter Emily writes that "[m]y father was always responsible for showing the proper way of living to his children." (Letter from Emily Lev, Exhibit 23).  Her older sister, Tiffany, adds:

> I work my hardest to live up to be the person he is; caring, generous, thoughtful and compassionate.  Whenever anyone asks for anything he gives it to them.  Not many people I know do that.  He is the rock of my family and helps countless people put food on their tables.  Without my father to help these families, their families too would fall apart.  Growing up I've seen many strangers in my house that would come speak to my dad, resulting in my dad always helping them.  I have never met a bigger giver than my father. (Letter from Tiffany Lev, Exhibit 30).

Tiffany also writes that her father has always encouraged her and her siblings "to do our best and help others in any way we can."  As a result, Tiffany volunteers generously of her time by preparing meals for those in need, tutoring children that need assistance with schoolwork, and babysitting for single mothers.  According to Tiffany, "[v]olunteer work and helping others has been a very important part of my life growing up.  This is the most fulfilling part of my day, helping others, and it is something my father taught me by example and instilled in me."  (*Id.*).

Others, too, describe how Arik's generosity has inspired them to be more giving in their own lives.  For example, Yaniv Dahari writes that he has "personally witnessed and been influenced by Arik's generosity, honest, and integrity" in a way that encouraged him to give financially, mentally, and emotionally to others.  As one example, Arik inspired Mr. Dahari to donate custom-made drapery to Shaare Tikva.  Mr. Dahari concludes: "I can honestly say I am who I am, and am a better person today, thanks to Arik.  In all my years

I have never met such a selfless man like Arik Lev." (Letter from Yaniv Dahari, Exhibit 13).

## C.     Arik's Family

The Lev family is heavily dependent upon Arik as their primary source of financial and emotional support, a situation only exacerbated by COVID-19. Because of the pandemic, Arik's wife Nadia has been unable to work. This has left Arik as the sole source of financial support for himself, his wife, and their five children. (Letter from Nadia Lev, Exhibit 27). However, Arik has also struggled to keep his business afloat despite the devastating impact of COVID-19. As noted in the Presentence Investigation Report, even without the obligation of making mortgage payments — which were temporarily paused under the bank's COVID relief program — Arik is currently forced to spend more than he earns to support his family, and the family is now amassing significant credit card debt. (PSR ¶¶ 53–54).

Arik's family relies on him not only for financial support, but for critical emotional support as well. And over the past year, the emotional stability that Arik provides has become more essential than ever. As discussed above, the COVID-19 pandemic has decimated the family's financial health, a stressor which has been amplified by the death of Nadia's mother due to COVID-19 and the continued uncertainty regarding the family's future. Arik's wife, Nadia, writes that the court proceedings have "put a strain on everyone in my family" and that her "heart breaks for [her] children and Arik." As an example, Nadia explains that her youngest daughter, ███, has been particularly affected, writing that her daughter "has become emotionally broken, even refusing to leave her room to see

26

her friends" and adding that she is "truly afraid for ▮▮▮▮ emotional state of mind." (Letter from Nadia Lev, Exhibit 27). In ▮▮▮ own letter to the Court, she explains that she is "so afraid" of the prospect of her father being incarcerated that she has begun to have nightmares. (Letter for ▮▮▮, Exhibit 24).

As described by Arik's wife, Nadia, having Arik incarcerated would have a tremendously negative impact on the Lev family, and particularly the children, who are already struggling with the fear of losing their father:

> If Arik would not be with us, it will affect all of our lives, especially my five children who are very attached to their father. He is their greatest supporter and comforter, from the oldest to youngest. My only son ▮▮▮ is especially attached to his dad. Arik spends the most time with him, taking him to school every morning, playing soccer and attending synagogue on a weekly basis. (Letter from Nadia Lev, Exhibit 27).

This is also explained by Arik's oldest children — Tiffany, Sharon, and Emily — who, in their letters to the Court, provide moving accounts of the care and emotional support they (as well as many others in the community) receive from their father. Emily writes that any time she encounters difficulty, she turns to her father, as "he has always been there for [her] and [she] relies on his guidance daily." When she needed him, her father would drop whatever it is that he was doing, no matter how busy he was. (Letter from Emily Lev, Exhibit 23). Tiffany describes her father as "the rock" of their family, and as the person who acts as their "support system." She worries that if they were separated from Arik, the family "would fall apart." (Letter from Tiffany Lev, Exhibit 30). And Sharon recalls that, ever since she was a little girl, her father has made her feel special. In fact, she writes that her father is "[t]he primary thing in life that makes [her] feel alive"

27

and that, without him, she "probably wouldn't be alive today." In a compelling example of her father's love, Sharon explains that when she became physically ill and suffered from depression and anxiety while traveling overseas, her father left his work and flew to Europe to ensure that she was ok. According to Sharon, "[t]hat act of being there for me when I so very much needed him was so precious that it was the catalyst of bringing me out of my depression." (Letter from Sharon Lev, Exhibit 29).

Many others whose lives Arik has touched also recognize the profound impact that he has on his family. Among many others, Arik's father writes that Arik "is a family man who is completely dedicated to his children's education and wellbeing." (Letter from Moshe Lev, Exhibit 26). Chaim and Miriam Moas add that "Arik is a loving husband and father — a solid pillar to his family who are inseparable and vulnerable." (Letter from Haim and Miriam Moas, Exhibit 34). Merav Noah agrees, stating that anyone who has spent time with the Lev family would see "the admiration and respect [Arik] has for his wife and children, and they for him." He adds that "[f]rom oldest to youngest Arik has worked hard to grow relationships with his children as both a friend and father." (Letter from Merav Noah, Exhibit 39). In his letter, Yaniv Dahari writes that it is a "beautiful picture" to see Arik taking care of his children, and states that Arik is deeply involved in his children's lives, to the point where "[h]e is not only their dad but their friend." (Letter from Yaniv Dahari, Exhibit 13). The family's heavy dependence on Arik is so palpable that Yaacov Azrad, someone Arik had known well for only a few months, signed for his bail in order to keep the family together. In his letter to the Court, Mr. Azrad writes that

28

he did so "[b]ecause [he] did not see how [Arik's] kids will survive and grow without him living with them.  He is a wonderful father.  And if God forbid Your Honor decides to send him away, his family and kids will be devastated."  (Letter from Yaakov Azrad, Exhibit 9)



### D.    COVID-19 and Conditions of Confinement

Since the time of Arik's arrest, the United States has become the epicenter of a global pandemic.  Prisons, in particular, have been a hotbed of COVID-19, with cases reaching at least 525,000 infections and at least 2,700 deaths — numbers that likely capture only a fraction of the true toll of the virus.[1]

---

[1] *See, e.g.,* N.Y. Times, *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, https://www.nytimes.com/interactive/2021/04/10/us/covid-prison-outbreak.html (last viewed April 23, 2021) (reporting that 39% of prisoners have tested positive for COVID-19); The Marshall Project, *1 in 5 Prisoners in the U.S. Has Had COVID-19* (Dec. 18, 2020), https://www.themarshallproject.org/2020/12/18/1-in-5-

While vaccinations — which Arik has not yet received — promise some relief from the pandemic, there are still significant questions concerning what course the pandemic will take over at least the coming months, if not longer.  In particular, vaccines are not completely effective at preventing the disease,[2] and it remains unclear how long protection will last.[3]  More importantly, new and worrisome variants of the virus continue to emerge and, in some cases, have been shown to make current vaccines significantly less effective.[4] Given these uncertainties, the risk of COVID-19 exposure and restrictions to limit its spread are almost certain to persist in prisons for some time, regardless of vaccine status.

If sentenced to a term of incarceration, Arik would face much harsher conditions of confinement due to COVID-19.  To begin with, he would be required to quarantine upon arrival at, and again before leaving, the prison, regardless of his vaccination status — likely in a small, windowless Special Housing Unit (solitary confinement) cell, for weeks and

---

prisoners-in-the-u-s-has-had-covid-19 (noting that the number of confirmed prisoner infections and deaths is "a vast undercount").

[2] *See* N.Y. Times, *2 Companies Say Their Vaccines Are 95% Effective. What Does That Mean?* (Nov. 20, 2020), https://www.nytimes.com/2020/11/20/health/covid-vaccine-95-effective.html.

[3] *See* CDC, *Key Things to Know About COVID-19 Vaccines*, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/keythingstoknow.html (last viewed April 26, 2021) (noting that we are "still learning how long COVID-19 vaccinations protect people").

[4] *See, e.g.*, N.Y. Times, *A New Coronavirus Variant Is Spreading in New York, Researchers Report* (Feb. 24, 2021), https://www.nytimes.com/2021/02/24/health/coronavirus-variant-nyc.html; L.A. Times, *California's coronavirus strain looks increasingly dangerous: 'The devil is already here'* (Feb. 23, 2021), https://www.latimes.com/science/story/2021-02-23/california-homegrown-coronavirus-strain-looks-increasingly-transmissible-and-dangerous; Washington Post, *Pfizer and Moderna vaccines have reduced effectiveness against South African variant, studies show* (Feb. 18, 2021), https://www.washingtonpost.com/nation/2021/02/18/coronavirus-covid-live-updates-us/.

potentially months, with limited, if any, access to medical care, and in total isolation, other

than short and infrequent showers.  (J. Sickler Decl., Ex. 60, at ¶¶ 23–27.)  Once out of

quarantine, he would still be subject to lockdowns as well as restrictions on his ability to

communicate with his loved ones, given ongoing visitation and communication blackouts

at many BOP facilities.[5]  (*Id*. at ¶ 29.)

Due to concerns surrounding the pandemic, Congress and the Department of Justice

acted to try to prevent this crisis by authorizing the BOP to "immediately" transfer

prisoners at risk of contracting COVID-19 to home confinement — particularly those who

(like Arik) "are non-violent and pose minimal likelihood of recidivism and who might be

safer serving their sentences in home confinement."[6]  Nonetheless, the BOP has failed to

stem the tide of infections, with conditions at BOP facilities leaving prisoners especially

vulnerable to this potentially deadly disease.[7]

### E.    Immigration Status and Conditions of Confinement

Any prison sentence also would subject Arik to significantly harsher, and lengthier,

conditions of confinement due to his citizenship status  — in multiple ways.

---

[5] *See, e.g.*, Filter, *Brooklyn Federal Prison Denying Communication Rights in Pandemic* (Jan. 25, 2021), https://filtermag.org/brooklyn-federal-prison-covid-communication/.

[6] *See* Office of the Attorney General, U.S. Dep't of Justice, *Memo. For Dir. of Bureau of Prisons re Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic* (Mar. 26, 2020), https://www.bop.gov/coronavirus/docs/bop_memo_home _confinement.pdf; Office of the Attorney General, U.S. Dep't of Justice, *Memo. For Dir. of Bureau of Prisons re Increasing Use of Home Confinement at Instits. Most Affected by COVID-19* (Apr. 3, 2020), https://www. justice.gov/file/1266661/download.

[7] *See, e.g.*, N.Y. Times, *Vulnerable Inmates Left in Prison as Covid Rages* (Mar. 10, 2021), https://www.nytimes.com/2021/02/27/health/coronavirus-prisons-danbury.html.

Although he is a lawful permanent resident alien who has lived in the United States for over 25 years, under BOP policy Arik would be ineligible to serve any part of his sentence in a minimum security facility, and therefore would face far harsher and more dangerous conditions of confinement than otherwise-similarly-situated offenders. (*Id.* at ¶¶ 9–17.) The harshness of these conditions would take many forms: heightened security, restricted movement within the facility, invasive physical searches, overcrowding, more limited access to medical help and other life necessities, intimidating visitation conditions, and — last, but certainly not least — being housed with more dangerous inmates with criminal records, including acts of violence and membership in organized criminal groups. (*Id.*)

Moreover, Arik would be ineligible for standard pre-release opportunities that are routinely available to defendants with his background and offense conduct. Typically, such defendants are eligible both for placement in a residential re-entry facility (or halfway house) for anywhere from six months to a year, as well as home confinement for the last 10% of their sentence. Such placements can substantially reduce the amount of time a defendant like Arik must actually spend in prison. Again, because Arik is a green-card holder and not a U.S. citizen, he would be ineligible for these placements. (*Id.* at ¶¶ 17–19.)

Arik's immigration status would result in further incarceration even after his sentence in this case is over. That is because he faces the prospect of being detained by U.S. Immigration and Customs Enforcement at the completion of his sentence, and further

incarceration — for up to six months or longer — while he awaits the outcome of proceedings to involuntarily remove him from this country. (*Id.* at ¶¶ 20–22.)

All of these factors would combine to result in far harsher and lengthier punishment for Arik, were he to be imprisoned.

### F.      Acceptance of Responsibility

In or about 2018, Arik was approached by other members of the conspiracy with the proposal that they all would enter into transactions in which individuals (who were looking for capital for their businesses) would purchase used luxury vehicles using a combination of down payments and financing, and then furnish the vehicles to Arik and others to rent out for profit. It was understood that the individuals would each be paid $10,000 per car, and that Arik's business would be responsible for funding the down payments and car financing payments. As part of this, Arik agreed that other individuals would make false statements to the financing companies about who was actually paying for and using the cars. Arik agreed to this in order to keep the financing companies from discovering who was actually paying for and using the cars. After a few months, payments to the financing companies ceased, while Arik and his associates remained in possession of the cars (though not renting them as much as planned, due to the lack of insurance on the vehicles).

Arik initially appeared before the Court on December 17, 2019. Despite numerous delays attributable in part to the COVID-19 pandemic, both sides worked to reach a plea agreement and, on December 7, 2020, Arik pled guilty to the charge of conspiring to commit bank fraud and wire fraud, in violation of 18 U.S.C. § 371.

Arik recognizes that he and others engaged in a serious offense and he is profoundly remorseful for his conduct.  Over the past months, Arik's remorse for his conduct has been visible to those within his community.  For example, Victour Zaibak writes to the Court that Arik has shown acceptance for his conduct and is deeply apologetic for the harm it has caused to others:

> Arik has acknowledged to me the behavior he exhibited, expressed great remorse and a desire to make amends.  I believe that Arik has every intention to improve since the incident.  Ever since I've known Arik, he always had a strong will for self-improvement.  I strongly believe that he is very sorry for what he has done.  Arik has accepted the fact that his life was negatively impacted by his own actions.  (Letter from Victour Zaibak, Exhibit 58).

According to Danielle Norman, over the past months she has watched Arik "transform from a person filled with light and joy — who spends as much time as he can with his beautiful children and wife — into a dull, sullen man who aches with remorse and wishes for forgiveness."  (Letter from Danielle Norman, Exhibit 40).  Arik's wife Nadia has also witnessed Arik's remorse:  "Arik understands his mistakes and takes full responsibility for his actions. . . . I believe Arik has changed and will never make this mistake again."  (Letter from Nadia Lev, Exhibit 27).  And Rabbi Friedman explains the depth of Arik's remorse, and his genuine desire to learn from his mistakes:

> Arik and I have had long introspective conversations about his current ordeal and I have come to realize how much he's grown from the mistakes he made. He has told me how regretful he is for going ahead with his decisions that wound up with him in trouble with breaking the law. I firmly believe that he is remorseful and will never run afoul of the law again.  (Letter from Yehuda Friedman, Exhibit 16).

As part of his plea agreement with the government, Arik agreed to pay a yet-to-be-determined amount of restitution to the lending companies that sustained losses as a result

34

of the offense.  In the meantime, beginning before he pled guilty and continuing after, Arik

has been in contact with several of these companies in an effort to return the five vehicles

over which he retained control.  To date, Arik has been able to return three of the five

vehicles and continues to diligently work to return others.  For the cars already returned,

the companies which provided financing, and the cars' approximate fair market values[8],

are Woodside Credit (two cars, worth approximately $133,000 and $159,000, respectively)

and Ferrari Financial (one car, worth approximately $174,000).  For the cars that Arik is in

the process of returning, the companies which provided financing, and the cars'

approximate fair market values, are TD Bank (one car, worth approximately $91,000) and

Bank of America (one car, worth approximately $31,000).  In addition, three banks have

already repossessed three other cars that were acquired as part of the offense:  Bank of

America (one car, worth approximately $33,000), TD Bank (one car, worth approximately

$50,000), and M&T Bank (one car, also worth approximately $50,000).[9]  All told, then,

financing companies have already received, or are about to receive, several hundred

thousand dollars in property as partial compensation for their losses (which the PSR

calculates to be $1,054,301).  Arik stands ready to work hard to find a way, consistent with

---

[8] All vehicle fair market values referenced in this memorandum are based on the average
retail values found at www.nadaguides.com, as of April 27, 2021, for cars of the same year,
make, and model.  We provide these values to provide a preliminary indication to the Court
of the potential magnitude of the restitution provided to date.  We acknowledge that the
exact amount of restitution owed will be based on various factors, including but not limited
to the value of the vehicles for restitution purposes, and will be determined at or after the
July 8, 2021 hearing that has been scheduled for this purpose.

[9] Arik was and is unaware of the location of the other (ninth) vehicle.

his current and future financial condition and ability to pay and any payments by his co-defendants, to satisfy the remaining restitution obligation.

Arik also has agreed to a forfeiture judgment of $942,411, representing the gross proceeds of the offense. To be clear, Arik actually spent more to (1) purchase the cars at the auctions, (2) ready them for sale to the individual purchasers, and (3) help effectuate those sales (primarily by funding the payment of sales tax), than he received from the sale of the cars to the individual purchasers. But we recognize that forfeiture is based on the gross (not net) proceeds resulting from this particular offense and thus Arik, as part of his plea agreement and in recognition of his wrongful conduct, has consented to forfeit that amount. (Plea Agreement, pp. 1–2).

## III. SENTENCING

### A. Introduction

Under the plea agreement, Arik and the government agree on a base offense level of seven (U.S.S.G. § 2B1.1(a)(1)), a 14-level increase for an offense involving more than $550,000 but less than $1,500,000 of intended loss (§ 2B1.1(b)(1)(H)), a two-level increase because the offense resulted in a substantial financial hardship to one or more victims (§ 2B1.1(b)(2)(A)), and a three-level reduction for acceptance of responsibility (§ 3E1.1(b)). Because he has no criminal record, Arik has a Criminal History Category of I. Therefore, under the plea agreement, the advisory Guideline range is 33 to 41 months. The Probation Department agrees. (PSR ¶ 56).

But any Guideline range provides only a "starting point and the initial benchmark" for a sentencing decision, and that starting point is, for all the reasons set forth below, too

harsh to serve as the basis for an appropriate sentence here.  *See Gall v. United States*, 552 U.S. 38, 49–50 (2007) (holding that a court may not "presume that the Guidelines range is reasonable" and instead "must make an individualized assessment based on the facts presented"); *Kimbrough v. United States*, 552 U.S. 85, 90 (2007) (observing that, post-*Booker*, the Guidelines are merely advisory and "serve as one factor among several courts must consider in determining an appropriate sentence"); *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) (holding that in fraud offenses, where a low base offense level is increased significantly by the loss enhancement, courts are entitled to consider a non-Guidelines sentence).

In the Presentence Investigation Report, the U.S. Probation Department — with the information then available to it — commendably recognized that Arik is deserving of a downward variance under 18 U.S.C. §3553(a).  The Probation Department recommended a below-Guideline sentence of 28 months.  However, additional information (much of which was not available to the Probation Department at the time) makes it clear that Arik is deserving of a significantly greater variance.  In particular, and as discussed further below, dozens of letters submitted by Arik's family, friends, and colleagues have shown the extent to which Arik's family is heavily dependent on him, for both financial and emotional support, as well as the extensive record of extraordinary good works and charitable acts that Arik has performed throughout his life.  In addition, we respectfully submit that the Court can, and should, take into account the unusually harsh conditions of

confinement that Arik will face as a result of his immigration status and the COVID-19 pandemic.

Taking all of these considerations into account, the non-Guideline factors the Court must consider under 18 U.S.C. § 3553(a) strongly support that a non-incarceratory sentence, with special conditions of home confinement and community service, would be "sufficient, but not greater than necessary" to achieve the goals of sentencing in this case.

**B.      There is a Compelling Case for the Court to Exercise Substantial Leniency Under § 3553(a)**

      1.      <u>Arik's History and Characteristics Merit a Non-Incarceratory Sentence</u>

           a)      *Family Circumstances*

A significant downward variance is warranted because of the critical role that Arik plays within his family. A defendant's family circumstances is a well-established basis for a downward variance. *See, e.g., United States v. Thavaraja*, 740 F.3d 253, 262 (2d Cir. 2014) (family circumstances are part of the "history and characteristics of the defendant" under 18 U.S.C. §3553(a)(1))*; United States v. Sherlock*, No. 17-cr-597 (RJS), 2020 WL 7263520, at *1 (S.D.N.Y. Dec. 10, 2020) (due to the defendant's "medical and family challenges," he received a sentence of 18 months despite a Guideline range of 63 to 78 months); *United States v. Kon*, No. 04 CR, 271-03(RWS), 2006 WL 3208555, at *5–6 (S.D.N.Y. Nov. 2, 2006) (granting downward variance from Guideline range of 30 to 37 months to time served (one day) because, among other factors, the defendant had a young daughter with no other caregiver); *see also United States v. Roque*, 536 F. Supp. 2d 987, 991 (E.D. Wis. 2008) (in a case with a Guideline range of 87 to 108 months, court

sentenced the defendant to five years' probation; court found that defendant's "family would obviously be better served by his presence because "defendant served as the sole provider for the family" and "[s]ending defendant to prison would have likely forced [his partner] to either find a job with limited skills and no work experience, then find child care, or to rely on family or public assistance").

As described above, Arik's wife and children depend on him heavily for financial support.  If Arik is imprisoned, his business will collapse and, with it, his family's main financial lifeline.  Having lost her job due to COVID-19, Arik's wife would be unable to independently support their family.  A term of incarceration would put unmanageable financial pressure on Arik's family — particularly when the family already faces mounting credit card debt, and Arik faces crippling forfeiture and restitution judgments in this case. And Arik has no parents, no in-laws, and no siblings who can provide financial support to his family in his absence.  Incarceration, in short, would be financially devastating to Arik's family.

Beyond his central role in the family's financial health, Arik plays a critical part in the family's emotional well-being.  In her letter to the Court, Arik's wife Nadia explains how critical Arik's presence is to the family's emotional security, stressing that "[i]f Arik would not be with us, it will affect all of our lives, especially my five children who are very attached to their father.  He is their greatest supporter and comforter, from the oldest to youngest. . . .  My heart breaks for my children and Arik. . . .  My children need their father and I need him too.  (Letter from Nadia Lev, Exhibit 27).

As Arik's daughter Tiffany puts it, Arik is the emotional "rock" of the family. (Letter from Tiffany Lev, Exhibit 30).  A term of incarceration will effectively remove that rock from the family for the foreseeable future.  A downward variance, on the other hand, would enable Arik to continue to provide essential support to his wife and children.

Beyond the impact that incarceration would have on Arik's wife and children, it would also impair Arik's ability to care for and visit his father.  As discussed above, Arik's father suffers from numerous medical conditions, and has undergone several major surgeries in past years.  Yet due to bail conditions and travel restrictions associated with COVID-19, Arik has been unable to see his father for over a year.  Now, if his father's health were to deteriorate further, a sentence of incarceration presents a significant risk that Arik would be unable to see his father again, exposing Arik to the same trauma and guilt he experienced at his mother's passing.  (*See* Letter from Moshe Lev, Exhibit 26; Letter from Nadia Lev, Exhibit 27).

b) *Consequences of Deportation and a Divided Family*

A downward variance is justified where a defendant's likely deportation will have a deleterious effect on the defendant's spouse and children.  *See United States v. Thavaraja*, 740 F.3d 253, 262–63 (2d Cir. 2014) (courts are empowered under § 3553(a) to consider "the uncertainties presented by the prospect of removal proceedings and the impact deportation will have on the defendant and his family"); *see also United States v. Chin Chong*, No. 13–CR–570, 2014 WL 4773978, at *13, 16 (E.D.N.Y. Sept. 24, 2014) (imposing a sentence of time served plus 10 days because "[a]dditional long incarceration beyond . . . banishment would not be 'just punishment'").

40

Here, Arik's likely deportation to Israel — a country where he has not resided for over 25 years, and where no member of his immediate family has ever lived — is a severe punishment for his conduct and warrants a substantial downward variance. After he is deported, Arik will be permanently separated from the community that he has long fostered and supported, and the life he has known for decades. What is more, Arik will be unable to run the Brooklyn-based business that, for many years, has provided the vast majority of his family's financial support.

Arik's likely deportation will also have a profound and tragic effect on his family, who will be faced with an impossible choice: (i) remain in the United States (where Arik's spouse and five children are all citizens) without their father who, for their entire lives, has been the family's primary source of financial support and an emotional pillar; or (ii) accompany their father to Israel, a place where Arik's wife and children have never lived and have no friends or community. Regardless of which choice is made, the family will unquestionably suffer for years as they struggle to adjust to their new, stark reality.

c)      *Exceptional Good Deeds and Charitable Works*

Charitable deeds are also an appropriate basis for a downward variance. *See, e.g., United States v. Cowan*, No. 09–CR–261, 2010 WL 694098, at *2 (E.D.N.Y. Feb. 18, 2010) (granting a downward variance from Guideline range of 41 to 51 months to time served and three years of supervised release because of, among other reasons, defendant's "good character"); *United States v. Tomko*, 562 F.3d 558, 560 (3d Cir. 2009) (affirming downward variance from Guideline range of 12 to 18 months to sentence of probation based on district court's consideration, under § 3553(a), of "[s]everal dozen letters written

41

on [the defendant's] behalf prior to his sentencing [that] demonstrate [the defendant's] community ties and extensive charitable works"); *United States v. Thurston*, 544 F.3d 22, 25–26 (1st Cir. 2008) (noting district court's consideration of the defendant's "charitable work, community service, generosity with time, and spiritual support and assistance to others" under § 3553(a)(1) and affirming district court's decision to vary downward from Guideline range of 63 to 78 months to a sentence of 3 months).

Arik's long-standing record of good deeds, charity, and generosity to others is extensive and unusual by any standard. As the many people who wrote letters on his behalf attest, Arik is a man who is devoted to helping others in big and small ways, without asking or expecting anything in return. As they have described in detail, Arik's unfailing dedication to caring for others extends beyond his family and friends, to include business associates, community members, and even complete strangers. He has given extensively — financially and emotionally, and with his time and physical labor — to his community, helping renovate synagogues in need; constantly welcoming strangers and friends alike; providing jobs and transportation for those without; providing assistance to victims of natural disasters, and much more. He has counseled many in his community when they found themselves at difficult crossroads in their lives, and has extended himself time and again to help anyone he sees in need. In light of Arik's lifelong, exceptional record of charitable acts and good deeds, the Court should grant a substantial downward variance on this basis.

42

d)    *Acceptance of Responsibility*

A downward variance is also warranted because of Arik's acceptance of responsibility and his efforts to make amends with the victims of his offense. A defendant's acceptance of responsibility presents a valid basis for a downward variance, even when a defendant is already credited with a downward adjustment under § 3E1.1.

> Where appropriate, courts may grant additional consideration to defendants who demonstrate acceptance beyond that necessary to obtain a two or three level reduction under § 3E1.1. This is so because such conduct bears directly on their character, § 3553(a)(1), and on how severe a sentence is necessary to provide deterrence and punishment, § 3553(a)(2). Further, courts should encourage offenders to mitigate their misconduct voluntarily, whether by admitting it, paying restitution or making efforts to address substance abuse, mental health or other problems that contributed to it.

*United States v. Milne*, 384 F. Supp. 2d 1309, 1312 (E.D. Wis. 2005) (granting two-level downward variance, in addition to three-level adjustment under § 3E1.1).

An effort to make amends financially prior to sentencing presents an appropriate basis for a downward variance under § 3553(a). *See United States v. Anderson*, 267 F. App'x 847, 850 (11th Cir. 2008) (affirming sentence of three years' probation where Guideline range was 18 to 24 months because "[t]he district court considered [the defendant's] 'prompt' payment of full restitution and a substantial civil penalty to the SEC and the economic hardship that the settlement necessarily imposed on him and concluded that [the defendant's] conduct indicated his genuine intent to make amends for his wrongdoing").

By entering into plea negotiations with the government and pleading guilty before a pre-trial motion schedule was even set, Arik timely accepted responsibility for his actions

43

and has allowed the government to preserve prosecutorial resources.   Similarly, Arik's continued efforts to return vehicles acquired as a result of the offense — a process which began even before he pled guilty — reflect his genuine remorse for his conduct and is a meaningful and tangible indication of his desire to make amends.

> 2.   Incarceration Is Not Required to Satisfy the Remaining Goals of Sentencing

Under 18 U.S.C. § 3553(a), courts must also consider the need for a sentence to "promote respect for the law," "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  *See* 18 U.S.C. § 3553(a)(2)(A)–(C), (6).   These objectives, too, would be satisfied in this case by a non-incarceratory sentence.

As an initial matter, a term of incarceration is not necessary to promote respect for the law or for general deterrence.  Arik is facing permanent removal from the United States and, along with it, separation from the only community he has known for over 25 years. In cases such as this, where the prospect of deportation creates a more severe punishment than incarceration alone, a non-incarceratory sentence would adequately reflect the seriousness of the offense, promote respect for the law, and provide adequate deterrence. *See Chin Chong*, 2014 WL 4773978, at *7 ("Less severe criminal sanctions will suffice to provide 'adequate deterrence' when the defendants face the double threat of incarceration and deportation as a result of their conduct."); *see also United States v. Edwards*, 595 F.3d 1004, 1011, 1016–18 (9th Cir. 2010) (finding that, in varying downward to five years of

probation from a Guideline range of 27 to 33 months, § 3553 "does not require the goal of general deterrence be met through a period of incarceration").

Likewise, incarcerating Arik is not necessary to protect the public. Arik's reputation, as well as his business, have been severely damaged over the past year, greatly reducing the risk that he would be in a position to re-offend. *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (approving finding that the fact that the defendant would "not be in a situation to commit the offenses of conviction again" lessened the need for deterrence); *see also United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (granting downward departure where the destruction of the defendant's business prevented recidivism). And while Arik has no intention to repeat his behavior, the likelihood that Arik will face deportation following the completion of his sentence obviates any need for his incarceration in order to protect the public. *See Chin Chong*, 2014 WL 4773978, at *9 (finding that "[t]he diminished need to 'protect the American public from further crimes of the deported defendant' argues in favor of shorter terms of incarceration."). Likewise, the rate of recidivism for those over 40 (Arik is 48 years old) drops significantly. *See, e.g.*, *United States v. Hernandez*, 604 F.3d 48, 54 (2d Cir. 2010) (recognizing that a defendant's age may indicate a decreased likelihood of recidivism); *see also* U.S. Sentencing Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders*, at 3, 22–25 (Dec. 2017) (stating that "[a]ge and criminal history exert[] a strong influence on recidivism" and observing that the re-arrest rate declines significantly for individuals in their late 40s or older in Criminal History Category I).

45

In short, Arik poses no threat to the public, and should be sentenced with that lack of a need for deterrence in mind. *See Pepper v. United States*, 562 U.S. 476, 492 (2011) (noting that the "likelihood that [a defendant] will engage in future criminal conduct" is "a central factor that district courts must assess when imposing sentence"); *United States v. Schulman*, No. 16 Cr. 442 (JMA), Doc. No. 155 (E.D.N.Y.  Sept. 26, 2017) (basing a below-Guideline sentence of probation, in part, on the fact that "the significant collateral effects of the defendant's conviction . . . have already achieved the goal of deterrence" and on the defendant's personal characteristics); *United States v. E.L.*, 188 F. Supp. 3d 152, 174 (E.D.N.Y. 2016) (imposing a below-Guideline sentence of probation where the defendant's risk of recidivism was "almost zero").

Finally, a non-incarceratory sentence would not entail unwarranted sentence disparities with defendants charged with similar conduct. *See* 18 U.S.C. § 3553(a)(2)(A), (6).  To the contrary, as a result of his lawful immigration status, Arik faces severe personal punishment not faced by many other defendants charged with similar offenses — both during any period of imprisonment as well as after it.  As noted above, the immigration consequences of conviction are an additional punishment that courts in the Second Circuit are empowered to consider under § 3553(a).  *Thavaraja*, 740 F.3d at 262–63.  And other mitigating factors — including but not limited to Arik's exceptional record of charity and good works, and the serious family hardships that would result from his incarceration — provide more than ample justification for any disparity between Arik and other defendants charged with similar conduct. *See, e.g., United States v. Merritt*, 988 F.2d 1298, 1307 (2d

46

Cir. 1993) ("Disparities resulting from important character differences are not only warranted, but clearly envisioned by the provisions of the Act."); *United States v. Warner*, 792 F.3d 847, 862–63 (7th Cir. 2015) (affirming that a sentence of community service and two years' probation — where Guideline range was 46 to 57 months — would not create "unwarranted" disparities because the defendant "offered evidence of significant charity . . . [and] otherwise impressed the district court with their personal character").

### 3.    A Non-Incarceratory Sentence Would Be Sufficient, But Not Greater than Necessary, To Comply with the Purposes of Sentencing

Given all of these factors, a sentence of probation, with special conditions of home confinement and community service, would be "sufficient, but not greater than necessary" to accomplish the goals of sentencing. *See* 18 U.S.C. § 3553(a); *Gall*, 552 U.S. at 51 (requiring sentencing courts to "take into account the totality of the circumstances").

A sentence of probation would subject Arik to significant deprivations. As the Supreme Court recognized in *Gall*, defendants serving probationary sentences are "subject to several standard conditions that substantially restrict their liberty." 552 U.S. at 48. As the Court elaborated, individuals on probation "may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court" and "[t]hey must report regularly to their probation officer, [and] permit unannounced visits to their homes." *Id.* Indeed, the choice between prison and probation is not a choice "between punishment and no punishment." *United States v. Leitch*, No. 11-CR-00039 (JG), 2013 WL 753445, at *12 (E.D.N.Y. Feb. 28, 2013). To the contrary, while "[p]robation is less severe than a prison term . . . both are punishment.

And as the Supreme Court has recognized, probation is significant punishment. . . .  In addition to standard and special conditions, there is an array of alternative sanctions — home confinement, community service, and fines, for example — that allow judges to impose enhanced (and sometimes even constructive) punishment without sending the defendant to prison." *Id.*

A term of home confinement would impose even greater restraints on Arik than probation alone — limiting his movements to his home for all but medical and other essential reasons.  It would also substantially shield Arik from the potentially lethal dangers of the ongoing COVID-19 pandemic.  Indeed, Arik is exactly the sort of "non-violent" individual who "pose[s] minimal likelihood of recidivism and who might be safer serving [his] sentence[] in home confinement rather than in BOP facilities" that former Attorney General William Barr envisioned when directing the Bureau of Prisons to maximize the use of home confinement due to COVID-19.[10]

A condition of significant community service would give Arik the opportunity to make amends to the community, while also continuing the work that has enriched the lives of so many members of that community over the last 20 years.  Community service is a widely accepted alternative to incarceration that has been praised by the United States

---

[10] *See* Office of the Attorney General, U.S. Dep't of Justice, *Memo. For Dir. of Bureau of Prisons re Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic* (Mar. 26, 2020), https://www.bop.gov/coronavirus/docs/bop_memo_home _confinement.pdf; Office of the Attorney General, U.S. Dep't of Justice, *Memo. For Dir. of Bureau of Prisons re Increasing Use of Home Confinement at Instits. Most Affected by COVID-19* (Apr. 3, 2020), https://www. justice.gov/file/1266661/download.

Probation Department as "a flexible, personalized, and humane sanction" that is also "practical, cost-effective, and fair—a 'win-win' proposition for everyone involved."[11] Courts also have recognized the value of community service as an alternative sentence, with one judge observing that "[a]lternatives to incarceration exist that can carry both the community and this Court's condemnation of your conduct but channel it in a way that's more constructive." *See* H. Hoelter, Symposium on Alternatives to Incarceration, U.S. SENTENCING COMM'N at 349 (Jul. 14, 2008); *see also, e.g., United States v. Samson*, No. 16 Cr. 334 (JLL), Doc. Nos. 24, 25 (D.N.J. Mar. 7, 2017) (imposing below-Guideline sentence of probation with conditions of home confinement and community service where the defendant, a former high-level government official, had conducted "a lifetime of good work," was elderly, and had already suffered significant collateral consequences due to his conviction); *United States v. Chatwal*, No. 14 Cr. 143 (ILG), Doc. No. 40 (E.D.N.Y. Dec. 10, 2014) (imposing below-Guideline sentence of probation with condition of community service and advising that the defendant, convicted of campaign contribution violations and obstruction of justice, continue his history of good works); *United States v. Warner*, No. 13 Cr. 731 (CPK), Doc. No. 33 (N.D.Ill. Jan. 14, 2014) (imposing below-Guideline sentence of probation and community service based, in part, on the court's analysis of "whether society would be better off with [the defendant] in jail or whether it would be best served by utilizing his talents and beneficence to help make this a better world" and

---

[11] *See* U.S. Probation & Pretrial Services, *Court & Community: An Information Series About U.S. Probation & Pretrial Services: Community Service* (2001), http://www.nhp.uscourts.gov/sites/default/files/pdf/ccservice.pdf.

its conclusion that "society w[ould] be best-served by allowing [the defendant] to continue his good works").

## IV.    CONCLUSION

We respectfully ask the Court to impose a non-incarceratory sentence on Arik Lev, with special conditions of home confinement and community service.  We respectfully submit that the numerous considerations detailed in this memorandum provide compelling justification for such a sentence in this case, and that those considerations make it clear that no greater sentence is necessary to achieve the purposes of sentencing.

Dated:  April 29, 2021
        New York, New York

                                 Respectfully submitted,

                                 /s/ Alan Vinegrad

                                 Alan Vinegrad
                                 Gavin Bosch
                                 COVINGTON & BURLING LLP
                                 The New York Times Building
                                 620 Eighth Avenue
                                 New York, NY 10018-1405
                                 (212) 841-1022

                                 *Attorneys for Arik Lev*

# EXHIBIT 1

March 15, 2021

The Honorable Judge John Koeltl
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

Dear Judge Koeltl,

My name is Batya Abraham. I am Nadia and Arik Lev's aunt and a mother of 5 children and 15 grandchildren. I reside in Brooklyn, NY.

I have always known Arik to be a kind, caring person. There is one instance in particular that I would like to highlight. About two years ago we organized a family vacation to Miami, FL. Nadia and Arik had travelled to Miami as well and they invited my family to join them for a ride on their friend's boat. We went to an area called Sandbar where the water is shallow and a delight to jump in for a swim. It was my first time on a boat and I was having the time of my life eating, drinking, playing music and spending quality time with family.

As we were winding down our outing Arik and his friend thought it would be nice to take the boat out a bit in the ocean to get a better view. The exit to the Atlantic Ocean in that area is called Bakers Haulover Inlet. It is generally smooth sailing, but unbeknownst to Arik who was driving the boat, we went head-on into extremely strong currents and waves. Arik shouted for everyone to brace themselves just as we encountered (what seemed to me) a 50-foot wave. It was a terrifying moment to say the least. We thought the worst had passed us unscathed and now could figure out a way to turn around to calm waters, however my 25-year-old son Moshe fell off the boat from the impact and was swept away at sea. We were in complete shock. Arik didn't hesitate and threw a rope, which my son managed to grab. While Miami- Dade Fire Rescue was already alerted and approaching, Arik didn't see them so he did what only Arik does: he jumped into the raging ocean to save my son from drowning.

Chaos ensued as we didn't know how to get them back on the boat. Luckily the rescue team was quick to pull my son with the rope Arik had cast out, saving my son and Arik. I shudder to think what the outcome would be if not for Arik's swift and heroic efforts.

I am asking Your Honor to take the good characteristics that Arik exemplifies into consideration when he humbly stands before you for sentencing. Arik has strong family and community ties that will surely enable him to keep doing good deeds and will not be any risk of reoffending.


Respectfully,

Batya Abraham

# EXHIBIT 2

Yael Abramovich

████████
████████████████

01/13/2021

Honorable John Koeltl
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

Dear Judge Koeltl:

My name is Yael Abramovich, I'm 44 years old. I am currently working as a realtor; I'm married with two children. One is a college student and one is in middle school.

I've known Arik through a mutual friend from New York (I live in Miami). I've known him for the last 15 years.

I was so surprised to find out about the allegation against him, and I'm writing this letter to support him and his family. I ask the Court for compassion because in all the years I've known Arik I know him as a hardworking, family oriented man, and very involved in the community.

The first time that we got to know him more closely was when Hurricane Irma hit Miami and we had to evacuate with my family and pets and were looking for a place to stay. Arik opened his house to all of us. He did it out of sympathy for us without knowing us very closely even.

I also got to work with him as a realtor on a rental property in Miami, which was a pleasure. He was paying rent on time and kept the property in perfect condition.

I know from our mutual friend that Arik is helping people in his community on a regular basis. I truly believe that he has a good heart. He is a father of five children, the youngest of whom is only six years old and he needs to be with his dad. His family needs him as well. He is the one providing for his family.

Honorable John Koeltl
01/13/2021
Page 2


Thank you for taking the time to read my letter and considering it when deciding Arik's sentence.


Respectfully,


Yael Abramovich

# EXHIBIT 3

Yehuda Alkobi



January 11, 2021

The Honorable John Koeltl
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007
Reference:     Mr. Arik Lev

Dear Honorable Judge,

My name is Yehuda Alkobi. I am married with four children and 9 grandchildren. I own and
operate a custom millwork company in Staten Island, NY.

Mr. Arik Lev has been a good friend of mine for the past 40 years. Our friendship started in
Israel and we have reunited about 25 years ago here in New York.

Arik is a generous man who supports his community, friends, and family. A couple of years ago,
Arik had called and asked of me to do the millwork at a new community synagogue in
Mill Basin, Brooklyn. Arik had requested to perform and complete this work in a very short
period of time to be able to open the Synagogue in time for the upcoming holiday (Rosh
Hashana). Even though the Synagogue ran out of funds and couldn't afford this work, Arik had
offered to pay the entire cost as a donation to the community. In addition to his generous
donation, I have witnessed Arik get hands on and physically work in the Synagogue day and
night to complete all the necessary work and ensure the community has a place to pray in time
for the holiday.  About a year later, Arik had called again and asked me to manufacture and
install custom bookcases for a community study room at another local synagogue and once again
this was fully paid for and donated by Arik.

I have also seen Arik on numerous occasions throughout the years welcome friends and
community visitors to his home for a Friday night (Sabbath) meal and even a place to stay.  His
wife, 5 children, and the community as whole depend on him.

Your Honor, I would like to take this opportunity and ask for your consideration of the facts and
instances described in my letter and of course your most generous compassion when deciding on
Arik's sentence, as he truly does deserve your mercy.

Respectfully yours,

Yehuda Alkobi

# EXHIBIT 4

The Honorable John Koeltl

United States District Judge

Daniel Patrick Moynihan United States Courthouse

500 Pearl Street

New York, New York 10007

February 10, 2021

Dear Judge Koeltl,

My name is Boris Aminov.  I live in Queens, New York. I am a married man with two kids.  I am currently self employed and own a demolition and container services company.

Through the years of knowing Arik, I have built a great relationship with him. We have done business together on numerous occasions and I have found Arik to be a very trustworthy and honest individual.

I am concerned for Arik and his family as he faces sentencing in his case.  Arik is a family man and has five children.  It would be extremely painful to have his kids grow up without a father figure in their lives, who can guide them through a positive path in life.

Arik is an extremely genuine human being whose actions show much stronger than just words. Arik has raised a lot of funds for our community and synagogue and takes time out of his personal life to care for so many in our community and beyond. Even during these tough times, his virtuous character remains constant. These caring attributes depict why it would be very unfortunate to see a man with Arik's compassion and good will sentenced to prison.

If Your Honor can please use compassion when deciding his case and allow Arik to prove himself to be the positive person I and our community know him to be - it will do a great service to him, his family and community.

Respectfully,

Boris Aminov

# EXHIBIT 5

The Honorable John Koeltl
United Stated District Judge
Daniel Patrick Moynihan United Stated Courthouse
500 Pearl Street
New York, New York 10007

January 26, 2021

Dear Judge Koeltl,

My name is Kfir Argaman. I am 33 years old and married with three children. I work as a full time barber and my wife has been working at an elementary school while also going to school herself to get her degree in special education. I consider myself involved in our community -- I attend our local temple every day, sometimes even twice a day. My 6 year old son attends the local Yeshivah Elementary School in the neighborhood, with Arik's son ████.

I have known Arik Lev for about five years.  We met at our local temple and have developed a great relationship ever since. Arik has a heart of gold, he always makes sure that our temple and its people are taken care of; whether it be by organizing food for the Sabbath or him and his wife hosting a ladies study group at their home.

Arik has a very supportive and loving family. Anytime I see him, his wife and children surround him. I can see the love he has for his family when we get together every Saturday at temple with our boys, who have become good friends.  From everything I know about Arik and his family over the years, I truly believe that if Arik were separated from his family, he would be irreplaceable and the effect on his children would be so detrimental.

I am a big believer in second chances.  People makes mistakes but it is how we choose to rise up when we fall down that makes us better people. Arik is a man of strong values, and always has been. I believe Arik is someone who recognizes his mistakes and will make sure to not repeat them. That is why I deem him worthy of the Court's compassion, because at the end of the day it is how we react and learn from mistakes that makes us better.


Respectfully yours,


Kfir Argaman

# EXHIBIT 6

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, N.Y. 10007-1312

January 11, 2021

Dear Judge Koeltl:

I would like to take a few minutes of your time to describe to you who Mr. Arik Lev really is. I have known Arik for many years, we live in the same community, our children attend the same elementary school, our wives are very friendly and we attend the same celebrations and events.

Arik is a stellar member of our community in Mill Basin.  He is known for being a great husband, father, friend and Jew. Arik single handedly put together our own little Synagogue so that the people from the many different Jewish backgrounds would feel comfortable praying together.  He made it known we accept anyone anytime. It was his actions that led me to become more committed to my Jewish faith; to pray more, to do more good deeds and to try my best to help anyone and everyone I can.

I personally witnessed Arik always trying to raise money to help the needy. Anyone that came to Arik with a problem he was eager to help. He always made calls to try and raise charity for people he knew and even some that he didn't know. Arik is a very good dad as well. He would take my daughter on family outings and I would take his. He always wanted to show the girls a great time and they loved going with him. I would like to ask the Court to please find in your heart compassion for a man who is a great husband, father, friend and community leader.

Arik is a humble man, the most generous understanding friend that I have. His five children, wife, friends and his community very much depend and need him. Please be merciful on him as many people depend on him.

Respectfully yours,

Michael Arje

# EXHIBIT 7

The Honorable John Koeltl
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

January 21, 2021

Dear Judge Koeltl,

My name is Cori Attias. I have been married for 30 years, have
two grown children and one grandchild. My family has known
Arik Lev and his family for as long as we can remember. When
anyone speaks his name the first thing that comes to our mouth
is "what a great guy". Why do we say this? Because he is a
compassionate man. A man that cares not only for his family but
his friends as well. He is there to help those in need, strangers as
well. Just mention the word and Arik steps in to lend a helping
hand by either organizing an event or taking money out of his
own pocket to help that person in need.

He is well respected by everyone in our community. He is a
humble man, a man that gives and asks for nothing in return. He
started his own Synagogue and when my husband's mother
passed away he organized the proper event needed to pay tribute
to her and alleviate that burden on my husband and his siblings.

Before Covid-19, every morning I would see Arik at the gym
exercising, minding his own business yet almost everyone
would stop him to shake his hand.

Arik is a man of his word and a good soul. A family man, a
husband and father who is needed at home. Please take into
consideration that he has 5 children that look up to him for his
guidance and wisdom.

Thank you for taking the time to read my letter.

Respectfully yours,

Scanned with CamScanner



Cori Attias

# EXHIBIT 8

The Honorable John Koeltl
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

January 14, 2021

Dear Judge Koeltl,

My name is Haim Attias. I work as a ventilation contractor and live with my wife and two teenage daughters. My wife and I have known Arik Lev for over 20 years. 20 years of witnessing generosity, sympathy and integrity. Arik has always been one of the good guys, constantly looking for where he can help, always helping out synagogues in any way that he could and promoting charities to support and attend.

His main priority is his wife and 5 lovely children, one of whom attended her early years of schooling with my oldest. From a father's point of view, I noticed how much he cares for his kids, always making sure they are protected and cared for as a father should. Arik is a great man and well respected. For the many years I have known Arik he has always shown humility learning new things, taking advice, and showing he is willing to work hard and surpass obstacles life may throw at him.

As we both visit similar synagogues I noticed how he was always the one to volunteer to be a helping hand when needed, for example cooking and preparing meals for the members of the synagogue and really anyone that was in need of a meal. To me, it is a blessing to know there are such empathetic people surrounding us and our community.

Respectfully yours,

Haim Attias

# EXHIBIT 9

January 13, 2021

United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, N.Y.  10007-1312

Dear Judge Koeltl:

My name is Yaacov Azrad. I know Arik Lev for many years, but I really got to know him in the last 16 months when he moved with his family to live above me while he was fixing his house.

He joined the synagogue I built in my building and was a very active member that donated to every Good cause.  He has, like me, 4 girls and one boy.  And ours kids got to be very good friends, especially his 11 years old daughter███, she became my 11 year old twins' best friend.

I saw how Arik's current situation has taken a big toll on his kids.  And I did something that I never did before and hopefully never need to do again.  I signed $100,000 bail on his behalf. Because I did not see how his kids will survive and grow without him living with them.  He is a wonderful father.  And if God forbid Your Honor decides to send him away, his family and kids will be devastated.  I have gotten to know Arik; he is very sorry for what he did and he is not a danger to society.  Actually it's the opposite - he will be more helpful to society by being a free man.

May God bless Your Honor and let you make the right decision.


Respectfully,


Yaacov Azrad
President and Founder of Azrad Congregation

# EXHIBIT 10



Anthony Bailey
60 Truman Avenue
Yonkers, New York 10703

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, N.Y. 10007-1312

January 25, 2021

Dear Judge Koeltl,

My name is Anthony Bailey and I am the CEO of Lumarjo Holdings, a boutique social impact investment firm in Yonkers, NY. This letter is a character reference for Arik Lev. A mutual friend introduced me to Arik for over 17 years ago and in that time period I have gotten to know him, his family, and close associates. Not only have we worked with each other, he and I consider one another as family.

Prior to starting my firm, I worked with Arik on various community initiatives. In 2010 as an education advocate I reached out to him to be a sponsor of a program that I was running at East Side Community High School that taught financial literacy to 7th-9th graders. Not only did he provide financial support, but he also spoke at various events and gave his time to mentor some students. From that moment we grew as business partners as well. His guidance and sincere caring has always shown throughout our relationship. From mentoring to business development Arik has been available at every moment.

Arik has always encouraged me to further my business by gently prodding me to be persistent and goal oriented. I have no hesitation in recommending leniency for Arik, and very much hope to have my friend available to continue his work for the benefit of so many. His work has not only helped me develop into the person that I am today, but also for other young men of color to achieve their dreams. If you need to reach me please free to contact me directly at ███████.

Respectfully,

Anthony Bailey

# EXHIBIT 11

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, N.Y. 10007-1312

01/14/2021

Dear Judge Koeltl,

Firstly, I hope that you and your loved ones are all safe and healthy during these uncertain times! As I'm sure Your Honor appreciates, if this past year has taught us anything, it's to enjoy every possible waking moment we can with our closest family members and friends, and never take our basic needs for granted. Lesson learned!

In regards to this particular matter, I would like to start off by introducing myself. My name is Rina Chayo and I am Arik Lev's sister-in-law.

Arik is a good man. And that's saying a lot in our day and age. I've known Arik for a long time now, over 20 years, and he never ceases to amaze me! I've never met an individual that was more giving, selfless, and kind-hearted than Arik. Just to clarify, I'm not referring to Arik displaying these traits just towards his immediate family and friends. I'm referring to Arik portraying acts of selflessness and kindness to each and every individual he has the pleasure of meeting. Seriously - it's like second nature to him. Each and every time an opportunity presents itself, he jumps in to give a helping hand.

I often read the Bible and try to incorporate its lessons in my life. When it talks about Abraham's hospitality, the commentaries say that his tent had 4 openings, one in every direction. This was the case so that travelers, near and far, could comfortably take shelter and refresh before resuming their journey. That is exactly Arik! I am not exaggerating; his door is always open for anyone in need. Whether a visitor out of town is in need of a home-cooked meal or a place to crash, Arik is always there to the rescue. It's kind of amazing to see. Sometimes it can take a toll on my sister Nadia (Arik's wife) as she has to constantly ensure the kitchen is fully stocked and the house is always clean and organized, but she knows Arik relishes the opportunity to host and she enjoys it too.

I'm going to end on a personal note. August 7th 2017 was one of the hardest and most painful days of my life. I woke up to the news that my father, who was my idol and my best friend, had passed away. I was an absolute wreck. My siblings and I, we all get by ok financially, but we weren't prepared for this financial burden. Without batting an eye, Arik took it upon himself to cover all the funeral expenses, as well as host the shiva (7 days of mourning) in his home. I mean, who does that?  I was in awe!

Judge Koeltl, Arik is no ordinary man. He has the desire and ability to inspire, change lives, and above all, make a positive difference in our world.

Respectfully,

Rina Chayo

# EXHIBIT 12

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, N.Y. 10007-1312

March 5, 2021

Dear Judge Koeltl,

My name is Joseph Chetrit and I came to United States in 2000 to
finish my academic degrees in the U.S. and at the same time I served
for the state of Israel in the Israeli Consulate and Israeli mission to the
U.N. At the same time that I worked for the Consulate, I was a part
time student at Fairleigh Dickinson University in Teaneck, New Jersey.

After 6 years I received my bachelors and master's degrees in public
administration. In my 7 years that I worked for the Israeli Consulate I
served various roles. I was fortunate to assist many people in difficult
situations, such as making proper arrangements to transfer deceased
persons from the U.S. to Israel for burial, lost passports or visas,
paperwork, prison transfers and much more.

Arik came to me a number of times seeking assistance for others that
needed the Consulate's intervention. Each time I was impressed with
his care and concern for someone else's wellbeing. One instance that I
would be remiss not to point out was in 2008. A family whose father
had passed away was in touch with me about transferring their loved
one from the U.S. for burial in Israel. As I began assisting them in
securing the necessary paperwork it became apparent that they were
financially destitute and unable to pay the almost $9,000 needed to
cover the costs. Although this was not directly related to my Consulate
work, I called Arik and a few other people to see if they can help the
family. Arik was eager to contribute and it was thanks to him and the
funds he pooled together from his friends that the family was able to
secure a proper burial for their father in their family plot.

As a friend of Arik I would like to say that he has been a big
contributor to the Jewish and Israeli community in New York and has
helped so many families in times of difficulty.

Arik was always one of the first individuals to come to me and ask if he
can help and volunteer his time for anything that was needed. Arik
helped me specifically with a program called "Metchaberim", which
means connection/communication in Hebrew. The program was
designed for at-risk Israeli Jewish youth and teenagers who had
problems or issues in and outside of their homes. The program helped
them to come together for an after school program, where they can
play sports and bond with each other. Arik not only contributed with a
donation, but also with his time by being a mentor through facilitating
group discussions and one-on-one conversations. Arik's presence and
caring words left an enduring impression on the participants.

To end my letter, I hope I have provided some insight in the true
character of Arik. He is a man with a good heart and brings so much
good to the community. He is in my opinion someone that deserves
the Court's compassion when deciding his fate.

Respectfully,

CHE TRIT

Joseph Chetrit

# EXHIBIT 13

January 19, 2021


The Honorable John Koeltl
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007


Dear Judge Koeltl,

My name is Yaniv Dahari. I am 46 years old, married with children plus grandchildren.  I am the owner and founder of a window treatment company called New York Window Fashion Inc. since 2005 with a showroom based in the Upper west side. I am currently on the board of a Temple called Magen Avraham and very much involved in my community.

When I first heard of Arik Lev's situation it devastated me. I am aware that Arik is being sentenced with respect to a Federal crime.  I am writing this letter on his behalf because he is very much worthy of my support and the Court's compassion.

I have known Arik Lev for the past 16 years. I met him and his family when my wife and I moved to the Mill Basin Community back in 2004.  At first he was my neighbor but then he became one of my good friends. It all started with the warm welcome that I received from Arik, his wife Nadia and his beautiful family, as we were their neighbors. That warm welcome blossomed into a close friendship. This was not something that you experience every day. Arik made our transition to a new community easy and smooth.

I have personally witnessed and been influenced by Arik's generosity, honesty, and integrity.  I have watched him strive to always help others in need and admired him for his efforts.  He pushed me to adopt his ways of helping others, whether it's physical help, mental help or financial help.  I can honestly say I am who I am, and am a better person today, thanks to Arik.  In all my years I have never met such a selfless man like Arik Lev.  His house has always been open and welcoming to anyone in need regardless if he knows them or not.  If someone has a problem Arik is the go-to guy.

I will never forget this story, when Arik realized right before the Holy Holidays that the Sephardic Center of Mill Basin Temple is in desperate need of renovation because it was falling apart.  One night I walked into the Temple to find Arik and his employees doing major renovations.  Arik is a very busy guy but that did not stop him.  After his daily work he went to the Temple to get the job done.  No one asked Arik to renovate, no one paid him for any part of the job.  He did it out of his good will.  Arik does not cut corners when he does something, he does it in the best way.  Of course, the job was done in time for the Holidays and the Temple looked beautiful.

His actions pushed me to want to be a part of this good deed and donate custom-made drapery to the Temple.

In our community, we have weekly distributions of food to families in need. Of course, Arik Lev is a major part of this organization. I have seen Arik packing boxes for the needy. As if this were not enough, Arik would get in the car and deliver some of these boxes throughout Brooklyn. About 8 years ago Arik decided to open a new Temple/center in the memory of his mom, who passed away. It is called "Shaare Tikva". He covers the burdens of running the Temple on a day to day basis. This Temple feeds and guides young and old people in need. Some of the people that attend do not have families, but the warm atmosphere and people make them feel at home. I have seen guys that were downtrodden make a huge turn around in their lives through the center. If it were not for Arik I do not know where these people would be today.

I can go on and on and on with stories of how Arik has touched so many lives. Besides the people that he has impacted in the community and outside, he is a great husband, father, son, and a friend. He has always put his wife Nadia first. She is his queen, and his children are his pride and joy. I have seen him taking care of his children and it is a beautiful picture to watch. He is very much involved in his children's life. He is not only their dad but their friend. Arik's last name is "Lev", which is a Hebrew word for heart. Arik could not have had a better fitted last name because Arik is ALL HEART.

I ask the Court to please have compassion on Arik Lev. If Arik would be incarcerated his family will, God forbid, fall apart. Arik provides critical and irreplaceable support to his wife and children and to all of the lives he has touched. I ask the Court to have mercy on him, the way that Arik has always shown mercy to others.

Respectfully yours,

Yaniv Dahari

# EXHIBIT 14

The Honorable John Koeltl
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

January 26, 2021

Dear Judge Koeltl,

My name is Alex Davidi. I am 52 years old and I am the founder of Davidi's Jewelry of NY

Corp. I am happily married for 28 years and am a father to four amazing children, followed by

██, my one and only granddaughter, for the time being. I am extremely family oriented and

very observant to my religion and culture. I spend a lot of time involving myself at my

community Jewish temple, whether it be for a charity event or simply to help others in need.

The person who I can truly thank for making me a better man. Whether it has to do with

family or business or any obstacles that life throws at us regularly, is my really good friend Arik

Lev. We have been friends since childhood and my family and I can genuinely call him our

family, because to me that's what he is. Arik is one of the most honest, charismatic, and good

hearted individuals that I know. He's the one person I can always count on in times of need or

just to have a sentimental conversation with about life. We have been through the ups and

downs together and I can say he is a person who will never let you down and will always be a

lifetime friend. He is loving, giving, doesn't have an ounce of hate in his heart, and just overall

such a great man to be around.

Most importantly, Arik is an outstanding father to his children and a great husband to

his wife.  He is very family oriented and would do anything for his loved ones. I think when you

judge a man's character it should be looked through how he treats his loved ones and also

strangers.  Arik is the same person no matter who he is around. Good vibes all the time, no

The Honorable John Koeltl

matter what he is going through. I respect Arik for his genuine heart and aura. And I am thankful to have known him for all these years. Anyone would be truly lucky to have him by their side as a companion.

I truly believe that Arik is worthy of the Court's compassion. His acts of kindness are limitless. I will never forget all the times where I personally saw Arik welcome strangers into his home who had no place to live, he welcomed them into his home like family. He has helped build a beautiful Jewish congregation in his neighborhood in Mill Basin and welcomes everyone with open arms. He is constantly doing generous charitable events for anyone who is in need.

It truly breaks my heart to see him going through this crisis. He loves his family beyond words and struggles greatly dealing with the outcome of his future. Arik can't imagine what life would be like not being around his family; he loves his wife and children unconditionally. I believe that Arik has shown great remorse for his wrongdoing. And he is capable of real growth to be better and do better.

Respectfully yours,

Alex Davidi

# EXHIBIT 15

1/14/2021

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, N.Y. 10007-1312

Dear Judge Koeltl,

My name is Saar Ezra. I am the owner of a mortgage loan company in Queens, NY and have owned my own business for a long time. I specialize in lending money to companies who are purchasing or refinancing their properties and I enjoy helping people become successful. I'm divorced and have 2 beautiful children whom I reside with 50% of the time as I have joint custody with my ex-wife. I am a dedicated father and a loyal friend.

Arik and I have known each other for about 5 years. He is a close friend and someone I trust. Arik is very helpful, always ready to give a hand, not only to me but to anyone. I have seen how much he helps others and that is a blessing.

He has helped me in various situations. For example, I needed personal relationship advice for a situation I was dealing with and he was there for me, giving me advice that helped me out immensely. Arik is just that way, a very humble down to earth man who cares for people.

I also would like to mention how great of a father he is to his 5 children and to his wife, especially to his only son who is 6 years old. As his only son, he wants to be able to teach him how to become a man, his son looks up to him, he plays sports with him and he would be devastated to not have his father around. Arik is a family man who enjoys spending time with his wife and children. Nothing is more valuable to him than his family.

Your Honor, I would like to address a point that is very close to home for me when considering Arik's sentencing: His youngest (and only) son ███. ████ is six years old, the same age as my son. The thought of his son watching his beloved daddy go to prison, the trauma of ████ being separated from his father, is unimaginable to me.

While I was writing this letter, I have done some of my own reading on the effects of parental incarceration and it truly left me astounded as to the extent of harm it causes. Incarceration increases, sometimes dramatically, family instability, unemployment, socioeconomic disadvantage, substance use, and mental health problems, to give just a short list. Furthermore, children with fathers who have been incarcerated are significantly more likely than other children to be expelled or suspended from school (23 percent compared with 4 percent).

Every day spent under community supervision rather than behind bars is an opportunity for Arik to work and to pay any restitution or fines. Most importantly it will enable him to be present and

care for his children. Rather than draining more resources from the public coffers as an inmate, Arik can be supervised in the community and make amends for his misdeeds.

The most valuable thing Arik cherishes is his 4 daughters, his son and his wife. Without them, both he and they would be devastated and lost. His family needs him around as the main person in the household. If he were to be incarcerated it would cause unfathomable pain and hardship on the family.

Your Honor, I know that Arik understands what he did was wrong. I beseech you to look at the entirety of Arik's good character and family when you are sentencing him. Please allow him to repay his debt to society by granting him the ability to continue his good deeds in the community and be with his family. If he can serve his sentence by being under court supervision and by paying restitution - not by incarceration - he can and will prove to you and the community that he is deserving of another chance.

God bless America!

Respectfully,


Saar Ezra

# EXHIBIT 16



# Chabad House of Canarsie

*Beit Mordechai*   ע"ש הרה"ח ר' מרדכי
בן ר' ישראל הלוי לוין

*917 E. 82nd Street • Brooklyn, New York 11236 • Telephone 718/209-0707*

### Chabad House of Mill Basin Georgetown Canarsie & Starrett City
2111 E. 65 Street  Brooklyn NY  11234  (718) 209-0707

Executive Director
Rabbi Yehuda Friedman

April 2, 2021

The Honorable John Koeltl
United States District Judge
Daniel Patrick Moynihan United Sates Court House
500 Pearl Street
New York, NY 10007

March 15, 2021

Dear Judge Koeltl,

I am a Rabbi in Mill Basin, serving the needs of my congregants and broader Jewish community for over 25 years.

I have been fortunate to be of service to many people in different circumstances. For example, as we are approaching the holiday of Passover there are extra expenses related to the festive meals and traditional food items. For some, it is a financial burden that stands in the way of celebrating. Every year we give out food boxes for the holiday; this year the demand is the highest that I can remember. We also have a special fund to assist financially destitute newlyweds in their wedding expenses.

Ever since I met Arik Lev in 2006 he has helped out with these charitable initiatives every step of the way. Arik is a community leader who doesn't just delegate to others in the hope it gets done; rather, he makes sure to see it through. His assistance wasn't just financial, it was his time and energy that spoke volumes.

Arik reminds me of the teaching from our sages when discussing the merits of giving charity. It explains that the highest form of giving is to give and enable (encourage) others to share in the good deed. Arik lives by that model in all of the community initiatives I have partnered with him.

*Get Ready For The Coming Of Moshiach*



# Chabad House of Canarsie

*Beit Mordechai*

ע״ש הרה״ח ר׳ מרדכי
בן ר׳ ישראל הלוי לוין

*917 E. 82nd Street • Brooklyn, New York 11236 • Telephone 718/209-0707*

**Executive Director**
Rabbi Yehuda Friedman

Arik and I have had long introspective conversations about his current ordeal and I have come to realize how much he's grown from the mistakes he made. He has told me how regretful he is for going ahead with his decisions that wound up with him in trouble with breaking the law. I firmly believe that he is remorseful and will never run afoul of the law again.

One of the concepts we spoke about was of repentance as it is taught in Judaism. As the Rambam/Maimonides writes in his work titled Laws of Repentance: "What is repentance? That the sinner abandons and strips himself of his sin and resolves in his heart never to do it again … and also that he be contrite over [what he has done in] the past … and he must confess in words, and declare verbally all that which he has resolved in his heart." This really resonated with Arik when reflecting on his actions.

Your Honor, Arik is remorseful for his decision to break the law and recognizes that he needs to make his amends. I ask that you please be compassionate in his sentencing, as he is a loving father and husband and a great asset to the community. Allowing him a non-custodial sentence will prove to be most appropriate, given his remorse and strong family and community ties.

Respectfully,

Rabbi Yehuda Friedman

*Get Ready For The Coming Of Moshiach*

# EXHIBIT 17

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, N.Y. 10007-1312


January 18, 2021

Dear Judge Koeltl,

My name is Mark Furman. I am writing a letter on behalf of Arik Lev, a man that I have known
for over 17 years and who holds a dear place in my heart. I am aware that he is being sentenced
with respect to a federal crime and am writing this letter on his behalf because I know that he is
worthy of my support despite this fact.

When I first moved to the United States, Arik served as a close personal friend and connection to
the Mill Basin community. Over the last two decades or so, Arik and I have grown incredibly
close, and he continues to serve as an effective point person in my support network. I turn to
Arik with questions about business, advice about my car, and reflective conversations on
becoming a better version of myself. He always listens intently, responds effectively, and guides
me on the right path.

One of the best decisions that I've ever made came about because of Arik. I had gone on a first
date with a girl and when I returned home, I spoke about the date with Arik. It had gone well, but
I was hesitant to move forward. Arik knew Shani already, spoke with me a bit more about her,
and convinced me to invite her out on a second date. Today, the two of us are happily married.
It's wonderful to think of how I have Arik to thank for my marriage.

Moreover, Arik has served and continues to serve as an incredible personal source of support to
me and our community. Arik generously provides for our community through the synagogue in
big and small ways, financially, emotionally, and socially. His presence lights up the room, and
the energy he carries always ensures exciting conversations, a few laughs, and a great time. Arik
provides critical amounts of support and assistance to countless members of our community.
The shul that he runs supports many unhoused neighbors and families that are struggling. I can't
imagine what we would all do without him being home and present; it would create a gaping
hole in the community fabric unfillable by others.

Our shared Israeli heritage and Jewish background binds us tightly; often, we speak exclusively
in Hebrew. In Hebrew, the word "Lev," Arik's last name, means heart. It's fitting that a man
with such a big heart is aptly labeled that way in his name as well.

A family man first and foremost, Arik is an incredible father and husband. His children and wife depend on him for financial and emotional stability and support, I urge Your Honor to demonstrate compassion when it comes to his sentencing.

Thank you for your time.

Yours Respectfully,

Mark Furman

# EXHIBIT 18

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, N.Y. 10007-1312


January 12, 2021


Dear Judge Koeltl:


Thank you for the opportunity to submit a letter on behalf of Arik Lev. I
have only amazing things to say about Arik. For all of the 15 years that I
have known him as my client, he has shown a tremendous amount of
respect and generosity towards me. Arik is constantly referring perspective
clients and honors his commitments and legal obligations when working
together. He is very straightforward and easy to engage in business with. I
have become friends with Arik throughout the past few years and can only
say good things about him. He is an admirable man who deeply cares
about his family and is constantly giving back to his community. All around
I am appreciative to have worked with this man. Please know that this is a
man that is kind, generous and deserving of the courts leniency.


Sincerely,

_0.C_
Osi Goodbeer (Jan 13, 2021 06:57 GMT+2)

Osnat Goodbeer

██████████████

# EXHIBIT 19

January 15, 2021


The Honorable John Koeltl
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007


Dear Judge Koeltl,

My name is Nathan Hanimov and my current occupation is e-commerce on eBay and Amazon.  I am single and 24 years old.

I know Arik Lev for about 7 years as we live in the same neighborhood and attend Synagogue together.

Arik is a genuine, warm hearted person who loves to give back to the community.  He is the president of our synagogue. I remember he came to my after school program to let us know he is opening a special prayer service at the house of worship for the younger guys and welcomed us to join. That's how I met Arik.  He wanted to make us feel comfortable so he came and personally invited us.

Arik also helps many families in the community in every way he can with tremendous sensitivity and care. He brings toys every Friday to the Synagogue for the little kids to play with and brings food for the congregants. He is always helping and being kind. Arik is always inviting me and other friends over for Shabbat dinner at his home and lets everyone know his door is always open.

When Arik asked if I can write a letter to the Court because he was being sentenced for a federal crime, I didn't hesitate to say yes because of all the good he does for the community and his family. It's the least I can do to show my gratitude to the person who helps out so much. Arik is truly loved in our community and is the backbone of the Synagogue.

Arik is also a husband and father to 5 very sweet kids who he raised with his wife to be very well behaved. In my honest opinion Arik is a good hearted person/father who always has good intentions and a heart of gold.


Respectfully,


Nathan Hanimov
███████

# EXHIBIT 20

The Honorable Judge John Koeltl

United States District Judge

Daniel Patrick Moynihan United States Courthouse

500 Pearl Street

New York, NY 10007


January 21, 2021

Dear Judge Koeltl,

My name is Pinchas Hatanian.  My wife and I met Arik Lev through the Synagogue three years ago, when we moved to Mill Basin. From the very beginning, Arik was always there with a smile, a kind word, and a pleasure to be around. Very quickly I realized how much Arik does for the community. Whether it is financial support or the willingness to lend a helping hand, you can always count on Arik.

Your Honor, I am writing this letter so you can better understand who Arik Lev is. He is a pillar of the community and a friend to everyone who meets him. He is kind, compassionate, generous, and a family man with deep-rooted values.

Arik and his wife Nadia have five beautiful children that rely on their parents for their love and support in every step of their lives. Their youngest ▮▮▮▮ is only six years old and looks up to his father for guidance in every aspect of life. Without his father around his world will likely fall apart. With COVID and all the emotional issues of the past year, being separated from their father and husband will devastate the family.

Please take this letter into consideration.


Respectfully,

Pinchas and Tehilla Hatanian

# EXHIBIT 21

January 27, 2021

The Honorable John Koeltl
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

Dear Judge Koeltl,

My name is Consuelo Hernandez.  I've resided in the Rockaway area of Queens for over
40 years. My ex-husband and I got married in 1986 and we opened C&L Tire Repair
Center Inc., and have served our community ever since. Our business consists of top of
the line tire repairs and wheel balance. Around the time I got divorced in 2006 I met Mr.
Arik Lev and provided service repairs for his vehicles. I left the business around 6 years
ago to take care of my mother, who is 90. I live with her and with my son.

I get very emotional when I think about the predicament that my friend Arik is facing.
He is an amazing person, with a wife and 5 children whom he takes such good care of.
He is the type of person that will give you the shirt off his back if he had to. He is a great
listener and so supportive, and a protector of his family and his employees.  I know he is
a wonderful, talented, and good-hearted man.

I pray that Your Honor hears my plea and gives Arik an opportunity to not face any
incarceration and that he be able to continue to do great things for his family and the
many other people who depend on him and his support. In my heart, I know he is a great
human being and no harm to society at all. He belongs with his family and community.
Arik can count on my prayers and support.  I hope Your Honor can see for yourself the
beauty in his heart and the great qualities he has.

Respectfully,

Consuelo Hernandez

# EXHIBIT 22



January 19, 2021

The Honorable John Koeltl
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

My name is Avigayel Klein. I am married, and am the stepmom of 2 boys, 26 and 21 years old, and am the mother of a 7-year-old boy as well. My husband and I are owners of Miami Mold Specialist, a mold inspection and remediation company based in South Florida. I am also previous owner of Five Boro Mold Specialist and Five Boro Mold Consulting, a mold inspection and remediation company and mold consulting company respectively, based in Brooklyn, NY.

While living in New York I belonged to the community Synagogue of Flatbush and currently I am a member of the South Beach Chabad Community Synagogue. My husband and I regularly make charitable donations for those in need requiring food and basic necessities in our local community.

Arik is a close family-friend who I have known for approximately 15 years. His house has always been open for those in need of shelter and he is constantly providing food for those in need. During Hurricane Sandy, he brought his wife and children from their Mill Basin home to stay by us in Marine Park, where it was less flooded. Once he settled his family in, he returned to Mill Basin on his own to lend a helping hand to those in need in whatever way he could, literally walking through flooded homes to rescue those whose entire lives were under water, ensuring they had a place to stay and a hot meal to eat. He personally went house to house to see who he could help without thinking about himself, putting his own life at risk, to be able to help others in need. He has always been the type of person that considers the well-being of others before thinking about himself.

Honorable Judge Koeltl, I am pleading with you to have mercy and compassion for Arik. His community is a better place because he is there. He has a family of 5 beautiful children and a loving wife that desperately need him to be by their side. Incarceration would leave a big hole in a community where his support and charity are so greatly depended on. He has always



NY: 1274872-1
**MIAMI MOLD SPECIALIST, LLC.**
11311 NW 7TH AVENUE, MIAMI, FL 33168
DADE: (305) 763-8070 / BROWARD: (786) 453-2148
TOLL FREE: 888-7FIXMOLD / MIAMIMOLDSPECIALISTS.COM

Scanned with CamScanner



demonstrated generosity, compassion and humility to all those around him. He is an incredible human being, with a noble heart. There are not many people of his kind left in this world.

Respectfully yours,

Avigayel Klein

**MIAMI MOLD SPECIALIST, LLC.**
11311 NW 7TH AVENUE, MIAMI, FL 33168
DADE: (305) 763-8070 / BROWARD: (786) 453-2148
TOLL FREE: 888-7FIXMOLD / MIAMIMOLDSPECIALISTS.COM

Scanned with CamScanner

# EXHIBIT 23

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, N.Y. 10007-1312

February 10, 2021

Dear Judge Koeltl,

I am writing this letter regarding my father Arik Lev.

My father is the most kind-hearted man there is. He is loving, nurturing, warm-hearted, caring and thoughtful. He's the type of man who puts others before himself to help in any way he can. He gives so much of his time and energy to our community and is known by everyone as always being there to help.

Aside from always helping others, he has been a wonderful father to me and my siblings. The relationship I have built with my father over the 18 years of my life is something so special and I am so thankful to have. Anytime something would go on in my life the one person I would turn to is my father. I would sit with my dad for hours and he would always give me the best advice. I truly can't imagine how I would live without my father by my side, he has always been there for me and I rely on his guidance daily. Where I am today is because of my father. Anytime I needed him he would drop everything and be there for me no matter the situation or how busy he was.

At this point in my life with everything going on with my father it's been really tough emotionally. All I want to do is hug my father so tightly and tell him everything will be ok, just like he did for me. My father means everything to me in this world, the love I have for him is endless.

My father was always responsible for showing the proper way of living to his children. He provides guidance to us and maintains the harmony among my family members. As a father, he motivates us to have the proper education and live as responsible and caring individuals. Every time he would drop me off at school and let go of my hand I would eagerly anticipate for school to be over so I could hold that hand again.

My father is not only the best dad but my best friend too. From his never ending jokes to motivating us in every walk of life, be it education, extracurricular activities or relationships at different stages of my life, I have come to truly realize the true depth and breadth of my father's presence throughout my life.

I am so blessed to have this man in my life!  I'm super proud to be his daughter and will always be.  No words written on paper can accurately express the love I feel for my father. I mean this with my whole heart and have so many tears in my eyes writing this. Please allow my father to stay with us, he's the glue that keeps our family together and the only happiness I have in my life. I don't know what I would do without him home.

Thank you for reading my letter and for taking my words into consideration when making your decision.


Respectfully,


Emily Lev

# EXHIBIT 24

Dear Judge Koeltl,

Hello my name is ███ ██. I'm a 11 year old girl whos in 6th grade. I'm the daughter of Arik Levi. I'm aware that my dad has a count in april, and I am so afraid, having nightmares of my father might be going to jail. I cant live without my dad. He's a very good person with a big heart. Everytime something was wrong, he would fix it right away. If something was ever wrong in school, like my seat was bad, or someone was being mean to me he would always fix it for me the same day. He always puts people before himself. He works all day and night just to support my mom, siblings, and me. Sometimes I dont even get to see him all day and night because he leaves to his work when I'm in school and by the time he comes back I'm already sleeping. So please Judge I really want my father to be with us. Sincerely

# EXHIBIT 25

The Honorable John Koeltl
United States District Judge
Daniel Patrick Moynihan United Sates Court House
500 Pearl Street
New York, NY 10007

March 11, 2021

Dear Judge Koeltl,


My name is Limor Lev, sister of Arik Lev. I am a mother of three children and
reside in Yahud, Israel. My oldest brother fittingly personifies his last name Lev
(heart in Hebrew). Arik truly is a man with a heart of gold, full of friends and
family surrounding him and loving him because of his good heart. He is merciful,
always willing to be helpful in times of need, with a huge giving hand even when
he does not have for himself. Arik is blessed with leadership qualities, kindness,
and giving.

When our mother Tikvah (may her memory be a blessing) had cancer, he turned
over worlds to help her live. He was prepared to give up everything just so our
mother can live, even if it was just to prolong her life a little bit. It was with
great sadness that our mother died at the age of 49 and my youngest and only
sister was without a mother at the young age of 13.

Arik was an absolute savior for my brother Abraham, who was critically injured in
a motorcycle accident a few years ago. His life was hanging in the balance
between life and death at the age of 42 with a wife and three children depending
on him. Arik dropped everything and came straight to Israel from his home in
New York to take care of him. Abraham was in the intensive care unit for 15
days yet Arik didn't leave his side, day or night. Arik made sure our sister in-law
Pnina and the kids had everything they needed emotionally and financially, he
also went to many rabbis to ask for prayers. Above all it was Arik's medical
advocacy that made the biggest difference in Abraham's outcome. He was
relentless in making sure that the best doctors were consulted. Thanks to the
tremendous medical care Abraham received from the persistence of Arik being
there by his side, Abraham lives today.

Your Honor, I ask you on behalf of all of the good that my brother represents,
please show my brother compassion. My family are believers in God. I pray that
you are able to see Arik as a person who – while he has made a poor decision
which has gotten him to this place – is deserving of another chance. I pray that
he be able to have a non-custodial sentence so that he can be there for his wife

Nadia and their five children. I know that doing so will also bring about so much good to his community that he cares for so deeply.

Respectfully,

Limor Lev

# EXHIBIT 26

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, N.Y. 10007-1312

April 22, 2021

Dear Judge Koeltl,

My name is Moshe Lev and I reside in Israel. I am the father of Arik Lev who is my firstborn son. I am a retired major crime investigator for the police department in Tel Aviv, Israel, having worked there for over 15 years. Arik was raised in a very loving home with great values of giving, ethics, and helping people in need. Even as a young child Arik always jumped in first to help out and he has always made me so proud.

When my wife (Arik's mother) passed away from cancer in 2000, Arik took it very hard and was broken. What especially pained him was that he wasn't able to be with his mother in her last days because of a visa issue. His mother didn't allow him to come because she did not want to create a problem for him.  Arik's wife and twin daughters went to be with his mother instead. Despite this, he was able to stay strong and went on to raise 5 beautiful children. He is a family man who is completely dedicated to his children's education and wellbeing. I am so proud of Arik,  especially seeing how together with all of the family responsibilities, he has been extremely active in his community. He dedicated a synagogue in memory of his mother, which is also a center that helps with food distribution and other economic assistance for the needy.

Besides always being there for his siblings - especially when my other son got into an accident and he was there for him and his family - Arik has always been there for everyone. One instance I recall was when an older person became ill, Arik did everything for him until his passing.  That's his nature, always looking for ways to help others.

I am an older man and unfortunately have suffered from a number of illnesses and surgeries including ███████████████████. I have a very strict regimen of medications I must take daily. To my great joy I have Arik who cares so much for me, he calls me every day and ensures I have and take my medications. I do not go to sleep until I get his call every evening. He is very much the person that keeps me going.

Due to my health condition I am unable to travel from Israel to America. I am very distraught of the mere thought of not being able have Arik come visit me in Israel if he were to be incarcerated.

Many community members and rabbi's contact me, blessing me for the merit of having a son like Arik who does so much for everyone and me, with a pure heart and soul. I know

that he is a good person with so many qualities with a loving family and community that will be a great asset for him to make a positive impact on society.

Thank you Your Honor for reading my letter about my son and please have compassion for my sake, his sake and for the sake of the entire family.

Respectfully,

Moshe Lev

# EXHIBIT 27

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, N.Y. 10007-1312

January 27, 2021

Dear Judge Koeltl,

My name is Nadia Lev. I am the wife of Arik Lev and the mother of our five children. I was born in Aleppo, Syria in 1972, the youngest child of eight. My parents were poor yet always provided a happy and healthy environment for all of us.

Your Honor, allow me please to give some background so you can better understand what I went through growing up in Syria. Ever since Syria had gained independence in 1946, the new government intensified its persecution of the Jewish population. The government severely restricted the teaching of Hebrew in Jewish schools, while attacks and boycotts of Jewish businesses became the norm. Our freedom of movement was severely restricted. Jews who attempted to flee faced either the death penalty or at best imprisonment of hard labor. For years, we lived in extreme fear. The Jewish Quarter was under constant surveillance by the secret police, who were present at synagogue services, weddings, bar mitzvahs and other Jewish gatherings. We were continuously subjected to persecution and violence, which took a toll on me mentally and emotionally. One instance that I will never forget was watching my father almost beaten to death as punishment for my siblings escaping Syria to save their lives. I was all of five years old at the time. The reason this moment stands out more than the rest is because due to this traumatic event my mother suffered a stroke and became paralyzed up until the last day of her life.

In 1989, through tremendous self-sacrifice and determination my parents secured a visa for me to find refuge in the United States. I was 17 with my two suitcases and not a penny to my name. Luckily my older sister had already settled in New York and was most instrumental in acclimating me to my new "home". I was happy because I finally felt freedom yet sad to have left my parents behind in a hostile, inhospitable country. In 1991, my parents were finally able to make their way to the United States, a family reunited at last.

In 1998 I met Arik and there was something different about this man. As a young five year old girl who witnessed the vicious attack of my father and the subsequent stroke which paralyzed my mother, I was robbed from feeling her love, affection, guidance, hugs and kisses. I had to raise myself while simultaneously taking care of my mother at such a young age, until I left them at 17 to fend for themselves. I was a lost young girl who didn't understand the meaning of self-love. Well that all changed when I met Arik. He taught me how to love myself by showing me what true love really is. Arik also

demonstrated an amazing capacity of being a help to anyone in need no matter what race, color, ethnicity, or religion. We got married the year we met and soon after welcomed our adorable twin girls Tiffany and Sharon.

In July of 2000 Arik lost his mother after a battle with breast cancer. She was 49 years old. Arik was utterly distraught. Due to his green card status, he was unable to say his goodbyes or even attend his mother's funeral in Israel. This ate him up inside. It was one of my toughest moments, watching my husband go through such pain and not knowing how to help him. It was very difficult for us to overcome this great loss and challenge but through our strong bond with each other and trust in God we persevered. Soon afterwards we welcomed our third daughter Emily Tikva, named after Arik's mother.

One of many accomplishments I would like to mention is how Arik put together a fundraising campaign in our community. He got many people to contribute and establish the synagogue which was named in honor of Arik's mother, Sh'aare Tikvah. He has used this platform to positively impact younger men and woman who need guidance physically and spiritually.

I will never forget the time Arik didn't leave my side when my father was diagnosed with lung cancer. I quickly became my father's care taker, bringing him to all his chemotherapy appointments for a period of two years. At that time, our youngest child ▮▮▮▮ was 1 years old. Arik became mommy and daddy as I had to attend to my father's needs. I was blown away how well he dealt with this situation and took care of my 3 teenage daughters and our 2 younger children who were under 6. These two years were so painful. Going to my father's chemotherapy appointments, surgeries and hospital visits just killed me slowly. Watching my dad laying there dying was the hardest experience in my life and I was not available physically and emotionally for my family. I don't know what I would do have done if Arik wasn't taking care of all the family's needs, financially, emotionally and physically being there for us through it all.

Upon my father's death in 2017 I was destroyed. It was my first time losing a parent. I was completely numb, while Arik planned all the funeral arrangements by himself. My family and I were in awe of the way he handled everything; his generosity, compassion and kindness. These are his true qualities that are embedded in him.

Arik understands his mistakes and takes full responsibility for his actions. Arik isn't a risk to himself or others. He is a major asset to our community. I am fully aware that Arik is being sentenced with respect to a federal crime. I am writing this letter and pleading before you for my husband Arik Lev. I believe Arik has changed and will never make this mistake again. I definitely see a black cloud over our family. I can see fear in his eyes as he looks upon our children, overwhelmed by the unbearable nightmare that he may not be able to be with them every moment. I'm not making any excuses for what he has done. I am only asking you to look upon him as a man with a wife and five kids, and believe that he can right the wrong that he has done without being separated from us. I am asking Your Honor for a compassionate sentence for the sake of my children's well-being.

2

Times are already very difficult due to the global pandemic, In March my mother sadly passed away from Covid-19. The added stress caused by his case has been devastating to my family. Due to the pandemic, I have been unemployed since last March and Arik has become the sole provider for our household. If Arik would not be with us, it will affect all of our lives, especially my five children who are very attached to their father. He is their greatest supporter and comforter, from the oldest to youngest. My only son ███ is especially attached to his dad. Arik spends the most time with him, taking him to school every morning, playing soccer and attending synagogue on a weekly basis. This case has put a strain on everyone in my family especially my 11 year old daughter ██, who is aware and understands some of what is going on. She has become emotionally broken, even refusing to leave her room to see her friends. I'm truly afraid for her emotional state of mind. My heart breaks for my children and Arik.

Please take my situation into consideration at sentencing. My children need their father and I need him too. Arik is a green card holder and any jail time will cause deportation issues. My children are born and raised in New York and I can't fathom the thought of taking them away from the one place they know -- "The land of the free" -- to a different country. Arik as well has suffered from a severe terrorist attack in Israel. He was attacked and stabbed in the back at the age of seventeen by Arab terrorists. It is the reason he left Israel and eventually made his way to the United States in 1996. This episode traumatized him deeply. While I pray every day that there should be peace in Israel, there are huge conflicts in Israel that result in constant terrorist attacks, and overall tension amongst civilians. I cannot imagine how our family could adapt to this kind of atmosphere -- especially our children, who have never been exposed to anything like this in their entire lives. It is crucial for my children to stay here, where they were born and raised, and not be separated from their father.

I am asking you Your Honor to consider all of the factors I presented when making your decision of what Arik's sentence should be. I fully understand that a sentence is in order but if possible please consider putting Arik on probation and allowing him to stay at home with his family that needs him. I appreciate your fairness throughout this difficult time in our life and I would like to thank you for this opportunity to express my feelings regarding my husband.


Respectfully,


Nadia Lev

3

# EXHIBIT 28

The Honorable John Koeltl
United States District Judge
Daniel Patrick Moynihan United Sates Court House
500 Pearl Street
New York, NY 10007

March 17, 2021

Dear Judge Koeltl,

My name is Penina Lev I am the sister in-law of Arik Lev and I live Jerusalem, Israel. On April 30, 2018, my husband Abraham and our nine year old daughter ███████ were seriously injured in a motorcycle accident. While ███████ required surgery on her teeth from the impact, my husband's injuries were far more significant and particularly critical. As he lay there sedated in the ICU, with numerous tubes and machines connected to his body to keep him alive, the doctor's prognosis was very grim. I was in shock with a feeling of helplessness and despair. My mental state at that moment was fogged and dark especially as I grappled with the reality of my husband's condition and what I saw as the inevitable outcome.

Our financial position at the time was not very good to begin with, I couldn't fathom how I would be able to take on the financial responsibility all alone. Who would provide for my three kids? Where would I have money for rent, food, utilities? My mind was racing and my heart aching seeing my husband in that condition.

Within 24 hours things took a drastic turn for the better thanks to one person, Arik Lev, Abraham's older (and only) brother. Arik arrived from New York without anyone requesting or suggesting he could be of help. Without fanfare but with tremendous fortitude he came to Abraham's bedside and fought for his life. He did so primarily by getting the best doctors to review Abraham's condition and find the best treatment. Arik was literally a godsend for Abraham and me. Having Arik there fighting for my husband shook me out of my despair and I was able to regain a sense of composure.

Two weeks or so passed with Abraham in the ICU until he woke up. What a joy and amazement! Following that he required a long

rehabilitation. Throughout, Arik was there for us by making sure the kids were provided for and cheering them up from this horrible hell of their father being in such bad health.

If it weren't for Arik's presence, concern, care and critical assistance I would not have been able to cope with the crushing stress and responsibility.

Today we are back to living well, back on our own two feet thanks to the generous and kind-hearted Arik. He took care of our family and made sure we came back to life. I plead with Your Honor to show compassion for my brother-in-law Arik. He is truly a man of tremendous generosity that has and will do so much for others.

Respectfully,

Penina Lev

# EXHIBIT 29

February 17, 2021

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, N.Y. 10007-1312


Dear Judge Koeltl,

My name is Sharon, I am 21 years old and one of 5 kids. I am writing to you about my father Arik Lev.

My parents both moved to America for a better life. In the beginning we didn't have much but my father never let me feel like I was missing anything.  Ever since I was a little girl my dad made me feel special.  Everything I am today is because of how my dad raised us. We were taught to do good deeds, help anyone in need, and give part of our earnings to charity.

People who know my dad, know that he is constantly opening our home to others with warm arms. Growing up every Friday night we had Shabbat dinner and he would invite people he didn't even know from the synagogue, strangers on the street who didn't have money for food or for a place to stay. He's the type of person to give you his own bed and sleep on the couch.

In 2019 I lived in Israel for a year. Soon after I broke up with my boyfriend and was going through a very rough time. I suffered from depression and anxiety. No one in my family knew about this except for my dad because I am really close with him and spoke to him every day. I travelled to Bosnia with friends in the hopes of finding some solace from my ongoing misery.  While there, my health deteriorated and I wound up in the hospital due to severe dehydration. I can't adequately describe the feeling of waking up in a Bosnian hospital to see my father by my side. He came on a 10 hour flight, left his work and everything he had going on just to make sure I was ok, to be there for me. My health rapidly improved and we travelled to Europe for a few weeks, it was all about bonding and having long talks. That act of being there for me when I so very much needed him was so precious that it was the catalyst of bringing me out of my depression. I sought professional help when I was back home and I am doing much better now.

When we landed in New York, that's when they had an arrest warrant for my dad and I felt a stabbing in my heart. The primary thing in life that makes me feel alive is my dad. Without him I am nothing and I probably wouldn't be alive today. There is no one I love more than my dad in this world. He is a good man with a good heart.

My dad always encouraged us to study, to learn, and to do well in school, and taught us that knowledge is key. I was in college in Israel and now work in residential real estate in Brooklyn and Manhattan. Everything I accomplished at such a young age is because of my dad's influence. I just want you to know, Your Honor, that my dad is a kind and good person.

Please Your Honor, I am asking for mercy on my dad's behalf. I am thinking of my younger siblings, I don't want them to be without a father figure and I am scared for my mom. I know that if he were to go away everything in my family will fall apart. If I could be punished instead of my dad just to save my family, I would.

Respectfully,

Sharon Lev

# EXHIBIT 30

January 26, 2021


The Honorable John Koeltl
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007


Dear Judge Koeltl,

My name is Tiffany Lev.  I am 21 years old and the oldest daughter of Arik Lev. I am one of five children, me being the oldest and the youngest being six years old.

My father has always encouraged me and my siblings to do our best and help others in any way we can. During my free time I like to volunteer in the local synagogue, by shopping and preparing meals for the needy and tutoring younger kids with their schoolwork. Many times I'd go babysit for a single mother who desperately needed help with her children, or babysit for free in order for them to run their errands. Volunteer work and helping others has been a very important part of my life growing up. This is the most fulfilling part of my day, helping others, and it is something my father taught me by example and instilled in me.

My father is known to be one of the most generous people in this neighborhood and in the Jewish community. Countless times he would sacrifice his personal time to ensure the comfort of others. Growing up my father would go out of his way to make sure all of his friends and family were okay, in terms of finances, food and other situations that might arise. He is the man that countless people turned to when they need guidance and help. He has kept the doors of our house open for anyone, and when we would have guests over he would put them before himself and give them a place to sleep, or clothing, or whatever else they needed to feel comfortable. My father has taught me and my family so much about giving. He always says "the more you give the more you get", especially in terms of happiness and fulfillment.

I work my hardest to live up to be the person he is; caring, generous, thoughtful and compassionate. Whenever anyone asks for anything he gives it to them. Not many people I know do that. He is the rock of my family and helps countless people put food on their tables. Without my father to help these families, their families too would fall apart. Growing up I've seen many strangers in my house that would come speak to my dad, resulting in my dad always helping them. I have never met a bigger giver than my father.

If my father were to be separated from us, my family would fall apart, we would not have any support system. It's me, my mom, my twin sister Sharon and 3 younger siblings, and we all need a father figure in order to grow up to be healthy, happy and productive adults. I cannot imagine my life without my father by my side. Judge Koeltl, I beg you with my whole heart to please be compassionate and open your heart to my father, as he has opened his heart to strangers.

Respectfully yours,

Tiffany Lev

# EXHIBIT 31

January 13, 2021

The Honorable John Koeltl
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

Dear Judge Koeltl,

My name is Michael Levy, a married, working professional residing in the same
community as my dear friend, Arik Lev. My wife and I are orthodox Jews, who regularly
attend services at Shaare Tikvah (Synagogue in Mill Basin) and devote much of our time to
community related events, outreach, and education. My wife and I met at a crossroads in our
lives, at a time of struggle and lack of guidance. We were ultimately introduced through
association with those at Shaare Tikvah, the very synagogue Arik Lev so humbly founded
many years ago. My relationship with Arik is one of friendship, guidance and good tidings;
and I have grown as a person professionally, spiritually and emotionally over the four years
of my knowing him. I am aware that Arik Lev is being sentenced with respect to a federal
crime, and despite this fact I am writing this letter on his behalf because he is truly a man
worthy of my support.

I would like to describe my personal relationship with Arik; however, in order to
effectively communicate the influence he has had on my life and family's life, I need to
establish a background. I came from a predominantly secular family, with little to no
tradition or import given to the family unit. There came a point in my life where the paths to
a future I thought I wanted to pursue seemed to get bleaker. Along a parallel timeline, Arik
established a new religious center, Shaare Tikvah, in the heart of the religious center of Mill
Basin. Fate would have it that I had come to meet an individual who had just begun to
frequent Arik's synagogue and invited me to join for a lecture, and a session of deep
meditation and introspection. I will never forget how I, a man who had little to no beliefs,
was greeted. Arik ran to grab me a seat amongst the warm, welcoming crowd and without
hesitation offered me food, drink and a warm smile. He is a man who, through no one's
inconvenience other than his own, went out of his way to treat every person who walked
through the door as someone who deserved to feel special, wanted and above all, important.
It was this very welcoming nature that had me coming back.

Weeks turned into months, and months turned into years. Arik would often invite
me for Sabbath meals, Friday night and Saturday day, which only contributed to the laying of
a stronger groundwork for my own path to religiosity, and I adopted attributes I wanted to
emulate with respect to his welcoming others and seeing the potential in everyone. It was
through this breakthrough in character and guidance by my new friend that led me to meet
my (now) wife via association with the very man who first welcomed me into Arik's
synagogue. The snowball effect of good fortune, mixed with a healthy adaption of positivity
that radiated from Arik's interaction with community members, led me to not only finding
my soulmate, but turning me into a community leader.

Arik has worked tirelessly and endlessly to expand the religious center throughout the community, and show people, regardless of how connected or disconnected to the faith, that everyone has a seat in God's home. From coordinating holiday dinners and weekly Sabbath children's programs, Arik, whether directly or indirectly, has made people, couples and families smile and grow through the power of love, attention and positivity.  I have personally seen Arik's emotional, physical and financial commitment to the synagogue; and all the while I have seen him always put his best foot forward in order to make another person feel good. I remember hearing how Arik would take from his own personal funds and deny himself a night's dinner, so that the synagogue could thrive another day with the proper utilities, stock and resources needed to grow.

As a result of his initial idea to begin a religious institution in a community that so desperately needed it, Arik has successfully, albeit indirectly, raised families through thick times, brought people together from opposite sides of the ideological spectrum, and shown those in the community what a real institution of giving can do to empower positive change. I have learned that as powerful as a synagogue is to inform change on a people and community, the true fire and spark that drives this effort is perhaps as crucial if not more – and that's Arik. Arik is everything that the synagogue represents, and his hospitality, kindness and passion is the very reason the walls of his synagogue stand strong. Arik is a family and community-oriented man, who undoubtedly provides irreplaceable support to his family, community and loved ones. I am respectfully pleading for compassion for my dear friend Arik, and for him to be seen as a man that represents the sum total of his positive actions, and not just a stain as a result of a negative action.  Thank you.

Respectfully yours,

Michael Levy

# EXHIBIT 32

Vlad Meir



The Honorable John G. Koeltl
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, N.Y. 10007-1312

January 12, 2021

Dear Judge Koeltl:

It's an honor to write this letter in favor of Mr. Arik Lev. Arik Lev had many positive impacts on my life and my parents along with my four children. He had invited me numerous times to the synagogue which I had never attended on our Holy and sacred Sabbath day. He simply would not take no for an answer. One day he finally convinced me to go to Synagogue and explained the reason why we should observe the Sabbath. That Friday night he invited my whole family to go to his house for dinner and showed me how important it is to spend this day with prayers and our loved ones. From that moment I had made a life changing decision to stop working on the Sabbath and observe it with my family and friend, Arik. We started going to the synagogue every Sabbath along with my children and my parents.

Everything has changed for me since then. My whole life has taken a positive route and I have followed a positive way of living. Six years later, I have become closer to God and have a different perspective on life. I look up to him. Arik has inspired me to try inviting as many people to the Synagogue so we can invite them to take part in our Jewish religion and heritage. Arik also took me along to a very special place for the first time, Jerusalem Israel. It is somewhere I always dreamed of going but didn't know who to go with and to really learn the history.

He took me there and taught me as much as he could about all of Jerusalem with an open hand and kind heart.

He has become a very close friend and I look forward to seeing him every Sabbath in the synagogue. The days that I don't see him I miss him and wonder where he could be and hope he is in a good place. As the founder of our amazing synagogue he brings tremendous impact to the synagogue and our community whole heartedly.

Thank you for your valuable time in reading my letter – I trust it sheds some light on how special Arik is. Please consider this when fulfilling your important duty of judging Arik.


With respect,


Vlad Meir

# EXHIBIT 33

**Mr. Damon A. Minus**



The Honorable John Koeltl
United States District Judge
Daniel Patrick Moynihan United States Courthouse

500 Pearl Street
New York, New York 10007

---

To Honorable Judge Koeltl,

Please accept this letter as my attestation of the good character and kind heart of Mr. Arik Lev. I, Damon Minus, am a married father of two children, ages 19 (daughter) and 27 (son). I work in the banking industry, commercial banking management and middle market banking, for over 23 years. In addition, I am a college assistant ay the CUNY School of Professional Studies and a member of Mt. Sinai United Christian Church, where I am the head of the security ministry, head of the financial empowerment ministry, and an active board member.

I have known Arik for about thirteen years. I met Arik in 2007 while working at HSBC Bank in Brooklyn NY. I managed his business banking and personal accounts which he maintained in a satisfactory manner. Over that time period we developed a friendship. I left HSBC Bank in 2011 but we maintained our friendship. Over the years I have developed a relationship with Arik, his wife Nadia and their five children. I had the pleasure of attending the bat mitzvah of the twins, Sharon and Tiffany, who have grown into two intelligent, successful and productive women that were guided by their parents Arik and Nadia. I have always admired Arik's love and dedication to his wife and children.

I was made aware of the federal charge against Arik. When I found out I was in disbelief. I could not believe that Arik was capable of what he is accused. Arik is one of the most kindhearted and generous people I know. I have witnessed Arik providing employment opportunities to young people, especially minorities who needed a job and an opportunity to provide for their families. I have witnessed him being a support system to employees who made

---

mistakes or who were in need of shelter and Arik provided money and/or a place to stay. Personally, I have been the beneficiary of his kindness, where he has donated his time, money or merchandise to me personally for causes that were dear to my heart. He has contributed greatly to my family during important events like weddings and birthdays. He has always been of good character and a man of faith.

His passion and dedication to his faith led him to start and fund the Sephardic Center of Mill Basin, for which I opened the banking accounts. He gave his time and tithings to ensure its success. As a fellow man of faith, I believe no man is perfect. I truly believe that Arik deserves the mercy and compassion of the Court. During this ordeal, I have witnessed Arik rely on his belief in God to guide him and his actions. Now more than ever, his focus in life is on being a better role model and caregiver for his wife and his children.

Any sentence would create a tremendous hardship for his wife, his five children, his other family members who he cares for financially, his employees who depend on him to feed their families, and his synagogue where he serves as a leader and mentor to many. I don't profess to know all the particulars of the case, but I do know Arik to be a good, kind man who is a benefit to his family, friends and community.

Respectfully,

Damon A. Minus

# EXHIBIT 34

January 14, 2021

The Honorable Judge John Koeltl

United States District Judge

Daniel Patrick Moynihan United States Courthouse

500 Pearl Street

New York, NY 10007

Your Honor,

My name is Miriam Moas, and my husband is Chaim Moas. My husband and I know Arik Lev for over 20 years. He is a most loyal friend, sensitive to others, and is always looking to help within our community and to many other causes. He is a man of integrity who is selfless and has a heart of gold.

His home has always been a warm and welcoming place.  Everyone knows that if you need a place to eat or sleep, "Just Knock on the Lev door". You are always welcomed with laughter and joy and treated with dignity. The light in their home is always bright and radiates into the soul.

Your Honor, this letter is written with deep heartfelt compassion for our beautiful and outstanding members of the community:  Arik, his amazing wife Nadia, and his five beautiful children Tiffany (21), Sharon (21), Emily (18), ███ (11), and ███ (6), who without their kindness, love, and overwhelming charitable generosity this community would not be the thriving community that it is.

Arik and his family are some of the most valuable members of our community. He is committed to our house of worship and his desire to help is continuous. He is loved by everyone. Arik is a loving husband and father -- a solid pillar to his family who are inseparable and vulnerable.  Any separation of Arik from his family will be detrimental to the well being of his wife and five children.

Thank you in advance for taking the time to consider our letter.

Respectfully,

Chaim and Miriam Moas

# EXHIBIT 35

Feb. 17, 2021

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Dear Judge Koeltl,

My name is Sharone Naim, and I can proudly say that Mr. Arik Lev is a dear friend to
me, is like a brother, and he is a man that I can rely on for any issue at any time of the day. Your
Honor, you see Arik is all heart, just like his last name ("lev") which means heart in Hebrew.
He is a man of the people and a man of the community.

I first met Arik fifteen years ago in our place of worship. Besides our holy Rabbi, he was
the first person to come over, shake my hand, gave me a welcoming smile, and said "welcome
home". Arik literally saved me when I was in financial need. Unfortunately life is like a roller
coaster. One day you are up and the next you are down. I owe him my gratitude for being there
to help me get on my feet. He is a humble man and no one but me knows of his hidden kindness.

Arik and I became very close over the years. We went on to build our house of worship
together. The building was in dire need of repair. Floors needed to be done, painting, and
plumbing all needed to be done to make the place habitable for patrons to pray. When you want
something miraculously done overnight, who do you call? Arik Lev. We built our house of
worship literally in three days. Arik didn't stop, didn't sleep, until we were ready to open the
doors just in time for the holiday.

It is difficult for Arik to see people in need. He donates (with the help of his only son)
food and toys to desperate families every Friday before the Sabbath. He is full of heart, kindness
and compassion. In a room full of people Arik is the first one to say "I will". He is a very hard
worker who employs many. What would be of those families if he should be incarcerated? What
would be of his wife and five children without him? Our world has changed due to the
devastation of COVID-19, with so much uncertainty, fear of unemployment, and depression has
become the new normal. With all this unrest and uncertainty, one thing remains constant: My
friendship with Arik, his humble dedication to those who have less, and his love for his family.

I beg Your Honor to look deeper into the spirit and essence of the man, and not only the
poor judgment he used in his business dealings. Our Torah says, to always try and look to find

good points in your fellow man.  Your Honor, please have mercy and compassion for my dear friend Arik.   Judge him favorably.  Give him a chance, give his family a chance, give the people he employs a chance.

I pray to the one above us all to guide Your Honor with wisdom and courage to find favor for Arik.

Respectfully,

Sharone Naim

# EXHIBIT 36

January 28, 2021


The Honorable John G. Koeltl
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, N.Y. 10007-1312


Dear Judge Koeltl,

My name is Dan Neuman.  I was introduced to Arik 12 years ago through my wife
Limor, who has known him a bit longer. I am a partner in NY Glazing Group,
a glass company in New York. The first time I met Arik, he was in the middle of
building the Shaare Tikva synagogue in our neighborhood with the goal of it
being open to everyone without high dues and membership fees. That is the type
of person Arik is, always looking to help those in need. As the years went by I've
become closer and closer with him and realized he has the kindest heart and
best of intentions. I've witnessed him and his wife constantly opening their home
for people to have Shabbat dinners and lunches.

As the years went by I never had any bad experiences with him, business or
personal. He was always a straight shooter and honest.  I have never seen any
bad side to him that would land him in any form of trouble.  He always has wide
open arms to help and welcome people in need.

I've also come to know that he is one of the most amazing fathers to his 5
beautiful children. He is there for them night and day no matter what he is doing.
And they depend on him very much.

Arik is a model neighbor, a model community participant, a model friend, a model
father and a model husband.

I don't know the specifics of what he pled guilty to, but I am wholeheartedly appealing to Your Honor to have compassion in his case because I know Arik to be a good person that will learn from his actions.

Respectfully,

Dan Neuman

# EXHIBIT 37

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, N.Y. 10007-1312

January 18, 2021

Dear Judge Koeltl,

My name is Limor Neuman. I am married to Dan Neuman and I am a housewife
with five beautiful children.

Arik Lev is a great friend of our family and someone that did so much for our
community. My daughter Eve and his daughter Emily grew up together and are
as close as sisters.

I can't fathom the hardship it would cause Arik's family to have their father away
from home. They are all such a beautiful family with so much that they have given
the world. Always helping, always nurturing, they treated my daughter as their
own.

Arik opened a Temple in our community. It brought families together. Arik is also
a wonderful father. He cares and worries so much for all of his children. He is a
man of good will and honor, looked up to by so many.

Please consider Arik's many wonderful qualities when sentencing him for his
wrongdoing and mistakes he has made. Please don't take him away from his
loving wife and children.

Respectfully,

Limor Neuman

# EXHIBIT 38

Haim Noah,



The Honorable John Koeltl
United States District Judge
Daniel Patrick Moynihan United States Courthouse 500 Pearl Street
New York, New York 10007

Dear Judge Koeltl,

Please excuse my English as it is not my first language.
I have the privilege of knowing Arik lev for the past 20 years. He is my best friend
and I can even consider him as my brother and an uncle to my kids.

I am a single dad of 2 kid 5 year old and 12 year old daughter I am a party planner
and I work at 26 florist Inc. located in Brooklyn NY, It is with great pleasure for
me to write him a letter of reference on his behalf. I am fully aware of what Arik is
being sentenced with fully respect federal crime and I am writing on his behalf
because I know he is worthy of my support despite the fact of what he is being
sentenced for and I will explain why.

During my time knowing Arik he has been with me throughout my struggles and
he was the only friend i had when the mother of my children was not around he
supported me and helped me build myself to where I am today .

He would fill up food in my refrigerator so my kids would have breakfast in the
morning and dinner at night. He showed me generosity time and love for my kids.
For me that's all you can have in a person that has a good heart and does good
deeds. My kids attend his organization at "SHAHRAH TIKVAH " they feel
welcomed, loved and no different  than other normal kids thanks to Arik and his
family .

He went out of his way to care for me in the hospital and made sure I was well treated and made sure I drank and ate. His wife made sure my kids were well taken care of, got them dressed for school and fed them!.

I've seen this long and struggling time for Arik has impacted on his life and family with sadness and grief and feeling of regret - I am confident that he will come out of this learning a real experience of changing anything that he needs to do better. It has been my honor to be part of the Lev family. I am asking you honorable judge to have mercy on Arik and especially his wife and young children. I know that they are in extreme hardship without him present.

Thank You,

Haim Noah

# EXHIBIT 39

The Honorable John Koeltl
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

January 19, 2021

Dear Judge Koeltl,

My name is Merav Noah. I live in the Mill Basin neighborhood and have been a part of the community for several years now. My husband and I are small business owners and have 4 children ranging in age from 17 to 24. Over the years my family has grown more involved in the community and has gotten to know many of the families very well due to similar ties in religion and backgrounds.

One of the families we've gotten to know very well over the years is the Lev family. Not only do we attend the same synagogue as the Lev family but our kids have gotten to know each other as they once attended the same school together. Arik and his wife Nadia have been friends of ours for many years and we've only had positive encounters with them.

Arik is a predominant member of the Mill Basin community as he is befriended by a majority of the Israeli and Jewish families that live nearby. On countless occasions, Arik has made himself available to help many members of the community and has been known to always help others in their time of need. Around 5 years ago the Rabbi of the synagogue our families both attended decided to move to Israel, leaving many of the congregation members concerned about the future leadership. Arik recognized this and decided to take the initiative in opening up a new synagogue where the members would feel more welcome and comfortable. Although it was a slow start Arik managed to amass a large group of dedicated members to the new congregation. One of the greatest things that emerged from the opening of the new synagogue was the efforts put in to attract a younger group of members. One of the biggest challenges the Jewish community in our neighborhood faced was being able to keep the younger generation involved with religion.  This has since changed with the opening of Arik's synagogue.

My son Eric, is one of the dedicated members of the congregation and has felt more welcomed and involved in the community than ever before.  Arik's

actions and the initiative has single-handedly influenced the lives of many young individuals who would have led very different lives if not introduced to the Share Tikva synagogue.

Arik's selflessness and kindness are transparent through his various acts of generosity and has helped our community grow for the better. Arik has always been happy to help at any time, whether it was by making himself available to offer advice or helping our family get settled into our new home.

Not only has Arik demonstrated his character as a leader of the community, but he has also excelled in the role of being a positive influence as a father. Any person who would get the chance to be around Arik and his family would be able to recognize the admiration and respect he has for his wife and children, and they for him. From oldest to youngest Arik has worked hard to grow relationships with his children as both a friend and father.

Arik has led his life with compassion and kindness towards others and I hope the Court will recognize this in deciding Arik's fate. If granted mercy and compassion I am certain that Arik will continue to lead a positive life filled with generosity and nobility and demonstrate great character as he has thus far.

Respectfully Yours,

Merav Noah

# EXHIBIT 40

The Honorable John G. Koeltl
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl St.
New York, NY 10007

To the Honorable Judge Koeltl,

My name is Danielle Norman. I'm a married woman with three children, I live in
North Miami Beach, Florida and I am a homemaker, wife and mother.

Arik Lev is a very dear friend of mine and has been for the last 10 years, ever
since we met at the Synagogue. You may witness Arik under a new light given
his unfortunate circumstances, but I know him for many years and I can tell you
that he is an honorable man and a real do-gooder in the community of Mill Basin
and beyond.

Anyone that comes into contact with Arik knows of his kindness, his caring and
generous persona. Arik is a pious man who is always ready to help fulfill a good
deed. If you spend any time with Arik at all, you know that his phone rings all day
with calls about families that can't put food on the table and he is always ready
and willing to help. Along with his wife Nadia, they are always helping and
feeding families who face hardships and tragedies in their life.

I recall specifically when a woman in the community lost her husband, Arik made
sure that she received food for her to enjoy a Friday night Sabbath meal every
week. This wasn't a rare one off occurrence, he was doing this (and still does) for
so many.

In the last year, I have seen this man transform from a person filled with light and
joy - who spends as much time as he can with his beautiful children and wife -
into a dull, sullen man who aches with remorse and wishes for forgiveness.
Please find it in your heart to give my friend a second chance to correct his
wrongdoing.

Please be merciful with his sentence so that his young children and teenage
children need not suffer in his absence. He will not disappoint you if you grant
him an opportunity to make things right.

Respectfully yours,

Danielle Norman

# EXHIBIT 41



# REALITY C.H.E.K. FOUNDATION

COMMUNITY HEADQUARTERS EDUCATING KIDS
44 Court Street, Brooklyn, NY 11201

The Honorable John Koeltl
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

March 10, 2021

Dear Honorable Judge Koeltl,

My name is Muhammad Abdul Nur; I am nearly 34 years clean from the use of heroin, crack, methadone and drinking largely in part due to people like Mr. Lev's generosity. Since the inception of my sobriety, I have dedicated myself to helping people like myself suffering from addiction, homelessness, joblessness and hopelessness. I created an organization called Reality C.H.E.K. Foundation which helps unfortunate individuals like myself to find a new way of life. The Reality C.H.E.K. Foundation is a 501(c)(3) nonprofit organization that stayed afloat by receiving contributions from various companies and individuals like Mr. Arik Lev.

I had the privilege, pleasure and opportunity to meet this gentleman over 20 years ago. He has made substantial contributions which allowed our organization to continue to service the community. He has been quite unselfish and giving in helping with our organization. Like Mr. Lev, I too was facing sentencing for numerous criminal charges. Fortunately, I was given a second chance to turn my life around and dedicate myself to serving the community as a way of making amends and giving back to society.  Mr. Lev has also done some extraordinary humanitarian gestures by helping my organization to help and serve underprivileged family, kids and the community with his donations.

Your Honor, I humbly and respectfully ask that Mr. Lev is given the opportunity to change his life without incarceration. I know that, with a second chance, Mr. Lev will strive to make amends and bring a difference and positive results in the community.

Respectfully,

*Muhammad A. Nur*

Muhammad A. Nur

# EXHIBIT 42



# Flatbush Park Jewish Center

**6363 Avenue U ● Brooklyn, NY 11234**

**(718) 444 - 6868 ● Fax: (718) 444 - 6879 ● E-mail: fpjc@optonline.net**

**FOUNDING RABBI**
DAVID S. HALPERN, D.D. A"H

**RABBI**
YISROEL PERELSON
917-535-9311
rabbi@fpjc.org

**CANTOR**
NATHAN GLICK

**OFFICERS**
**Board-Chairman**
EDWARD WEISS, Esq.
**Vice-President**
NORMAN SHAFER
**Vice-Chairman**
ALEX ROVT, Ph.D.
**Treasurer**
ROBERT IZSAK
**Recording Secretary**
PAULETTE LICHTMAN

**TRUSTEES**
YAKOV GALPERT
JEFF GOLDMAN
BRIAN KHUNOVICH
DANNY PELED
CHANA PULVEMACHER
NUSIN SHTERN
LARRY BIRNBAUM
VICTOR COHEN
MARTIN WOLF, Esq.

**SISTERHOOD**
**President**
RONNIE BIRNBAUM

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, N.Y. 10007-1312

January 25, 2021

Dear Judge Koeltl:

I am writing this letter with great pain and concern for Arik Lev. I write on behalf of myself and my congregation at the Flatbush Park Jewish Center synagogue. We are a congregation of honest hard working people. I preach about love and kindness to humanity and to all living things around us. We love our country and pray for its safety all the time.   We are a congregation that believes in honest business and we do the right thing even in tough times.

Our congregation has 300 members, and every Saturday we have 60 children around the neighborhood coming to join us. We instill in our children values of caring for a fellow person, helping a fellow person, integrity, and honesty.  As the Rabbi of the synagogue I am proud to say that we foster an atmosphere that attracts families that share the same values we do.

One of the beloved and important friends of our congregation is Arik Lev. He is a person that cares for and respects everyone.   Our congregation cares for him because he cares for us. He is a hard working honest man that likes to share what he has.

When I first met Arik more than ten years ago I saw a man with great qualities, a man that has the fear of G-d in him. He has endeared himself to our community and now is part of our extended family.

I pray with all my heart to G-d that Arik will have complete peace of mind and peace in his home once again.

I implore Your Honor to examine this matter with wisdom and compassion.  In doing so, I believe you will find a kind hearted honest man who is trying to earn a living while helping others around him.

Respectfully,

Rabbi Yisroel Perelson

הבית שמגדלין בו תורה ותפלה

**1952 · SIXTY NINE YEARS OF SERVING THE JEWISH COMMUNITY · 2021**

# EXHIBIT 43

The Honorable John Koeltl
United States District Judge
Daniel Patrick Moynihan
United Sates Court House
500 Pearl Street
New York, NY 10007

January 21, 2021

Dear Judge Koeltl,

My name is Lenin Perez and I am a good friend and colleague of Arik.

He and I met when I was 21, a new employee at Delta Airlines with no way to get to and from my job at the airport. Arik was inspired by my ambition to take on a role and realized that I didn't have a sure fire way to travel to it, and so he helped me secure a deal on a car. I really appreciated the gesture of kindness and we stayed in contact over the years. He has served as a mentor to me, providing me with both professional and personal advice.

I lost my best friend last year and it really shook me as his death was unexpected. Arik stepped up to the plate and offered me a ton of support during those trying times. If it wasn't for his counsel, I don't know where I would be today. He is an excellent friend, father and husband. His heart is pure and he genuinely wants to help people, any way he can.

Arik's absence would be a detriment to his family, friends and others who know him. He is extremely valuable to his community and I hope that Your Honor can afford him some mercy during this decision making process.

Thank you for your service.

Respectfully,

Lenin Perez

# EXHIBIT 44



**85 Rockaway Ave, Brooklyn, NY 11233**
**Bishop Ronald Tolliver Perrien, Senior Pastor**
**917-403-5487 – Church Phone**

**March 14, 2021**

**To:** The Honorable John Koeltl
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

I am Bishop Ronald Tolliver Perrien the senior pastor of the Resuscitated Church of Brooklyn, NY. And the Presiding Bishop of the Prophetic Praise International Fellowship of Churches. I was introduced to Arik Lev 2 years ago by Muhammad Singletary to do some counseling with him. Arik has come out and supported the church community with food and school supplies. He also assisted us in passing out the food and supplies during the events. He has been a supporter for the past two years.

I am aware that Arik is being sentenced with respect to a federal crime. I plead the compassion of the court as he has been an upstanding citizen in the community by assisting The Resuscitated Church with food for those in the community and school supplies before the pandemic hit. Despite the charges I feel he deserves the support as he has shown tremendous growth in the community in the 2 years, I have known him.

Respectfully Yours,

*Bishop Roald Tolliver Perrien*

Bishop Ronald Tolliver Perrien

# EXHIBIT 45

ב"ה



*"Your one stop for everything Jewish"*

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, N.Y. 10007-1312

January 13, 2021

**RE: ARIK LEV**

Dear Judge Koeltl:

I extend my greetings and pray that this letter finds Your Honor in the best spirits.

I am writing on behalf of Arik Lev in my attempt to express my humble and sincere view of him.

My knowledge and experience of Arik has been garnered over many years. While I lived in New York I visited with him during 2009-2014; we met every Friday for Shabbat. During this period, these many meetings and my experiences with him, I can state I know him to be a family man, a devout believer and practitioner of the Jewish religion and a man of faith. I have known him to be a strong supporter of Jewish institutions and the community. We have always shared positive and uplifting conversations and experiences. Even after I moved to Jamaica, he and I have remained in contact and I seek to visit him whenever I travel to New York. In my opinion and experience, I truly consider Arik Lev a good man, a man of God and my friend.

He has regrettably run afoul of the law and has committed himself to your fair and just judgement. This current situation has taken a heavy toll on him and his family, and while I would never seek to question the veracity and integrity of the judicial process, I do write to beseech you, Honorable Judge, to take my words in consideration as Arik is a good man, worthy of the opportunity to correct his indiscretions and maintain his useful place as a contributing member of his community and society.

Respectfully,

Rabbi Yaakov Raskin



# EXHIBIT 46

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

March 10, 2021

Dear Judge Koeltl,

My name is Shalev Raz, I am 21 years old and live in Jerusalem, Israel.

I'd like to say a few words about Arik Lev.

I'm the daughter of a single mother and have no contact with my father at all. My father left before I was born and chose not to support me and not to know me at all. Arik heard about my situation and that of my mother and decided to take us as a "project", to help and support us so that we would not fall along the way due to difficulties that my mom and I experienced.

Arik helped us both financially and emotionally, supporting and helping us with everything we needed since I was a little girl. When I completed my army service in Israel, Arik encouraged me to start academic studies and promised that he would help me with everything that I needed. I was very undecided and worried because I didn't know how I could pursue a higher education when I needed to fund the studies and the necessary living expenses. On the other hand, I really wanted to go to school. Arik was persistent and reminded me over and over again that he would support me and that I shouldn't worry about anything, just succeeding in school.

I am currently an optometry student at Hadassah Academic College in Jerusalem. I have big dreams and a strong desire to move forward and be the best I can be and all it is all thanks to Arik's help and support. Arik took care of my tuition so I could pay for my studies and even sent me spending money every week so that I wouldn't worry about money and I could focus on my studies. He often calls me, speaks and encourages me despite the distance. He is a very significant figure in my life. If I didn't meet him my whole life would be different.

I ask that Your Honor please read my sincere words of how life-changing it has
been to have Arik in my life. I know that I am not the only one who he has
helped and guided, people rely on him every day. I hope that Your Honor can
see to it that Arik can continue the tremendous goodwill he extends to everyone
by keeping him with his family and community.

Respectfully,

Shalev Raz

# EXHIBIT 47

January 10, 2021

The Honorable John Koeltl
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

Dear Judge Koeltl,

Hello my name is Magdalena Rigamonty. I'm a 35 year old single mother and I've been working for Mr.
Lev for about 13 years now. I can say my life is pretty stable right now but it wasn't always like that.
When I started working for Mr. Lev back in 2008 I was a young mother ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Every other employer I had didn't understand what
▮▮▮▮ was at that time and had to let me go. I don't think Arik really understood what it was but he saw
on my face that it was hard on me. Arik saw something in me that no one else saw, as he is a family man
himself and takes so much pride in his children, he understood what I was going through.

I couldn't finish High School because I had to work. Arik pushed me to get my GED which took about 3
hours off of the time that would have been dedicated to his business. It was 3 days a week for 6 months
and he didn't lower my salary. Thanks to him not seeing me as an employee but as family member I got
my GED back in 2009.

My life wasn't easy but it could have been a whole lot worse if I didn't know and work for Arik. I never
had luck in men - yes I know this is my personal life - and Arik didn't meddle into my private life - I came,
did my job, enjoyed it and went home. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Arik and his wife Nadia
moved me out of the Bronx to Brooklyn in 3 days to get away from that horrible situation. That
emotional and physical support that Arik and his wife Nadia gave me and still give me is something that I
will never forget and I cherish so deeply.

When I started with Arik I knew nothing about the car business. He is my mentor, he taught me the
business from A-Z. He really treated me like family, proving to me that there are kind people out there.
When you work hard, no matter if you're a woman you can make a life for yourself and by yourself.
Fast-forward and I'm proud to say that I am becoming a partner now at a dealership. I can say with

absolute certainty that I owe this achievement to Arik.  My hard work did pay off but the knowledge he shared with me and the pep talks he gave me are what got me here. Most importantly he showed me that it didn't matter if this was a male dominated field, I'm a woman and I achieved this.  Thanks to Arik I'm not that scared little girl that was ashamed to speak and blamed myself for other people's evil doing. Now I speak my truth, with self-confidence, I made partner in a car dealership, and have a 17 year old son who wants to go to college -- all to the credit of Arik Lev.

I trust that Your Honor will read my words and be moved by them. Arik really deserves compassion from the Court as he is a good person with tremendous qualities of fairness, friendship and good character.

Respectfully,

Magdalena Rigamonty

# EXHIBIT 48

 

BEDFORD-STUYVESANT VOLUNTEER AMBULANCE CORPS
727 GREENE AVENUE
BROOKLYN, NY 11221

The Honorable John Koeltl
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

Dear Honorable Judge Koeltl,

Arik Lev has been an inspiration and a contributor to Bedford-Stuyvesant Volunteer Ambulance Corps. He has demonstrated the willingness and concern to make sizable contributions for over 11 years. He has paid for EMT courses for the kids whose family were unable to afford it.

On September 11, 2001, BSVAC lost two EMT's as well as major damage to their ambulance. Without hesitation, Mr. Lev. assisted BSVAC by contributing towards the replacement of an ambulance.

Mr. Lev has demonstrated a spirit of excellence towards Bedford-Stuyvesant Volunteer Ambulance Corps.

Respectfully yours,

*Chief Shanida Robinson*

Chief Shanida Robinson
Vice-President

# EXHIBIT 49

THE HONORABLE JOHN KOELTL
UNITED STATES DISTRICT JUDGE
DANIEL PATRICK MONIHAN UNITED STATES COURT HOUSE
500 PEARL STREET
NEW YORK, NEW YORK 10007

January 13, 2021

Dear Judge Koeltl,
My name is Ezra Rome. I am a married man with three children and three grandchildren.
I live in Mill Basin, Brooklyn, NY. I am self-employed and I am a founding member of
my synagogue in Mill Basin, which I have belonged to for over 30 years.
I am a friend of Arik's for over ten years. I am aware of Arik's current situation but am
proud to write this letter on his behalf.  He is worthy of my support and the Court's
compassion for many reasons; I will try to cite a few of them here. We live in the same
community where I have seen his many acts of generosity and kindness. He founded a
synagogue in the community by putting all of his effort and time, all to serve the
community. I never saw a limit to his generosity and compassion. Any time someone
asked for his help I never saw him refuse. I remember after Hurricane Sandy I lost my car
and he offered to lend me a car till I was able to figure everything out. He is a kind man
and a good father to his beautiful children. He is a great asset to the community and his
absence would create a huge void in the community.
Please show compassion to Arik as he is a vital part of the community and is needed here.


Respectfully,

Ezra Rome
███████████
███████████

*Ezra Rome*

# EXHIBIT 50

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, N.Y. 10007-1312


January 11, 2021


Dear Judge Koeltl:

My name is Jacqueline Ryklin.  My husband Joey and I have had the pleasure of knowing Arik and his family for the past 6 years.

Arik is a man of few words. His actions define his character and moral standards. The best way I can describe who Arik is and how he has helped my family is by explaining how he has touched my family dearly in particular ways.

Arik has the biggest heart, something that most people don't have or don't understand. He goes by a simple principle which is "treat people as you want to be treated". Easier said than done, right?  Well when Arik heard that my husband wanted to propose to me and was frightened with the financial aspects of a wedding, Arik told him not to worry. He quietly got different venues and a place in his local synagogue and helped us throw a beautiful wedding. The look on my face when I entered the room was indescribable. I will forever be grateful to him for his selfless acts.

Another moment I would like to share with you is when my husband was out of work. I was three months pregnant and very worried how we would financially get all the things prepared for our baby. Arik is a man of faith and every time he saw me he told me not to worry and to trust Hashem (God). He called my husband every day to check on him and offered him a job at his car dealership. Because of God's mercy and grace upon my family and Arik giving my husband a job we were able to get all the things in order to provide for the birth of my son. I would like to explain how precious this was for myself and my family. I have had complications with a few pregnancies before this one which ended in miscarriages. My heart was broken each time but my strength in God helped me to overcome these challenges. I truly believe God brought Arik into our life and he has been such a blessing to us.

I have seen Arik and his family go thru ups and downs throughout the years, but their unity and strength help them overcome all challenges and opposition. Arik is a man of good moral character. I know he is really upset as a result of this case and has been under tremendous stress due to it. I am asking Your Honor to consider these real life experiences and see the true character that Arik has, and has shared with us.

I can confirm that in all the time my family has known him, Arik Lev has been a reliable, trustworthy, warm hearted and generous man. I just pray that Your Honor has mercy in deciding his sentence.


Respectfully,

Joey & Jacqueline Ryklin

# EXHIBIT 51



**קהילת קודש מגן אברהם מיל-בייסין**
*Congregation Magen Abraham of Mill Basin*
2114 East 66th Street • Brooklyn, NY 11234

January 12, 2021

The Honorable John Koeltl
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, N.Y. 10007

Dear Judge Koeltl:

I write this letter on behalf of Arik Lev. I write to request as lenient a sentence as Your Honor deems appropriate in these circumstances.

Arik is an individual I have known for two decades. He is someone upon whom my community can always rely for help. He has personally helped me fund many community projects and publications. He does so with a giving and loving heart, and with joy. Arik is looked at by the community as a beacon of light for he brings smiles to all the people who he comes into contact with. He is kind hearted and caring to all he knows and meets.

I not only know Arik himself, but also his family as well. He is a true family man and a symbol of a dedicated and loyal husband and father.

I personally know how Arik has helped take initiative in the renovation of two synagogues in the community. One synagogue was old and worn out, and Arik on his own, organized the renovation of it. The congregation was stunned in how everything was done so swiftly, efficiently and professionally. He was our savior.

I personally know how Arik took care of his brother and sister in law when they arrived here from Israel. Arik found them an apartment, he got them a car, supplied his brother with a job and financially backed them for their entire stay here, which was well over a year. He did so with no request for anything in return.

And closest to home, Arik has always been there for me when I needed him. Anytime I



קהילת קודש מגן אברהם מיל-בייסין

*Congregation Magen Abraham of Mill Basin*

114 East 66th Street • Brooklyn, NY 11234

called upon him for aid, whether it be financial or physical, he was always there for me. I remember approaching Arik when I needed financial help in publishing one of my works, and he immediately supplied me with the aid I needed. He did so with willingness and love.

To sum up Arik in a few words or even paragraphs is a difficult task, but I will say that Arik is the kind of individual that makes a community better and this country better. Arik is the kind of man every community wished they had. We all love him.

Respectfully yours,

Rabbi Ronen Shaharabany

# EXHIBIT 52

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, N.Y.  10007-1312

January 13, 2021

Dear Judge Koeltl,

My name is Shai Shololom. I am single and I have one six-year-old boy. I work in construction and attend the same synagogue as Arik. I have known Arik for over 15 years.

Arik is an outstanding citizen, close friend, and incredible family man. We have connected and formed an intimate friendship over the past decade and a half and have rode through the ebbs and flows of life alongside one another. Our 6-year-old sons are close friends, we spend Shabbats together often, and he demonstrates his care and character at every chance. For example, he often provides Shabbat dinner to members of the congregation that are unable to afford the ritualistic foods and techniques associated with the weekly holiday. Through Shabbats together, Arik has proven his dedication to community building, providing for the less fortunate, and improving the general well-being of our neighborhood. His work in building and maintaining the synagogue, providing for others through the donation apparatus of it, and serving as a listening ear and caring hand throughout the process are unmatched. Arik is worthy of the Your Honor's compassion because of his demonstrated commitment to enhancing our community, caring for others, and providing in times of need.

Since his legal case began, Arik has shown intense distress over it. His family is struggling to adapt and his mood has considerably changed for the worse. I know that Arik has the potential to be an incredible asset to the community and its people; due to this legal issue, however, he has been relegated to a smaller role.

I hope for the sake of the community, his family, and the myriad friendships he has established, that the Court demonstrates compassion in his sentencing and with his future. He deserves the opportunity to continue to provide for others, improve his life, and be there for his family.


Respectfully,

Shai Shololom

# EXHIBIT 53

The Honorable John Koeltl
United State District Judge
Daniel Patrick Moynihan United State Courthouse
500 Pearl Street
New York, NY 10007

January 12ᵗ 2021

Dear Judge Koeltl,

My name is Yoav Shriki. I am married and a father to two beautiful nine year
old twin girls. I was born in Israel and served three years in the Israeli
Defense Force. After my service, I moved to New York in 1999 and since
my arrival I have worked in the car sales industry where I met Arik Lev
twenty years ago. Today, Arik and I reside in the same community, Mill
Basin, where we both pray in the same synagogue Shari Tikva, which he
helped found in memory of his mother, Tikva, for the benefit of the
community.

Over the years of knowing Arik Lev, I have had the privilege to get to know
him in many different ways.  Arik Lev has a huge heart and is always willing
to help others who are in need. I have personally witnessed this, by this kind-
hearted man.

Four years ago, I witnessed a community member walk into his office and
share that he had tremendous debt and was not able to pay his rent. He was
served with an eviction notice at the time and needed to find a place for him
and his family to live. Once Arik heard that this man and his family were in
need, Arik immediately jumped in to help him and his family by arranging to
shelter the family in a hotel for a week, until they were able to get situated.
 Arik continued to assist the man after that.

I would like to point out that Arik is not a person who talks about his
contributions and helping others. If I had not seen it myself, I would not have
known or heard the extent of what he does to help those in need.

Another story I know of was of a woman who was suddenly widowed and
was left with 3 children. She had no car to drive her children to school and
was struggling to take care of them. Her story very much touched Arik, who
decided to give the woman a car (a used mini-van) so she could have
transportation for herself and her children as a gift.

I also know that Arik donates time and money on a regular basis to help
needy families get food products every week.  He also supports his brother,
who is married with small children who are in Israel, because his brother is
unable to make a living.

Arik is a mainstay of his wife and children. He is an admirable father who
tries to address all their needs. He is a warm, loving, and devoted father. His
6 year old little son ███ is very attached to him.

If Arik is sentenced to prison, the community will lose a person who helps
and gives the best of his ability.  It also would harm his family, who need
him as the mainstay of the family. In addition, there is the reality of
economic deterioration of his family as he is the breadwinner for the family.

I hope that Your Honor can take all of this into account in sentencing this
very worthy man.

Respectfully,

Yoav Shriki

# EXHIBIT 54



Wednesday, February 17, 2021

The Honorable John Koeltl
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

Dear Judge Koeltl,

Arik Lev is a prominent volunteer at Aishel Shabbat. Aishel Shabbat is a 501c3 non-profit organization founded in November of 2002. Aishel Shabbat's volunteers assemble and deliver packages of food to over 250 less fortunate families in our Brooklyn community on a weekly basis. We have a warehouse located at 1002 Quentin Road, Brooklyn, NY 11223.

On behalf of Aishel Shabbat, I would like to inform you of Arik's continuous volunteering at our warehouse. Arik has been a volunteer deliverer for over 2 years, using his vehicle with boxes of food and produce to deliver to needy families in Brooklyn. Arik is a valuable member of our team and we count on his services weekly. Our fellow members and staff at Aishel Shabbat plead for compassion from The Honorable Judge, as Arik is compassionate and generous with us.

If you need any more information or if you have any concerns, please call me at █████ ████████ or visit our website



Respectfully,

Anat Stavrach
Chairwoman

# EXHIBIT 55

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, N.Y. 10007-1312

March 5, 2021

Dear Judge Koeltl,

My name is Abie Abraham Todd, I came to United States from Israel in 1950 as a
son of a Holocaust survivor and I have been living in New York ever since. I am
85 years young. I met Arik 5 years ago in my Jewish community synagogue and
ever since I met him he has been nothing but a golden light in my life. He has
helped me so much since I met him that I can't even keep count of how many
times he's been there for me.

As a senior citizen it's not so easy to accomplish things as you get older. He has
accommodated me so many times for Jewish holidays if it would be with food, his
time, helping me with transportation, and just by helping me in general. I can't
count how many times Arik took time out of his day to help with my day and
never thought twice to help. Arik has a heart of an angel and always looks to help
and make other people happy and looks to do deeds all the time which in our
Jewish religion it's called mitzvah. I'd like to call him a walking mitzvah because
from my experience and time that I spent with him all he does is mitzvahs and
good deeds for everyone around him.

Please recognize that Arik is a big part of the community and understand that
he's a good person with an amazing heart which from my experience, it is not
easy to come across amazing people like him. I for one will be greatly impacted if
Arik is absent for any duration.

I thank Your Honor for your time and for considering my experiences with this
special person.

Respectfully,

Abie Todd

Abie Abraham Todd

# EXHIBIT 56

The Honorable John Koeltl
United States District Judge
Daniel Patrick Moynihan United Sates Court House
500 Pearl Street
New York, NY 10007

January 11, 2021

Dear Judge Koeltl,

My name is Maayan Twina. I am the sister of Arik Lev. I am 33 and I
reside in Ashdod, Israel with my husband and four children. I would like
to tell you a little bit about my oldest brother who is 15 years my senior.
When I was just 14 years old my mother passed away from an illness. It
was a devastating loss that left me emotionally distraught. No one could
replace my mother, but Arik filled that void as much as he can. Arik
would check in with me constantly to make sure I was happy and staying
focused in school, guiding me in those critical teen years. I would tease
him that he is my therapist, in many ways he was - and beyond. Despite
our physical distance I have always felt his presence right there with me.

In 2013, when I was 15, I flew alone from Israel to NY to visit Arik and
his family. I had such a pleasant three weeks spending quality family
time that I was reluctant to leave! I was all packed up with the suitcases
by the door when I started not feeling so well. At first I thought it could
be just fatigue or my mixed feelings of having to say good-bye. 20
minutes later while still getting ready to leave, I collapsed.  Arik was
quick to bring me to consciousness and rushed me to a doctor friend of
his. Our thought was it would be best just to make sure I am ok to
continue on to the airport and make my flight. The doctor advised that I
am not going anywhere but the hospital <u>immediately</u>. After a battery of
medical tests at the hospital it was determined that I had a massive
kidney infection. I spent 2 weeks on IV until I was released and able to
make the trip back home. Those 2 weeks in the hospital Arik did not
leave my side. Years later he did the same for my brother Abraham when
he had a horrible motorcycle accident.

Arik's care was in no way limited to family, as I've seen - during my
numerous visits over the years - the many people he and Nadia host and
assist. His care for me and his overall care for others is something he
actively seeks out with joy.

My 73 year old father is not in the best of health right now and is very
concerned about Arik's legal troubles. He is unable to travel to America
to visit because of his health condition and the pandemic. I worry for my
father, I worry for Arik, his wife Nadia and their 5 children.

I would like to believe that all the good that Arik exemplifies will inform the judge of who Arik is and why he should be able to stay with his family and continue all of the good that he does.

Respectfully,

Maayan Twina

# EXHIBIT 57

The Honorable John Koeltl
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

January 25, 2021

Dear Judge Koeltl,

My name is Liz Vanunu and I am a 21 year old living in Brooklyn, New York. I
work as a teacher in a day care in Brooklyn.

Arik, to me, is like a second father. His daughters and I went to middle school
together, from 1st grade to 8th grade. I practically grew up in their household.
Whenever I was in the Lev home I would always witness Arik reading books
about faith, learning with Rabbis, and helping families who need support. His
daughters have the same giving trait as him. The Lev family is a family of givers.
There are countless families who would have fallen apart and not had food on
their tables if it was not for Arik Lev. He attends the same synagogue my father
goes to and he supports the synagogue in every way he can.

Whenever I was in Arik's house he was always kind to me, offering advice and
asking if I ever needed help with anything. There is always a smile on his face,
even when he went through hard times. Growing up, I would see how his children
aspired to be like him and got certain traits from him, like donating to charity,
helping others, and having compassion for everyone.

Arik deserves to be treated the way he treats people, and that is with
compassion. Arik always had an open heart to any person that he has ever come
across with, no matter their age, race, or nationality. Arik's children and wife work
really hard, but without him the family wouldn't be able to survive. His wife and
children need him.

He has prevented so many families from falling apart due to his generosity and
compassion and now I beseech you, Your Honor, please extend compassion to a
very worthy individual.


Respectfully,


Liz Vanunu



# EXHIBIT 58

Honorable John Koeltl
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

<u>Re</u>: US v. Arik Lev

01/15/2021

Dear Judge Koeltl:

I am writing this letter in reference to the federal case of Arik Lev.


I have known Arik for roughly 12 years.  We live in the same neighborhood in Mill Basin,
NY and became really good friends right after we met the first time in a local
supermarket, where he invited me to attend prayer services at the synagogue he
started.


Arik has been an integral part of the Jewish community for 25 years.  He has
volunteered at our local synagogues helping Jewish families, and his efforts have made
positive impacts upon hundreds of people.


For all these years, I have known Arik to be a responsible person, trustworthy,
hardworking, a true friend and someone who is of good character.  Lately he has
been under a lot of stress due to his legal case, and he's so worried about his family.
Arik has acknowledged to me the behavior he exhibited, expressed great remorse and
a desire to make amends. I believe that Arik has every intention to improve since the
incident. Ever since I've known Arik, he always had a strong will for self-improvement. I

strongly believe that he is very sorry for what he has done. Arik has accepted the fact that his life was negatively impacted by his own actions.

Due to his case, he is facing deportation, losing future business opportunities, losing his position in the community that he loved, and potentially being separated from his family. Arik already has been punished a great deal.  The people who will suffer greatly if he's sent away are his wife, his kids, and many other people that depend on Arik for support and help.

Thank you so much for taking the time to read my letter. I hope that Your Honor will consider my thoughts on the day of sentencing. Despite the current case, I still believe Arik to be honorable individual, a valuable member of our community, a devoted father, and caring brother.

Respectfully and sincerely,


Victour Zaibak

# EXHIBIT 59

January 12, 2021

The Honorable John Koeltl
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

Dear Judge Koeltl,

I am Joseph Zarger, a friend of Arik Lev. I have been Arik's friend since the day he got to the US over 25 years ago. Arik is a good hearted person and a family oriented guy. He is a person that will give you the shirt off his back if you need it.

Arik is a pillar in his community synagogue where he donates time and money and helps people in need at every opportunity. I love his good heart, Arik is like a brother to me, a lot more than a friend. We have been together for the past 25 years and I only have seen him do good things in life for people. Most of all Arik is someone who doesn't wait around to help out, he jumps at an opportunity to assist people in any way he can, I've seen it with my own eyes. Let me tell you a story: one day in 2008 me and my wife, Arik and his wife went out to the city.  On the way back as we were driving eastbound on the belt parkway a car lost control and flipped over on the westbound side of the belt parkway. It was close to 4:30 AM, nobody was around but us. Arik made me stop the car and he ran across the highway to help the driver who was bleeding all over. I couldn't bear the sight of such an injury but Arik was there calming the driver and helped get him out of the flipped car. The paramedics arrived soon after and took the driver to the hospital for his injuries. I have never seen something like this before. Arik was a true hero at that moment and I am not just saying that.

Arik is truly a person that likes to help people in need and that is what I call a good hearted person. Thank you Judge and please have mercy on him, he is and always will be a good person, from the bottom my heart thank you. Thank you Judge for taking the time to read my letter.

Respectfully,

Joseph Zarger

# EXHIBIT 60

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-v.-

ARIK LEV,

Defendant.

No. 20 Cr. 440 (JGK)

## DECLARATION OF JOEL A. SICKLER

I, JOEL A. SICKLER, declare as follows pursuant to 28 U.S.C. § 1746:

1.     I am the founder of, and a sentencing specialist for, the Justice Advocacy Group, LLC, a consortium of criminal justice professionals based in Alexandria, Virginia.  The Justice Advocacy Group provides research for and advises criminal defense lawyers, U.S. probation departments, and federal judges on federal sentencing issues and matters involving federal confinement.

2.     I have been retained by Arik Lev to advise on his likely Bureau of Prisons ("BOP") classification and designation, if he is sentenced to a term of incarceration, as well as the likely conditions he would face in federal confinement.

## I.     Education and Experience

3.     I earned a Bachelor of Science in Criminal Justice at Saint Anselm College in Manchester, New Hampshire, and a Master of Science in the Administration of Justice at American University's School of Justice in Washington, D.C.  Since then, I have practiced as a criminologist

with particular expertise in the area of federal sentencing and corrections, with 40 years of experience in the field.  My resume and biography is attached hereto as Exhibit A.

4.     Over the course of my career, I have prepared over 2,500 evaluations for felony-level defendants facing sentencing in federal courts nationwide.  I have submitted sentencing reports in 41 of the 94 federal judicial districts, received 40 federal court appointments as a capital case mitigation specialist, and testified as an expert regarding mitigation findings and recommendations in six federal jurisdictions.  I have visited 51 federal prisons and have advised clients with inmate-related matters in 86 of the BOP's 122 institutions.

5.     I am an associate member of the National Association of Criminal Defense Lawyers and a founding member of the National Association of Sentencing Advocates and Mitigation Specialists, for which I served as Vice President from 1998 to 2000.  I speak regularly at conferences and seminars for these associations, and am published and widely cited in the media on the topics of federal sentencing and confinement.

6.     I have reviewed and am thoroughly familiar with the following Program Statement of the federal Bureau of Prisons: *Inmate Security Designation & Custody Classification* (P.S. 5100.08, September 12, 2006).  I have spoken on numerous occasions with personnel at the Bureau's Designation and Sentence Computation Center ("DSCC")[1] and regional and central office officials in the correctional programs administration when seeking clarification about a specific BOP policy or program statement.

7.     In this case, I also have conferred with defense counsel about Mr. Lev, reviewed case materials regarding this case, and spoken to Mr. Lev in the presence of counsel.

---

[1]     The DSCC is an office within the BOP's Office Complex located in Grand Prairie, Texas. All facility designations or assignments and inter-facility transfers are processed and made by the DSCC.

2

8.      In this declaration, I set forth the likely impact that Mr. Lev's status as a non-U.S. citizen, permanent resident alien (or "green card" holder) would have on his BOP classification and designation and the conditions of confinement he would likely experience as a result, as well as likely impact the ongoing COVID-19 pandemic would have on Mr. Lev's conditions of confinement, were he to be sentenced to a term of incarceration in a BOP facility.  Specifically, if sentenced to a term of imprisonment:

(a)      Mr. Lev would be assigned to a secure prison and not a minimum-security facility, and therefore be subject to considerably harsher and more dangerous conditions of confinement than would otherwise be the case for defendants with his background, offense of conviction, and lack of criminal history;

(b)      after serving any prison sentence, Mr. Lev would likely be required to serve an additional, potentially lengthy period in custody in U.S. Immigration and Customs Enforcement (ICE) detention as he awaits potential removal (deportation) from the United States;

(c)      as a non-U.S. citizen, Mr. Lev would be denied any opportunity to be pre-released to the community toward the end of any custodial sentence, and therefore would be ineligible for placement at  a community-based reentry center, or a halfway house, or home confinement — all of which would generally be available for defendants with his background and offense of conviction; and

(d)      at the outset of any term of imprisonment and for an indefinite period thereafter, Mr. Lev would be subject to more restrictive conditions of confinement due to the COVID-19 pandemic, including at least several weeks of solitary confinement at the commencement of his sentence and significant limitations (including on his movement within the facility and visitation privileges) thereafter.

## II.     **Impact of Mr. Lev's Immigration Status**

### A.      **Harsher and More Dangerous Conditions of Confinement**

9.      Ordinarily, if sentenced to a term of imprisonment, a defendant with Mr. Lev's offense (non-violent), who has no history of violence, no prior criminal history, and no outstanding detainers, would be eligible to be designated by the BOP to a minimum-security prison facility.[2]

---

[2]      Mr. Lev's BOP security level scoring, utilizing BP-A337.051 (Inmate Load and Security Designation Form), is estimated to be as follows: he may be allowed to surrender voluntarily (-3

However, BOP designators also use Management Variables (MGTV) and Public Safety Factors (PSF) to account for security considerations not included in their numeric security point system. In Mr. Lev's case, if he were sentenced to a term of imprisonment, although he would have a total of only five (5) security level points—which ordinarily would result in him being designated to serve his sentence at a minimum-security facility—a PSF of "Deportable Alien" would be assigned to his security classification, which would automatically result in him being designated to a prison facility above the minimum-security facility range.[3]  Instead, Mr. Lev would be designated as, at the least, a low-security inmate, rather than as a minimum-security one.

10.     Low-security prisons generally have security protocols and living conditions far different than what exists at a minimum-security facility.  There are four main differences between a low-security prison facility versus a minimum-security facility.

11.     The first main difference is the perimeter security and other forms of heightened physical security.  Minimum-security facilities are fenceless compounds that have the appearance and feel of an austere college campus.  They do not have "controlled movements" that restrict inmates' movements to certain designated times.  By contrast, a low-security facility (or, Federal Correctional Institution (FCI)) is surrounded by physical barriers to prevent escape: walls, fencing with barbed or razor wire, secured and defensible main gates, security lighting, motion sensors, and roving patrols.  Within the institution, remotely controlled doors, CCTV monitoring, alarms,

---

pts.); his offense (property offense > $250,000) severity would be rated "Moderate" (3 pts.); he has a criminal history score of zero (0 pts.); no history of prior violence (0 pts.); no history of escape (0 pts.); no outstanding detainers (0 pts.); he is 48 years old (2 pts.); he has graduated high school (0 pts.); and he has no history of substance abuse within the last five years (0 pts.). Therefore, his total security designation points are *two* (2), yielding a security level of "Minimum."

[3]      *See* P.S. 5100.08, Inmate Security Designation & Custody Classification, ch.5, p.9, Code H (Sept. 12, 2006), https://www.bop.gov/policy/progstat/5100_008.pdf ("A male or female inmate who is not a citizen of the United States . . . shall be housed in at least a Low security level institution."); *see also id.* at p.12 tbls. 5-2 and 5-3 (security level "Low" for deportable alien).

cages, restraints, nonlethal and lethal weapons, riot-control gear, and physical segregation of units are used to maintain security.   In an FCI, inmate movement throughout the facility is highly controlled, with access from one location to the other allowed only for 10 minutes at the beginning of the hour.   Body searches, where groups of inmates are strip-searched so officers can inspect their bodies for bruises or lacerations indicating violence, or fresh tattoos indicating gang involvement, are routinely conducted.   Housing units are searched far more frequently than at minimum-security facilities.

12.     The second main difference is the institution's size, atmosphere, and population density.   FCIs are five to ten times larger than minimum-security facilities.   As a rule, the bigger the institution, the more stressful it is on the general population in the prison.   Large FCIs have cramped housing quarters, where 90-100 inmates sleep in small cubicles with four or more bunk beds and compete for use of the dozen or so showers, sinks, and toilets.   In some low-security facilities, inmates are placed on mattresses on the floor in "overflow units."   Sleep disturbances (resulting from sleeping on thin mattresses, snoring, constant light, and movement) are common. Noise is incessant in a secure correctional facility, and in some (those that have cubicles, for example), there is little to absorb or otherwise block nighttime noise.   Inmates also may be awakened repeatedly for late night head counts.

13.     Other problems exist in the more crowded FCIs.   For instance, there are longer lines to use the telephone, to see a member of your unit team, for medications and checkups, or to use the library.   Crowding also impacts food service in FCIs.   The busy, noisy cafeteria serves institutional food—pre-packaged and pre-made, sometimes days before it is served.   Inmates eat in shifts (each housing unit is called in an ever-changing rotation), and if your unit is called last, most of the edible food is gone.   There are also long lines to use toilets, sinks, and showers.

Cramped, crowded conditions where thousands of men are virtually on top of one another also result in such prisons being more unsanitary, even rodent infested.

14.     The third main difference between a minimum-security facility and an FCI is the type of inmate.  Minimum-security facilities house generally younger drug offenders who are serving sentences of less than 10 years, as well as white-collar property offenders such as Mr. Lev. Inmates at minimum-security facilities generally are, like Mr. Lev, first-time offenders who have committed nonviolent crimes, have minor to no criminal history, and pose no public safety or flight risk.  They tend to generally behave well, out of fear they will end up in a higher security institution.  By contrast, inmates at low-security FCIs are generally serving sentences greater than 10 years, likely have a prior record involving a gun or violent offense, may be gang-affiliated, or are otherwise security or flight risks.  FCIs also house members of organized crime, drug cartel leaders, and serious sexual offenders.  Statistically, there is a 143 percent greater chance of being assaulted at an FCI as opposed to a minimum-security facility.[4]  Furthermore, the rate of "serious assault" is 553 percent higher in low-security institutions than minimum-security facilities.[5]

15.     Based on my experience, which is consistent with these statistics, low-security facilities can be violent environments.  Almost all of the dozens of white-collar inmates housed in low-security facilities that I have assisted have reported feeling intimidated and scared by the environment.  Several of them have actually been assaulted or threatened with assault, and many of them have been victims of extortion.

---

[4]     This percentage is based on the average rate per month (per 5,000 inmates) of "inmate on inmate" assault (serious and less serious) from 2008-2017. *See* Fed. Bureau of Prisons, Office of Research and Evaluation (data files on assault from 2008-2017) (on file with the declarant).

[5]     *Id.* Serious assault is defined in BOP P.S. 5270.09, Inmate Discipline Program, p.44, tbl.1 (August 1, 2011) (CODE 101 - "Assaulting any person, or an armed assault on the institution's secure perimeter (a charge for assaulting any person at this level is to be used only when serious physical injury has been attempted or accomplished).").

16.     The last main difference is harsher conditions of visitation. At a minimum-security facility, an inmate's family can drive up to the compound, park in a lot next to the visiting hall, walk in unescorted, show ID, and then the inmate whom they are visiting appears, often in an outdoor space on the facility grounds. By contrast, at an FCI, visitors are met with imposing walls and barbed wire and must proceed to a guarded gate to access the facilities parking area. They are observed by officers on patrol in the parking lot. Once inside the prison, they pass through metal detectors, and are subjected to random pat-down searches (with vehicles on the property also subject to inspection). Their hands are tested for drug use, they are escorted through several check points, and they wait, sometimes for long periods, for the inmate to be brought to the visiting room (typically a crowded indoor environment). The impact of these measures on a visiting family member should not be underestimated, and in my experience negatively color the entire visitation experience for both the inmate and the visitors. All of these factors would have an especially profound effect for Mr. Lev, who has five children, three of whom are under 21 years old.

**B.     Lengthier Term of Pre-Release Imprisonment**

17.     Mr. Lev's access to pre-release, re-entry transitioning, and a productively structured return to his community would also be prohibited because he is not a U.S. citizen. Normally, an inmate would be accorded a portion of their sentence for community re-entry through one of the BOP's Residential Re-Entry Centers (RRC), or "halfway houses." Toward the end of an inmate's sentence, for a period determined based on his transitional needs, he would usually be pre-released to an RRC—likely between six and twelve months before his release date (*see* 18 U.S.C. § 3621). As a non-U.S. citizen, however—even one who has lived in the United States for

25 years and has a green card—Mr. Lev would likely not be eligible for RRC or "halfway house" placement.[6]

18.    Further, most minimum and low-security facility inmates are also pre-released (in addition to their RRC or halfway house time) to home confinement for the last 10% of their sentence, up to a maximum of six months (*see* 18 U.S.C. § 3624).  Again, as a non-U.S. citizen, Mr. Lev would not be eligible for this placement.[7]

19.    By being ineligible for the normal statutory pre-release opportunities afforded American inmates, Mr. Lev would be held longer in federal prison—as much as a year longer, if not more—than American prisoners.  This is in addition to any ICE detention which may follow the completion of any prison sentence, as I now describe below.

###    C.    Lengthier Term of Post-Sentence Incarceration

20.    Mr. Lev's post-incarceration return home would be further impacted by the fact that a U.S. Immigration and Customs Enforcement (ICE) detainer would be placed on him (upon incarceration) to eventually accommodate the process of deporting him as a non-U.S. citizen at the completion of his sentence.

21.    When a non-U.S. citizen inmate's sentence is complete, they are placed in ICE custody and their status is changed from "prisoner" to "detainee."  Armed ICE agents would transport Mr. Lev to another detention center once he is formally released from BOP custody, to await the process of being physically removed from the United States.  Unfortunately, this involves further incarceration at what are typically county jails (with conditions as harsh as low-security

---

[6]    *See* BOP PS 7310.04, Community Corrections Center (CCC) Utilization and Transfer Procedures, at p.10 (Dec. 16, 1998), https://www.bop.gov/policy/progstat/7310_004.pdf.

[7]    *See* BOP PS 7320.01, Home Confinement, at p.7 (Sept. 6, 1995), https://www.bop.gov/policy/progstat/7320_001_CN-1.pdf.

facilities, if not harsher) to further await the process of being removed from the country. These detention and deportation procedures apply even for defendants who have the desire to leave the United States voluntarily at the end of their prison sentence.

22.     Another punitive result of the ICE deportation process is the length of time one can be held after his or her sentence has been satisfied. It can take up to six months, if not longer, for arrangements (internally within the United States as well as with officials of one's home country) to finalize the details necessary to complete this process. All the while, an individual who should have been released from custody continues to languish in ICE detention. All of this is very time consuming and is further evidence that an incarceratory sentence would impose a much more substantial hardship on Mr. Lev than it would upon a similarly situated U.S. citizen.

**III.    Impact of the COVID-19 Pandemic - Harsher Conditions of Confinement**

23.     In response to the spread of COVID-19 across BOP facilities, BOP has instituted a strict quarantine requirement for <u>all</u> prisoners entering and exiting BOP facilities, regardless of vaccine status. As a result, if Mr. Lev were sentenced to a term of incarceration, he would be placed in quarantine at the beginning and, if conditions required, the end of his term of incarceration. While measures to control the spread of COVID-19 are necessary, the conditions of these quarantine confinements are, in practice, unnecessarily punitive and oppressive.

24.     Based on my experience, prisoners held in quarantine are almost always housed in an isolation cell in the facility's Special Housing Unit (also known as "the SHU" or "the hole"). Such housing is, in essence, solitary confinement. As a general matter, cells in the SHU measure approximately 8 x 10 feet, with no windows except for a small, wire mesh window on the door, to permit observation of the prisoner. The cell includes a bed, toilet, and sink, and sometimes a desk and chair. Prisoners held in the SHU are kept isolated in their cells 24 hours a day, 7 days a week, except for intermittent and brief periods of time for showers.

25.     Prisoners in the SHU are deprived of virtually all human contact.  Meals are served under the door.  Family and other social visits are not allowed, and while legal visits are not expressly prohibited, I have found that they do not occur in practice.  Similarly, prisoners are frequently not allowed to make telephone calls during their quarantine, including legal calls.  In some institutions, no mail is allowed.  I am aware of many institutions in which, contrary to BOP policy, prisoners in quarantine are kept in their cell, without books or anything else with which to occupy their time during the weeks or even months that they are confined there.

26.     In addition, prisoners introduced into the BOP system through quarantine are not offered the standard Admissions and Orientation program until their quarantine is complete.  Accordingly, these prisoners do not meet with a case manager, counselor, or unit manager when they arrive at the facility.  In addition, they do not receive a physical examination or standard medical tests, or consult with a treatment provider concerning their medications, until the quarantine has concluded.  Based on my experience, it is at best uncertain whether a particular quarantined inmate will or will not receive his or her required medications, including medications for life-threatening or other serious conditions.

27.     While BOP policy states that quarantine must extend for "at least" 14 days[8], in my experience, the current standard length of quarantine is at least 21 days, with some prisoners facing far more extended periods of isolation for reasons outside of their control.  For example, one prisoner I have advised, who is currently incarcerated at the Federal Correctional Institution ("FCI") in Allenwood, Pennsylvania, was required to quarantine for a total of **73 days** (i.e., approximately 2-1/2 months) because other prisoners on his unit tested positive for COVID-19.  A

---

[8]     *See* BOP, *BOP Modified Operations* (Nov. 25, 2020), https://www.bop.gov/coronavirus/covid19_status.jsp.

second prisoner that I advised, who was designated to serve his term of imprisonment at the minimum-security facility adjacent to the United States Penitentiary ("USP") at Tuscon, Arizona, spent two-thirds of his sentence—**60 days** of a 90-day sentence—in isolation due to COVID-19 quarantine procedures. And I am aware that a third prisoner, whose case has been covered in the media, was kept in isolation at USP Lompoc, California for **56 days**, despite testing negative for COVID-19 a total of 10 times. All of these prisoners were designated to serve their sentences at minimum or low security facilities, but were nonetheless required to serve their periods of quarantine in the SHUs of neighboring, higher-security facilities.

28.    Notably, the National Commission on Correctional Health Care has recognized that "[p]rolonged (greater than 15 consecutive days) solitary confinement is cruel, inhuman and degrading treatment, and harmful to an individual's health" and advised that "[s]olitary confinement should never exceed 15 days."[9] The United Nations' *Standard Minimum Rules for the Treatment of Prisoners* (the Mandela Rules) also prohibit solitary confinement in excess of 15 consecutive days, and declares that such conditions amount to "torture or other cruel, inhuman or degrading treatment or punishment."[10]

29.    Even after prisoners are released from quarantine, conditions in the general population of the facility are also severely restricted due to COVID-19. Most facilities are on modified lockdown, with prisoners sequestered in their housing units. In addition, while prisoners are theoretically required to wear masks, other than when they are eating, other precautions—such as hand sanitizer, social distancing, and adequate ventilation—are frequently unavailable.

---

[9]    *See* NCCHC, *Solitary Confinement (Isolation)*, https://www.ncchc.org/solitary-confinement (last visited on April 19, 2021).

[10]    *Id.*

11

30.     In addition, I understand that Mr. Lev has not yet received a COVID-19 vaccine. Moreover, even when he does, my understanding, from my review of governmental guidance and other public information concerning COVID-19, is that he remains at risk of COVID-19 infection from either the initial strain of the virus (since the vaccine is admittedly not 100% effective) or from one of the several variants of the virus that are currently spreading throughout the United States (for which the efficacy of the current vaccines is currently uncertain).  In addition, even with the vaccine, Mr. Lev would still present a risk of transmission from and to others.  As a result, he would still likely be subjected to extended COVID-19 restrictions at his designated facility. This is consistent with my experience and understanding of how the BOP is currently addressing the COVID-19 pandemic.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on April 27, 2021 in Alexandria, Virginia.


/s/ *Joel A. Sickler*

Joel A. Sickler, Founder

12